DAVID A. HUBBERT
Deputy Assistant Attorney General
JAMES PETRILA
NITHYA SENRA (CA SBN 291803)
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 683, Ben Franklin Station
Washington, D.C. 20044
202-307-6648 (Petrila)
202-307-6570 (Senra)
202-307-0054 (f)
James.Petrila@usdoj.gov
Nithya.Senra@usdoj.gov
*Attorneys for the United States of America*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| United States of America, | |
|---|---|
| Plaintiff, | Case No. 3:20-cv-00087-BEN-KSC |
| v. | **UNITED STATES' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| Robert Goldsmith, | |
| Defendant. | **Date:      March 15, 2021**<br>**Time:      10:30am**<br>**Courtroom: 5A**<br>**Judge:     Hon. Roger T. Benitez** |

1

# **TABLE OF CONTENTS**

STATEMENT OF UNDISPUTED FACTS ................................................5

SUMMARY JUDGMENT STANDARD FOR WILLFULNESS .........................12

ARGUMENT ..................................................................................14

   *1. Defendant already admitted to 3 of the 4 elements of the United States' claim.* ...................................................................................14

   *2. Defendant acted recklessly and thus willfully.* ...............................15

   *3. Defendant's subjective belief that he did not "own" the Account does not create a material issue of fact.* ................................................22

CONCLUSION ...............................................................................23

**TABLE OF AUTHORITIES**

**Federal Cases**

*Bedrosian v. United States*, 2020 WL 7129303 (E.D. Pa. Dec. 4, 2020)...... 17 & 20
*Bedrosian v. United States*, 912 F.3d 144 (3d Cir. 2018).........................................13
*Farmer v. Brennan*, 511 U.S. 825, 114 S. Ct. 1970, 128 L. Ed 2d 811 (1994).......13
*Jones v. United States*, 2020 WL 2803353 (C.D. Cal. May 11, 2020).......... 13 & 16
*Kimble v. United States*, 141 Fed. Cl. 373 (2018) ........................................ 15 & 20
*Norman v. United States*, 942 F.3d 1111 (Fed Cir. 2019) ............................. 13 & 17
*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007)..................................................13
*United States v. Bernstein*, 2020 WL 5517315 (E.D.N.Y. Sept. 14, 2020) ...........22
*United States v. Bohanec*, 263 F. Supp. 3d 881 (C.D. Cal. 2016)................. 13 & 17
*United States v. DeMauro*, 2020 WL 5757466 (D.N.H. Aug. 28, 2020) 14, 19 & 23
*United States v. Horowitz*, 978 F.3d 80 (4th Cir. 2020) ................... 13, 15, 20 & 22
*United States v. Kalai*, 696 F. App'x 228 (9th Cir. 2017)........................................22
*United States v. McBride*, 908 F. Supp. 2d 1186 (D. Utah, 2012) ............... 13 & 17
*United States v. Ott*, 441 F. Supp. 3d 521 (E.D. Mich. 2020) ................. 17, 19 & 21
*United States v. Pomerantz*, 2017 WL 2483213 (W.D. Wash. June 8, 2017)14 & 21
*United States v. Rum*, 2019 WL 3943250 (M.D. Fl Aug. 2, 2019) .............. 16 & 22
*United States v. Sturman*, 951 F.2d 1466 (6th Cir. 1991) ........................................14
*United States v. Williams*, 489 F. App'x 655 (4th Cir. 2012) .......................... 4 & 14
*United States v. Zimmerman*, 2020 WL 6065333 (C.D. Cal. Sept. 16, 2020) ........20
*Viacom Int'l, Inc. v. YouTube, Inc.,* 676 F.3d 19 (2d Cir. 2012) ............................22

**Federal Statutes & Rules**

26 C.F.R. § 1.1-1(b) ......................................................................................................4
26 U.S.C. § 61(a) ...........................................................................................................4
31 C.F.R. § 1010.306 .....................................................................................................4
31 C.F.R. § 1010.350 .....................................................................................................4
31 C.F.R. § 103.24(a)...................................................................................................14
31 C.F.R. §
103.27(c)……………………………………………………………… 14
31 U.S.C. § 5314 ............................................................................................................4
31 U.S.C. § 5321(a)(5)(C)-(D) ...................................................................................14

The United States brought this timely action because Defendant willfully failed to timely file Reports of Foreign Bank and Financial Accounts ("FBAR"s)[1] for the 2008, 2009 and 2010 calendar years.  *See* Exs. 1 & 2 to the Petrila Declaration ("Ex. 1") & ("Ex. 2").  U.S. persons are required to file FBARs if they own a foreign account exceeding $10,000 in value during the preceding calendar year.  *See* 31 U.S.C. § 5314, 31 C.F.R. §§ 1010.350 & 1010.306(c).  Defendant owned a Swiss bank account at Basler Kantonalbank ("Basler") containing hundreds of thousands of dollars for decades, including the three years at issue.  Despite this, Defendant did not file the required FBAR reports.  In addition, Defendant did not otherwise disclose his Swiss bank account ("the Account") to the United States government, such as by paying federal income tax on either the income generated by the Account or on any capital gains included in the tens of thousands of dollars that Defendant withdrew from that Account.  As a result, the United States seeks a money judgment for the civil penalties associated with Defendant's willful failure to file FBARs, accumulated non-payment penalties and other interest—totaling $309,453.48 as of April 27, 2020,—as well interest and penalties according to law from the date of judgment until when the judgment is paid in full.  *See* Ex. 3 to the Petrila Declaration ("Ex. 3").

Of the elements that the United States must prove in this action, the only one that Defendant contests is that his failure to file FBARs was willful.  As is discussed further, *infra*, there are no disputes of material fact that bear on this question and as a result summary judgment is appropriate.  Defendant argues that his failure to file FBARs was not willful because he did not believe that he owned the account.  Defendant is incorrect as a matter of law.  The standard for

---

[1] An FBAR is an information report that (for the relevant calendar years) must be filed no later than June 30 of the year following the calendar year during which the account was held.  31 C.F.R. § 1010.306(d); *United States v. Williams*, 489 F. App'x 655 (4th Cir. 2012).  The FBAR is an additional requirement beyond the requirement that United States persons report whether they own foreign accounts and any income earned from such accounts on Schedule B of their federal income tax returns.  *See* 26 U.S.C. § 61(a); 26 C.F.R. § 1.1-1(b).

willfulness is an objective one and as a result the United States does not need to prove or disprove whether Defendant held a subjective belief about his ownership of the Account if the United States can prove that his failure to determine whether he needed to file FBARs was sufficiently reckless to be willful as a matter of law.

The ample, undisputed evidence that is probative of Defendant's willfulness includes, but is not limited to: Defendant concealing the Account from the IRS through (1) false statements on his federal income tax returns and (2) directing Basler not to disclose identifying information regarding his numbered[2] account to the IRS, (3) Defendant paying Basler a regular fee to "hold" his mail and not send the mail into the United States, (4) Defendant's concealment of the Account from his longtime accountant and tax preparer, and (5) Defendant's instructions to Basler to divest U.S. securities in order to avoid legally required disclosure to the IRS. This evidence goes well beyond the evidence that other courts have found persuasive and requires a finding of willfulness—and thus summary judgment in favor of the United States—as a matter of law.

## STATEMENT OF UNDISPUTED FACTS

The money in the Account originated with Defendant's father who lived in Nogales, Arizona, but owned a business just across the border in Nogales, Mexico. Robert Goldsmith Deposition ("R. Goldsmith Dep.") at 27:19-28:1. To Defendant's knowledge, his father did not have any U.S. bank accounts, preferring to keep the revenue from his business in Mexican bank accounts. *Id.* at 28:21-24. However, Defendant's father also wanted a "safe haven" to keep the pesos his business was earning from being devalued against the dollar. *Id.* at 28:7-12. Rather than put that money into a United States bank account, Defendant's father moved the money from Mexico into an account at Basler. *Id.* at 28:13-18. There

---

[2] Different documents refer to either Defendant's client number ending in -2819, or the account number itself ending in -81.71.

is no evidence in the record regarding whether Defendant's father used his Swiss bank account to avoid paying U.S. taxes on the money earned in Mexico.

Defendant's father predeceased his mother, and when Defendant's mother passed away, the funds in his parents' account at Basler were transferred to a new numbered account at Basler—the Account—opened and owned by Defendant. *Id.* at 34:2-6, 104:25-105:8. As a result, Defendant both knew the amount of money in the Account, and that he had control over the Account. Although Defendant stated during his deposition that he did not recall the value of the Account when he inherited it, documents produced by Basler demonstrate that the Account had a value of CHF 638,446.33[3] as of June 30, 2005. Ex. 4 to the Petrila Declaration ("Ex. 4") BKB000935. This is well in excess of the $10,000 threshold above which an FBAR must be filed, as were the amounts in the Account for the calendar years at issue in this action—2008, 2009, and 2010. Ex. 5 to the Petrila Declaration (Defendant's Responses to Interrogatories) ("Ex. 5") at 6 (stating that the account balances as of June 30, 2009, June 30, 2010 and June 30, 2011 were 356,705.60, 310,560.97, and 278,955.88 Swiss francs respectively, and the highest account balances for 2008, 2009 and 2010 were CHF 601,365.14, CHF 378,745.39, and CHF 378,745.39 respectively[4]).

During the entirety of the time between when Defendant's mother passed away and when Basler closed the Account, Defendant used Howard Zipser, CPA, as his accountant and tax preparer. Despite this decades long relationship, Defendant did not disclose the existence of the Account to Mr. Zipser prior to at least July 1, 2011. Ex. 6 to the Petrila Declaration (Defendant's Responses to Requests for Admissions) ("Ex. 6") at 2. Defendant did not disclose the Account

_____

[3] The average exchange rate in 2005 was 1.25 dollars to 1 Swiss franc.

[4] During the years at issue, the USD:CHF exchange rate moved between .93 and 1.2. The exact exchange rate on any given day does not materially effect whether the civil penalties assessed were within the statutory maximums, or whether Defendant was required to file and FBAR for each of the years at issue.

to Mr. Zipser despite the fact that documents produced by Mr. Zipser demonstrate that it was routine for the Defendant to ask Mr. Zipser questions about what income needed to be declared to the IRS.  *See* R. Goldsmith Dep. at 79:2-9. Defendant's concealment of the Account is further demonstrated by the fact that for each of the years at issue, Mr. Zipser asked Defendant and his wife to fill out a questionnaire, which included a question asking whether Defendant had "an interest in or signature or other authority over a bank account, securities account, or other financial account in a foreign country."  For 2008 and 2009, Defendant answered that question "no" despite his ownership of the Account, while for 2010 Defendant answered "yes," but only disclosed an Italian account that Defendant had opened, and which had less than $10,000, thereby failing to trigger reporting requirements.  *Id*. at 81:19-25; Ex. 7 to the Petrila Declaration ("Ex. 7) at Goldsmith_000697, Goldsmith_000137, and Goldsmith_000206.

Defendant's concealment of the Account from Mr. Zipser was part and parcel of Defendant concealing the Account from the U.S. government both through failure to file FBARs and through signing and filing—under penalty of perjury—his federal income tax returns for the years at issue with incorrect answers to question 7(a) of Schedule B Part III.  *See* Ex. 6 at 2; Ex. 8 to the Petrila Declaration ("Ex. 8") at Goldsmith_000235, Goldsmith_000384, Goldsmith_000466.  Question 7(a) asks whether Defendant had "an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account, and Defendant responded "no" for the years at issue despite his ownership of the Account. Question 7(a) also directs the taxpayer to instructions that include exceptions and filing requirements, *see* Ex. 8 at page 6, but Defendant stated that he did nothing to determine whether the Account was subject to any exceptions or to filing requirements.  R. Goldsmith Dep. at 86:22-87:5.  Nor can Defendant claim that the reason he did not investigate reporting requirements was that the Account was a

foreign account.  When Defendant opened an Italian bank account, an account that had less than the $10,000 FBAR reporting threshold, he informed Mr. Zipser of that account and asked if it had to be reported.  *Id*. at 88:8-11.  That Defendant could and did easily inquire regarding filing requirements for one foreign account, but did not for the other far larger Account, is both unexplained and inexplicable.

Defendant visited Basler on an annual basis to discuss his Account with Basler employees, including Thomas Pfister, the representative assigned to Defendant, and to withdraw money from the Account in person, in cash.  The only reason Defendant went to Switzerland was to visit Basler and withdraw cash from the Account.  *Id*. at 36:18-21.  Although Defendant could have avoided these trips to Switzerland by moving the money in the Account back the United States, he testified that they did not repatriate the funds in the Account in part because he "enjoy[ed] going" to Europe and in particular to "Trieste" in Italy where he and his wife went every summer for three to six weeks on trips funded by the money in the Account.  *Id*. at 40:20-41:5; 47:23-25 ("We had hotels, we had car rentals, we had meals.  Yes, we would spend the money while we were there.").  When Defendant did not spend all of the money he withdrew from the Account during his European vacations, the remainder was brought back into the United States.  *Id*. at 49:18-23 ("[I]f there was any money left over, we probably b[r]ought it home.  I don't know, a thousand dollars maybe.").  In addition to spending money from the Account on himself, Defendant directed Basler to hand deliver funds to his son Michael when Michael was on business trips[5] to Switzerland.  *Id*. at 49:10-16 ("Could have been 7, $8,000.  I don't remember how much he took—what was sent from the

---

[5] Basler's notes indicate that money was hand delivered to Michael on at least three occasions in amounts ranging from $8,000 to $9,000, but Mr. Goldsmith testified to only remembering having money delivered to his son once.  Ex. 9 at BKB00089-90, R. Goldsmith Dep. at 106:3-107:9.

account."); Ex. 9 to the Petrila Declaration (Ex. 9)[6] (Basler's notes on the Account listing three separate instances of money from the Account being hand delivered to Defendant's son when Defendant's son was in Switzerland).  Defendant's expectation was that his son, an authorized signatory on the account, and his daughter would inherit the Account.  R. Goldsmith Dep. at 55:23-56:6, 90:13-15.

Defendant also made decisions regarding how the money in the Account was invested.  *See*, *e.g.*, *id*. at 58:9-15 ("I remember they had—there was a Japanese railroad that they were very high on.  They said we should allocate some of that money there, okay, you know, okay, if you think so.  I'm sure they were getting a nice commission from it, but I figured that as long as we made some money out of it, why not."), 92:6-18.  Despite making determinations about how the money in the Account was invested, deciding how to spend the money in the Account, including on travel expenses and via disbursals of money in the Account to his son, and planning to leave the money in the Account to his children, Defendant testified that "it was my account in my name, but it wasn't my money."  *Id*. at 53:18-19; 54:6-11.  Defendant did nothing to determine whether he was required to disclose the Account, such as by filing FBARs.  *Id*. at 57:19-24.

In addition to concealing the existence of the Account from his accountant, Defendant took other steps to conceal the Account's existence.  For example, Mr. Goldsmith paid a regular fee to Basler for Basler not to send him any mail in the United States—a "hold mail" order.[7]  R. Goldsmith Dep. at 61:24-62:1; Ex. 10 to the Petrila Declaration ("Ex. 10").  Then, on August 29, 2000, Basler gave Defendant a choice between disclosing his account to the IRS and divesting all

---

[6] Pages 1 and 2 of Ex. 9 are the as produced Basler notes on Defendant's accounts in German.  Pages 3 and 4 are the English translation, and page 5 is the certificate of translation.  The certificate of translation is also applicable to Ex. 12.

[7] Basler's notes on the Account state that Defendant also told Basler at one point that they could "destroy" all of the mail, but at his deposition Defendant did not recall giving Basler permission to destroy the held mail.  Ex. 12 at BKB00044, R. Goldsmith Dep. at 94:15-21.

U.S. securities, and Defendant chose to divest the securities rather than disclose the Account to the IRS.  Ex. 11 to the Petrila Declaration ("Ex. 11") at BKB000224[8]. The form, which Defendant signed, states that Defendant is "liable to US tax" and that the choice between disclosure to the IRS and divestment is due to "new US withholding tax and reporting regulations."  *Id*.  Defendant has no explanation for why, after being forced to make this choice, he did nothing to determine what if any disclosure requirements were imposed by U.S. law.  After 2000, Defendant signed additional forms confirming his choice to forego the opportunity to hold US securities in order to continue to conceal his account and identity to the IRS on September 18, 2002, August 9, 2007, and again on August 5, 2009.  Ex. 11 at BKB000227, BKB000229, BKB000234.  Defendant also signed separate forms on September 18, 2002, August 9, 2007, and again on August 6, 2009, which note at the top that those forms are "subject to Swiss banking secrecy," and "will not be forwarded to either Swiss or foreign authorities," and state that Defendant was "subject to taxation" in the "USA" and that "under US taxation law [Defendant] is the beneficial owner" of the Account.  *Id*. at BKB000228, BKB000230, BKB000239.  On August 5, 2009 and again on July 27, 2011, Defendant signed yet another form regarding U.S. reporting requirements, which confirms that he is waiving the right to hold U.S. securities and states in part that "[I]t is in particular unclear whether the QI Agreement in its future form is to apply generally to all US persons notwithstanding whether securities (including other than US securities) and/or other assets of whatever nature (including simply account relationships) are held by US persons with banks.  The IRS's intentions appear to be moving in the latter direction."  *Id*. at BKB000231, BKB000241.  Despite signing all of these forms, Defendant did nothing to determine what if any reporting requirements

---

[8] The BATES number of this document is obscured due to how the document was printed, but it is page 1 of the exhibit.

attached to the Account, and made no effort to pay taxes to the United States on income or gains generated by the Account.

At some point, Basler informed Defendant that the bank planned to close the Account even though Defendant "didn't want to close it."  *Id*. at 46:13-15. Basler's notes regarding the Account state that on October 27, 2010, Basler explained to Defendant that there were issues related to the reporting requirements in the Foreign Account Tax Compliance Act ("FATCA") and that as a result of that discussion the "clients will probably terminate the relationship in 2011."  Ex. 12 to the Petrila Declaration ("Ex. 12") at BKB00044, R. Goldsmith Dep. at 95:9-97:25.  Basler's notes go on to state that on July 28, 2011 Defendant wished to terminate the Account within the next few months or years and was annoyed that Basler set a monthly cash withdrawal limit of $10,000.  Ex. 12 at BKB00045, R. Goldsmith Dep. at 98:1-8.  Basler's notes also state that after the October 27, 2010 discussion of FATCA, Defendant's in person withdrawals accelerated in frequency.  Ex. 12 at BKB00044-46 (list of withdrawals), R. Goldsmith Dep. at 99:2-25 ("No. I recall nothing of this, nothing.").  Instead, Defendant testified that when Basler said it was closing the Account he "realized that maybe something was wrong …. [and] [m]aybe we shouldn't be doing something."  *Id*. at 46:15-17. When Basler closed the Account, Defendant walked away with $200,000, which he repatriated to the United States.  *Id*. at 45:24-46:1.

Although Defendant claims he did not believe that he owned the Account, he was not confused about other, domestic assets.  When Defendant's mother passed away, he also inherited an interest in commercial properties located within the United States.  *Id*. at 13:1-13.  Mr. Goldsmith informed his accountant Mr. Zipser of the existence of the inherited commercial properties, and paid taxes on income generated by those properties.  *Id*. at 16:23-17:1.  When asked why he considered himself the owner of the interest in commercial properties he inherited from his mother, but not the money he inherited from his mother in the Account, the

Defendant could only state that they were "different." *Id.* at 57:8-18 ("Q: So how can I understand the difference between [the commercial properties and the Account]? A: You know, I think of them as different … I can see how you think they did the same.  To us it's not the same at all, inheriting the Monterey Pass buildings.  It was just passed on to my sister and me.  And I imagine the Basler fund did the same thing, but I don't know.  I don't think on those lines.  It wasn't the same to us.").  Once again, when confronted by an asset Defendant paid taxes on, Defendant was unable to explain why he did nothing to determine whether there were disclosure and tax obligations that attached to the Account.

In addition, Mr. Goldsmith is the beneficial owner of an account with Morgan Stanley. *Id.* at 20:16-17.  For that account, Mr. Goldsmith relies on his stockbroker for investment strategy. *Id.* at 20:25-21:5 ("He buys and sells our stocks and tells me what he feels is good and not.  We leave everything to him."). Despite Defendant's protestations that he did not think of Basler as a "bank," Defendant agreed that his experience with Basler and his experience at Morgan Stanley were "very similar." *Id.* at 58:16-20.  Furthermore, Defendant confirmed that he understood that income from his Morgan Stanley account had to be reported to the IRS and could not explain why income from the Account would be any different. *Id.* at 59:3-18 ("Q: And so can you try to explain what you thought the difference between the investments held in Switzerland and the investments held at Morgan Stanley was? A: No, no.  Like I said, never even occurred to me. When I look at it rationally, I would say, wow, we should have declared this or that.  If we had to declare, we would probably declare on the benefit of whatever we made, as far as the stocks and bonds or whatever.  I guess we should have declared that, but no, we didn't.  We just didn't.  I don't know.").

## SUMMARY JUDGMENT STANDARD FOR WILLFULNESS

In order to obtain summary judgment on the issue of willfulness, the United States is required to show a careless or reckless disregard of the duty to file an

FBAR, not Defendant's actual knowledge of FBAR reporting requirements.  *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007) ("[W]here willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well."), *Williams*, 489 F. App'x at 658, *Norman v. United States*, 942 F.3d 1111, 1115 (Fed Cir. 2019) (willfulness in the FBAR context includes recklessness), *United States v. Bohanec*, 263 F. Supp. 3d 881, 888-89 (C.D. Cal. 2016) (holding that willfulness under § 5321 can be shown through "reckless disregard of a statutory duty"). Furthermore, because recklessness itself is judged on an objective rather than subjective standard where, as here, there are no disputes as to material facts the issue is ripe for summary judgment.  *See Safeco*, 551 U.S. at 68 ("While the term recklessness is not self-defining, the common law has generally understood it in the sphere of civil liability as conduct violating an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known.") (quoting *Farmer v. Brennan*, 511 U.S. 825, 836, 114 S. Ct. 1970, 128 L. Ed 2d 811 (1994) (internal quotations omitted)); *see also United States v. McBride*, 908 F. Supp. 2d 1186, 1204 (D. Utah, 2012) ("An improper motive or bad purpose is not necessary to establish willfulness in the civil context.").

In a formulation that has been widely adopted by other courts, the Third Circuit described the objective test for recklessness as whether a taxpayer "(1) clearly ought to have known that (2) there was a grave risk that" he was not meeting the tax-filing requirements for his foreign accounts and "(3) ... was in a position to find out for certain very easily." *Bedrosian v. United States*, 912 F.3d 144, 153 (3d Cir. 2018) (internal quotation marks and citations omitted); *see also United States v. Horowitz*, 978 F.3d 80, 89 (4th Cir. 2020); *Jones v. United States*, 2020 WL 2803353, at *6 (C.D. Cal. May 11, 2020).

Willfulness may also be proven through "conduct meant to conceal or mislead sources of income or other financial information," or "from a conscious effort to avoid learning about reporting requirements." *Williams*, 489 F. App'x at 658 (quoting *United States v. Sturman*, 951 F.2d 1466, 1476 (6th Cir. 1991)).

## ARGUMENT

Summary judgment that Defendant's failure to file an FBAR was willful under 31 U.S.C. § 5321 must be granted if the United States shows that (1) Defendant was a "U.S. Person," who (2) had an interest in or authority over the subject foreign accounts, which (3) had an aggregate value of $10,000.00 or more, and (4) that he willfully failed to file an FBAR Form for the accounts. *United States v. Pomerantz*, 2017 WL 2483213, at *5 (W.D. Wash. June 8, 2017).

1. *Defendant already admitted to 3 of the 4 elements of the United States' claim.*

Here, Defendant is a U.S. Person and has already filed delinquent FBARs for the 2008, 2009, and 2010 calendar years demonstrating that he held a foreign account exceeding $10,000 in value during those years and did not timely file the required FBARs.  ECF No. 7 (Answer) at ¶¶ 7, 23.  As a result, the IRS assessed a civil penalty for each of those years.  Each penalty for a willful violation can be the greater of $100,000 or 50% of the balance in the account at the time of the violation. 31 U.S.C. § 5321(a)(5)(C)-(D), 31 C.F.R. § 103.24(a), § 103.27(c); *see also United States v. DeMauro*, 2020 WL 5757466, at *8 (D.N.H. Aug. 28, 2020). Defendant confirmed that his account balances for the three years at issue were in excess of $275,000 thereby supporting the civil penalties assessed by the IRS.  *See* Ex. 5 at 6.  The civil penalties assessed by the IRS of $122,375.00 for 2008, $82,082.00 for 2009, and $69,389.00 for 2010 are far below the statutory maximum—the greater of $100,000 or 50% of the balance in the account at the time of the violation—allowed by Section 5321.

2.  _Defendant acted recklessly and thus willfully._

Defendant acted recklessly as a matter of law.  He should have known there was a grave risk that he was not complying with U.S. law, including filing FBARs, either because of question 7(a) on Schedule B Part III of his federal income tax returns, which specifically asks about foreign accounts, or as a result of any of a number of forms that Basler requested he sign acknowledging his U.S. tax obligations as a U.S. person, or for one of the other reasons detailed below. Furthermore, Defendant was in a position to easily find out what if any filing obligations he was under as the owner of a foreign account, as shown by Defendant's actual efforts to determine what obligations attached to an Italian account he opened.  Instead of finding out what obligations he was under, such as through a discussion with his accountant, Defendant concealed the Account from his accountant, and the IRS, until Basler informed Defendant that they were going to close his account.  Only once Defendant faced the possibility of involuntary disclosure and potential criminal risk, when Basler notified defendant that his account information would be shared with the IRS, did he choose to come clean. Defendant participated in the IRS's Offshore Voluntary Disclosure Initiative ("OVDI"), a program that offered taxpayers with unreported accounts immunity from criminal prosecution and civil FBAR penalties in exchange for (1) full disclosure of the taxpayer's foreign account holdings; (2) payment of any tax deficiencies, penalties, and interest; and (3) payment of a miscellaneous civil penalty that would be less than the taxpayer's potential exposure under a full tax and/or FBAR examination.  But Goldsmith decided to withdraw from the OVDI program, and so the IRS referred his case for a full tax examination and an investigation into his compliance with the FBAR requirements.  This conduct more than meets the objective standard of willfulness whether due to Defendant's recklessness or the inference of willfulness the Court can draw from Defendant's efforts at concealment.

15

*First, Defendant admits that he filed his federal income tax returns for the calendar years 2008, 2009 and 2010 under penalty of perjury*. *See* Ex. 6 at 2. This is important because question 7(a) of Schedule B Part III asks whether Defendant had "an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account," and Defendant responded "no" for the years at issue despite his ownership of the Account. *See* Ex. 8. Defendant's false answer, given under penalty of perjury, is evidence of an intent to conceal the Account from the IRS, and a result of his concealment of the Account from his accountant and tax preparer. More than that, these false answers are also evidence of recklessness because question 7(a) directs the taxpayer to instructions covering the filing requirements (including FBAR obligations) and exceptions to those requirements. *See* Ex. 8. When Defendant falsely answered question 7(a), for each of the years at issue, he clearly should have known that there was serious risk that he was not complying with his legal obligations, and he was in a position to easily discover that he needed to file an FBAR. Defendant just had to look at the instructions or talk to his accountant.

Other courts have found falsely answering question 7(a) on Part B of Form 1040 under penalty of perjury to be prima facie evidence of willfulness. *See Kimble v. United States*, 141 Fed. Cl. 373, 386 (2018) (granting summary judgment where taxpayer's false answer to question 7(a) "evidence[s] conduct by Plaintiff, as a co-owner of the UBS account that exhibited a 'reckless disregard' of the legal duty under federal tax law to report foreign bank accounts to the IRS by filing a FBAR."); *Horowitz*, 978 F.3d at 90 (affirming summary judgment); *United States v. Rum*, 2019 WL 3943250, at *8 (M.D. Fl Aug. 2, 2019) (granting summary judgment where "[a] taxpayer's failure to review their tax returns for accuracy despite repeatedly signing them, along with 'falsely representing under penalty of perjury' that they do not have a foreign bank account (by answering 'no' to

16

question 7(a) on Line 7a of Schedule B of a 1040 tax return) in and of itself supports a finding of 'reckless disregard' to report under the FBAR."); *see also* *Bedrosian v. United States (Bedrosian III)*, 2020 WL 7129303, at \*5 (E.D. Pa. Dec. 4, 2020) (finding signing Form 1040 under penalty of perjury to be evidence of recklessness); *Bohanec*, 263 F. Supp. 3d at 890*; Jones*, 2020 WL 2803353, at \*6 (explaining that even if a taxpayer signed a federal income tax Form 1040 under penalty of perjury the failure to file an FBAR could still be non-willful if "a taxpayer did not know about, and had no reason to know about, her overseas account"); *McBride*, 908 F. Supp. 2d at 1207 (D. Utah 2012); *United States v. Ott*, 441 F. Supp. 3d 521, 530–31 (E.D. Mich. 2020).  Although the court in *Jones* held that signing a Form 1040 that includes Schedule B is prima facie evidence of willfulness, it noted that the taxpayer can still defend against this evidence by arguing he or she did not know about the foreign account.  Here, however, Defendant knew about the Account.

   *Second, Defendant signed multiple forms describing Defendant as the beneficial owner of the account, a U.S. taxpayer, and referencing U.S. reporting obligations, but did nothing to investigate what tax and reporting obligations he was under*.  Defendant instructed Basler to sell all of his United States securities at the same time he signed Basler's Qualified Intermediary ("QI") form.  *See* Ex. 11 at BKB000224.  Under the QI regime, banks that offer their clients the ability to invest in United States securities are required to register with the IRS and undertake documentation, withholding and reporting requirements in relation to those investments.  Rather than risk Basler reporting his account to the IRS under the QI regime, Defendant sold his U.S. securities.  Other courts confronted with this type of evidence found willfulness.  *See*, *e.g.*, *Norman*, 942 F.3d at 1115–16.

   It is undisputed that Defendant read and signed the forms in question.  R. Goldsmith Tr. at 65:1-73:9.  And, as an objective matter, the language on these forms put Defendant on notice of the clear risk that there was a grave danger he

17

was not complying with his federal tax and reporting obligations.  For example, as explained *supra*, the various forms, which Defendant signed multiple times over the years, stated that Defendant was "liable to US tax," gave a choice between disclosure to the IRS and divestment of U.S. securities due to "new US withholding tax and reporting regulations," and stated that some forms were "subject to Swiss banking secrecy," and "w[ould] not be forwarded to either Swiss or foreign authorities."  Still other forms stated that Defendant was "subject to taxation" in the "USA" and that "under US taxation law [Defendant] is the beneficial owner" of the Account.  Defendant's claim that even after reading and signing these forms he still did not investigate his tax and reporting obligations is evidence of at least recklessness towards his fulfillment of those obligations, and thus willfulness.

*Third, Defendant knew that the Account was generating income, that the investments in the Account were appreciating, and Defendant in fact benefited from the Account's appreciation in value, but did not pay taxes on that income.*  The undisputed facts are that Defendant knew his Account was generating interest income and that in some years the assets held in the Account appreciated in value.  Defendant also knew that when he withdrew funds from the Account, in cash, at least once a year, that he was benefiting from this appreciation.  Despite his awareness of these facts, and understanding that taxes are due on these types of gains, Defendant did nothing to educate himself on tax paying or reporting requirements.  Defendant's inaction was despite the fact that Defendant did pay taxes on distributions from a partnership that held commercial property situated in the United States—also inherited from his parents.  Defendant's inability to explain why he knew he had to pay taxes on domestically situated commercial property inherited from his parents, but not a foreign account that the IRS was unaware of, further shows at least recklessness on the part of Defendant:

Q: But we've looked at non-bank accounts that you informed Mr. Zipser of, right, for instance, the distributions from Monterey Pass or income earned from your Hawaii condo, neither of those are banks, but you informed Mr. Zipser of them, right?

A: Yeah, we informed him about anything that we did here in the western hemisphere, of course.

Q: But you also informed him about the bank account in Italy, right?

A: Oh yes, yes, we did.

Q: So you informed him of anything in the western hemisphere and bank accounts in Italy, but why not the account in Switzerland?

A: It wasn't an account. It was a fund. It was not ours, you know. It's completely separate.

R. Goldsmith Tr. at 88:17-89:6.  In this way, the case is similar to *DeMauro* where the taxpayer claimed that she did not believe that she had to pay taxes on foreign accounts housing assets gained as a result of her divorce, but did not seek advice regarding that subjective belief from an attorney or accountant, and paid taxes on other, domestic, assets gained during her divorce.  *DeMauro*, 2020 WL 5757466, at \*12–14 (D.N.H. Aug. 28, 2020) (granting the United States partial summary judgment on the issue of willfulness).  Similar to Defendant in the instant action, who disclosed the inherited domestic commercial property to his CPA, but not the inherited foreign Account, DeMauro sought out professional advice regarding paying taxes on domestic assets, including domestic assets gained from her divorce.  *Id*. at \*13-14 (finding willfulness from "(1) her past practice of relying on such professionals to handle her affairs, (2) her admission that she knew her foreign accounts were accruing interest, (3) her payment of taxes on interest earned from her domestic savings accounts, (4) her payment of taxes on residential assets she acquired through her divorce decree, and (5) her representation to UBS that she had sought unspecified tax advice for her account.").

The facts in the instant action are also similar to *Horowitz*, where the Fourth Circuit upheld summary judgment, finding it indicative of recklessness that the taxpayers knew that they were "earning interest income on th[e] account," and that interest income was "taxable income under American law, at least when earned in

19

a domestic bank account." *Horowitz*, 978 F.3d at 89.  In that case, the taxpayers claimed that they did not believe that they had to file FBARs because of a conversation with friends in Saudi Arabia in the late 1980s, but the Fourth Circuit still upheld summary judgment in favor of the United States.  Here, taxpayer's subjective belief that he did not have to report the Account was due to an alleged belief that he did not "own" the account, but, similar to the taxpayer's subjective belief in *Horowitz*, that is insufficient to defeat summary judgment.

*Fourth, Defendant set up his account as a "numbered" account and paid Basler a regular fee to "hold" all mail regarding the account*.  A "hold mail" order prevents mail from being sent into the United States where it might spoil efforts to conceal the Account.  These facts are similar to *Horowitz* where the taxpayers set up a numbered account and issued hold mail instructions.  There, summary judgment was granted to the government on the issue of willfulness. *Horowitz*, 978 F.3d at 90; *see also United States v. Zimmerman*, 2020 WL 6065333, at *4 (C.D. Cal. Sept. 16, 2020); *Bedrosian III*, 2020 WL 7129303, at *5 (finding hold mail order to be evidence of recklessness); *Ott*, 441 F. Supp. 3d at 531 (E.D. Mich.) (finding pattern of concealment where defendant directed mail to foreign address); *Kimble*, 141 Fed. Cl. at 384 (granting summary judgment and finding evidence of concealment where "[p]laintiff maintained a numbered account and instructed UBS not to send any account-related correspondence to the United States").

*Finally, Defendant concealed the Account from his accountant and tax preparer, Howard Zipser*.  Even though Defendant used Mr. Zipser to prepare his tax returns for the entirety of the time Defendant owned the Account, Defendant did not disclose the existence of the Account to Mr. Zipser prior to at least July 1, 2011.  This was despite the fact that during the years at issue, Defendant filled out annual financial questionnaires provided by Mr. Zipser that included multiple questions regarding offshore accounts, such as Defendant's Basler account.  *See*

Ex. 7.  Each time Defendant falsely filled out that questionnaire, and then failed to disclose the Account when discussing the questionnaire with Mr. Zipser, he acted to conceal the Basler account and evade his reporting responsibilities.  Defendant's purposeful attempts to conceal the Basler account from his tax preparer and the IRS are further evidence of Defendant's willfulness in failing to timely file required FBARs.  *See* *Pomerantz*, 2017 WL 2483213, at *6 ("Actual knowledge of the duty to report may be inferred from a course of conduct that demonstrates a conscious attempt to conceal the failure to report."); *Ott*, 441 F. Supp. 3d at 530–31 (The Defendant's failure to discuss his foreign investments with his long-time accountant Weide, for example, indicates a conscious effort to avoid learning about reporting requirements.") (internal citation and quotation omitted).

Defendant's concealment of the Account from Mr. Zipser is not just evidence of Defendant's purposefulness, it is also evidence of recklessness.  Part of the standard enunciated in *Bedrosian* is the ease with which a taxpayer could have discovered his reporting obligations.  Here, as shown by Defendant and his wife making an inquiry as to any reporting obligations that attached to their Italian bank account, it was very easy for Defendant to disclose a foreign account, such as the Account at Basler, to his accountant and discover that he needed to file FBARs.  The episode with Defendant's Italian account also speaks to the first to prongs of the *Bedrosian* test.  Defendant clearly ought to have known there was a grave risk that he was not meeting his filing obligations because *he knew there was a risk* that he might not be meeting filing obligations when he opened up the Italian foreign account.  If Defendant knew there was a risk that one foreign financial account triggered reporting obligations he also "clearly ought to have known" there was a risk regarding another one, worth hundreds of thousands of dollars, as well.

//

//

//

### 3. *Defendant's subjective belief that he did not "own" the Account does not create a material issue of fact.*

The evidence of Defendant's willful failure to file FBARs in this matter goes far beyond what other courts have found supports a willfulness determination. *See, e.g., United States v. Kalai*, 696 F. App'x 228, 231 (9th Cir. 2017) (upholding a jury's determination in the criminal context that failure to file an FBAR was willful because the defendant knew the foreign account held more than $10,000, had signatory authority over the account, and was informed of at least one transfer of funds). When courts confront evidence that is similar to the evidence in this case, they grant summary judgment on the issue of willfulness. *See Rum*, 2019 WL 3943250, at *8 (granting summary judgment where taxpayer's "pattern of signing his tax returns without reviewing them, along with falsely answering 'no' to question 7(a) suffices to support a finding of willfulness"); *Horowitz*, 978 F.3d at 384 (affirming summary judgment on evidence that taxpayer set account up as a numbered account with "hold mail" service, that the account had a not insignificant amount of money and as a result taxpayer was aware of it, not disclosing the foreign account to their accountant, and falsely answering question 7(a) under penalty of perjury.).

Against this undisputed, factual evidence, Defendant claims that he did not believe he owned the account. This type of argument, relying on a subjective state of mind, is why the willfulness standard is objective and may be proven through a showing of recklessness. *See United States v. Bernstein*, 2020 WL 5517315, at *7 (E.D.N.Y. Sept. 14, 2020) ("The civil law uses [recklessness] … to prevent an actor from denying the patently obvious.") (citing *Viacom Int'l, Inc. v. YouTube, Inc.,* 676 F.3d 19, 35 (2d Cir. 2012)). Defendant's explanation that he did not believe that he owned the Account, and thus that the Court should excuse his failure to file FBARs or pay taxes on the Account does not create a material issue of fact considering Defendant's complete control over the Account including use

of the Account for his own personal benefit.  *See DeMauro*, 2020 WL 5757466, at *12 (D.N.H. Aug. 28, 2020) (Taxpayer's explanation for why she never sought professional advice from an attorney or accountant regarding tax obligations was "neither objectively reasonable nor subjectively credible and thus undercuts [taxpayer]'s representations about the reasons for her conduct.").

## CONCLUSION

Based upon the foregoing undisputed facts in this case, summary judgment is appropriate and the United States requests that the Court grant it summary judgment on the issue of Defendant's willfulness and a money judgment as civil penalties under 31 U.S.C. § 5321(a)(5) for his willful failure to report his relationship with Basler Kantonalbank, for the 2008, 2009, and 2010 years, in the amount of $309,453.48 as of April 27, 2020 (which includes, in addition to the FBAR penalty assessments of $273,846.00, a late payment penalty imposed under 31 U.S.C. § 3717(e)(2) of $30,520.70 and pre-judgment interest of $5,086.78) along with all non-payment related penalties under 31 U.S.C. § 3717(e)(2) and interest that accumulate between April 27, 2020 and the date of judgment, plus post-judgment interest under 28 U.S.C. § 1961, and any penalties according to law, from the date of judgment until the judgment is paid in full.

Dated: February 1, 2021.

DAVID A. HUBBERT
Deputy Assistant Attorney General

*/s/ James Petrila*
JAMES PETRILA
NITHYA SENRA
Trial Attorneys, Tax Division
U.S. Department of Justice

*Attorneys for the United States of America*