DAVID A. HUBBERT
Acting Assistant Attorney General
JAMES PETRILA
NITHYA SENRA (CA SBN 291803)
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 683, Ben Franklin Station
Washington, D.C. 20044
202-307-6648 (Petrila)
202-307-6570 (Senra)
202-307-0054 (f)
James.Petrila@usdoj.gov
Nithya.Senra@usdoj.gov
*Attorneys for the United States of America*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Robert Goldsmith,<br><br>Defendant. | Case No. 3:20-cv-00087-BEN-KSC<br><br>**UNITED STATES' MEMORANDUM OF CONTENTIONS OF FACT AND LAW** |

In this action, the United States seeks a money judgment to collect civil penalties that were assessed against Defendant Robert Goldsmith. Robert Goldsmith willfully failed to report his interest in a foreign financial account in Switzerland ("the Account") for the years 2008, 2009, and 2010. Defendant was required to report his interest in his offshore account through filing a Report of Foreign Bank and Financial Accounts ("FBAR") for each year at issue.

## PROCEDURAL POSTURE

The United States filed a Motion for Summary Judgment on February 1, 2021, as there were no material facts in dispute, and asking the Court to find in favor of the United States on all claims brought against defendant Robert Goldsmith (Dkt. 19, 19-1, 19-2, 19-3). The motion was fully briefed on March 8, 2021 (Dkt. 20, 21), and the Court vacated the hearing date and submitted the

1   Motion on March 12, 2021, noting that the Court would issue a written Order (Dkt.
2   22).

3       Pending the outcome of summary judgment, this action is scheduled for a
4   jury trial, and the Court's scheduling order (Dkt. 14, ¶ 10) permits the parties to
5   file Memoranda of Contentions of Fact and Law and take any other action required
6   by Civil Local Rule 16.1(f)(2) by May 3, 2021. Accordingly, the United States
7   submits the following Memorandum of Contentions of Fact and Law.

8                           **FACTUAL ISSUES FOR TRIAL**

9       Should the Court find there are material facts in dispute with regard to
10  willfulness, then the only issue of fact for trial by the jury is whether Defendant's
11  failure to report his interest in a foreign financial account was willful.

12      Although Defendant has not challenged the amount of the assessed penalties,
13  any such challenge would be an issue of law suitable for post-trial briefing and not
14  an issue of fact for the jury. *See United States v. Rum*, 2021 WL 1589153, at *10
15  (11th Cir. 2021) (upholding finding of willfulness and applying arbitrary and
16  capricious standard borrowed from the APA to review penalty amount
17  determination), *Jones v. United States*, 2020 WL 2803353, at *8 (C.D. Cal. 2020)
18  (applying the Administrative and Procedures Act's "arbitrary and capricious"
19  standard to review the IRS's penalty assessment for an FBAR violation).

20                       **PLAINTIFF'S STATEMENT OF THE CASE**

21      This is an action to reduce to judgment a civil penalty assessed against
22  Defendant Robert Goldsmith under 31 U.S.C. § 5321(a)(5) for his willful failure to
23  report his interest in a foreign financial account he held during 2008, 2009, and
24  2010.

25      U.S. persons must report their interests in foreign financial accounts under
26  the Bank Secrecy Act of 1970, 31 U.S.C. §§ 5311 *et seq. See* 31 U.S.C. § 5314(a).
27  If such a person has a "financial interest in, or signature or other authority over, a
28  bank, securities or other financial account in a foreign country," then they must

report "such relationship to the [IRS] for each year in which such relationship exists." 31 C.F.R. § 103.24 (1987-2011). The report is made by filing a completed form TD F 90-22.1, commonly referred to as an FBAR. If the value of a person's foreign account exceeds $10,000 at any time during a calendar year, then that person must file an FBAR on or before June 30 of the following year. *See id*. § 103.27(c) (1989-2011). Persons who willfully fail to file an FBAR are subject to civil penalties under 31 U.S.C. § 5321. The maximum penalty for a "willful" failure is either $100,000 or 50 percent of the balance in the account at the time of the violation, whichever is greater. *See* 31 U.S.C. § 5321(a)(5)(C)-(D).

To prove its case, the government must show that: (1) Mr. Goldsmith was a United States person; (2) he had an interest in, or signature or other authority over, a financial account; (3) the financial account had a balance that exceeded $10,000 during each of the years 2008, 2009, and 2010; (4) the financial account was in a foreign country; (5) Mr. Goldsmith failed to report his interest in the financial account on a timely filed FBAR disclosing the foreign financial account by June 30th of the year following the calendar year at issue; (6) Mr. Goldsmith's failure to file was willful; and (7) the amount of the civil penalty assessed against Mr. Goldsmith was proper. *See United States v. McBride*, 908 F. Supp. 2d 1186, 1201 (D. Utah 2012). The government expects that the only real dispute at trial will be with respect to the "willfulness" element.

The United States expects to prove that Defendant was willful based on his actions and inactions. Among such acts and omissions, Defendant kept the Account hidden, told the foreign bank not to send any correspondence to his U.S. address (and paid money to have the Swiss bank hold his mail), failed to report his interest in the Account on an FBAR, falsely represented in his federal income tax returns that he did not have an interest in a foreign bank account, and failed to disclose his account to the U.S. government even after the Swiss bank repeatedly put him on notice of his noncompliance.

Defendant Robert Goldsmith was required to timely report his interest in the Account at Basler Kantonalbank ("Basler") for each of the years 2008, 2009 and 2010 on an FBAR[1]. He failed to do so. Because his failure to report the Account was willful, he is liable for the full amount of the civil penalties assessed against him pursuant to 31 U.S.C. § 5321(a)(5)(C).

The United States expects that the evidence will show that Defendant had (1) actual knowledge of the existence of the Account, (2) regularly used the Account to pay for his European vacations and provide money to his children, and (3) concealed the Account from the United States Government through (i) false statements on his federal income tax returns relating to his interest in foreign accounts and the income earned in the Account, (ii) opening the Account as a "numbered" account identifiable only by a number and not Defendant's name, (iii) directing Basler not to disclose identifying information regarding his numbered account to the United States, (iv) paying Basler a regular fee to "hold" his mail and not send the mail into the United States, (v) concealing the Account from his longtime accountant and tax preparer, and (vi) instructing Basler to divest U.S. securities in order to avoid legally required disclosure to the United States.

### APPLICABLE PRINCIPLES OF LAW

The "preponderance of the evidence" standard applies to the determination of whether a taxpayer willfully failed to report his interest in a foreign bank account. *See United States v. Garrity*, 304 F.Supp.3d 267 (D. Conn. 2018). The proper standard for "willfulness" is the one used in other civil contexts: a

---

[1] For the years at issue, the specific FBAR form required to be filed was a Form TD F 90-22.1. An FBAR is an information report that (for the relevant calendar years) must be filed no later than June 30 of the year following the calendar year during which the account was held. 31 C.F.R. § 103.27(c) (1989-2011).*United States v. Williams*, 489 F. App'x 655 (4th Cir. 2012). The FBAR is an additional requirement beyond the requirement that United States persons report whether they own foreign accounts and any income earned from such accounts on Schedule B of their federal income tax returns. *See* 26 U.S.C. § 61(a); 26 C.F.R. § 1.1-1(b).

defendant has willfully violated 31 U.S.C. § 5314 when he either knowingly or recklessly fails to file an FBAR. *See Bedrosian v. United States*, 912 F.3d 144, 152 (3d Cir. 2018). Willfulness is conduct which is voluntary, rather than accidental or unconscious.

An improper motive or bad purpose is not necessary to establish willfulness. Willfulness is established by showing a careless or reckless disregard of the duty to file an FBAR, not Defendant's actual knowledge of FBAR reporting requirements. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007) ("[W]here willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well.").

Furthermore, recklessness itself is judged on an objective rather than subjective standard. *See Safeco*, 551 U.S. at 68 ("While the term recklessness is not self-defining, the common law has generally understood it in the sphere of civil liability as conduct violating an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known.") (quoting *Farmer v. Brennan*, 511 U.S. 825, 836, 114 S. Ct. 1970, 128 L. Ed 2d 811 (1994) (internal quotations omitted)); *see also United States v. McBride*, 908 F. Supp. 2d 1186, 1204 (D. Utah, 2012) ("An improper motive or bad purpose is not necessary to establish willfulness in the civil context."). A person acts recklessly when he disregards a known or obvious risk that his conduct violates the law.

In a formulation that has been widely adopted by other courts, the Third Circuit described the objective test for recklessness as whether a taxpayer "(1) clearly ought to have known that (2) there was a grave risk that" he was not meeting the tax-filing requirements for his foreign accounts and "(3) . . . was in a position to find out for certain very easily." *Bedrosian*, 912 F.3d at 153 (internal quotation marks and citations omitted); *see also United States v. Horowitz*, 978 F.3d 80, 89 (4th Cir. 2020); *Jones v. United States*, 2020 WL 2803353, at *6 (C.D. Cal. May 11, 2020).

Willfulness may also be proven through "conduct meant to conceal or mislead sources of income or other financial information," or "from a conscious effort to avoid learning about reporting requirements." *Williams*, 489 F. App'x at 658 (quoting *United States v. Sturman*, 951 F.2d 1466, 1476 (6th Cir. 1991)).

## FACTS

The money in the Account originated with Defendant's father who lived in Nogales, Arizona, but owned a business just across the border in Nogales, Mexico. Robert Goldsmith Deposition ("R. Goldsmith Dep.") at 27:19-28:1. To Defendant's knowledge, his father did not have any U.S. bank accounts, preferring to keep the revenue from his business in Mexican bank accounts. *Id*. at 28:21-24. However, Defendant's father also wanted a "safe haven" to keep the pesos his business was earning from being devalued against the dollar. *Id*. at 28:7-12. Rather than put that money into a United States bank account, thereby exposing his income to taxation by the U.S. government, Defendant's father moved the money from Mexico into an account at Basler in Switzerland. *Id*. at 28:13-18. As such, it is likely that the Basler account was originally opened for the purpose of tax avoidance by allowing Defendant's father to avoid declaring income earned in Mexico in the United States.

Defendant's father predeceased Defendant's mother, and when Defendant's mother passed away, Defendant transferred the funds in his parents' account to a new account identifiable only by number and not Defendant's name at Basler—the Account—opened and owned by Defendant. *Id*. at 34:2-6, 104:25-105:8. Defendant was a signatory on his mother's account at Basler, and as a result Defendant was able to take possession of the funds in his mother's account without having those funds enter his mother's estate, thereby avoiding any estate taxes.

As a result of these transactions, Defendant both knew the amount of money in the Account, and that he had control over the Account. Documents produced by

1    Basler demonstrate that the Account had a value of CHF 638,446.33[2] as of June
2    30, 2005.  BKB000935.  Thus, the Account's value was well in excess of the
3    $10,000 threshold above which an FBAR must be filed, and during discovery
4    Defendant admitted that the Account's value for the calendar years at issue in this
5    action—2008, 2009, and 2010—continued to be well above the $10,000 threshold.
6         Not only did Defendant know the operative facts that required an FBAR
7    filing for each of the years at issue, but he worked to conceal that information from
8    others.  During the entirety of the time between when Defendant's mother passed
9    away and when Basler closed the Account, Defendant used Howard Zipser, CPA,
10   as his accountant and tax preparer.  Despite this decades-long relationship,
11   Defendant did not disclose the existence of the Account to Mr. Zipser prior to at
12   least July 1, 2011.
13        Defendant did not disclose the Account to Mr. Zipser despite the fact that it
14   was routine for the Defendant to ask Mr. Zipser questions about what income
15   needed to be declared to the IRS.  Defendant's concealment of the Account is
16   further demonstrated by the fact that for each of the years at issue, Mr. Zipser
17   asked Defendant and his wife to fill out a questionnaire, which included a question
18   asking whether Defendant had "an interest in or signature or other authority over a
19   bank account, securities account, or other financial account in a foreign country."
20   For 2008 and 2009, Defendant answered that question "no" despite his ownership
21   of the Account, while for 2010 Defendant answered "yes," but only disclosed an
22   Italian account that Defendant had opened, and which had less than $10,000, and
23   would not, by itself, trigger reporting requirements.
24        Defendant's concealment of the Account from Mr. Zipser was part and
25   parcel of Defendant concealing the Account from the U.S. government both
26   through failure to file FBARs and through signing and filing—under penalty of

27   ───────────────
     [2] The average exchange rate in 2005 was 1.25 dollars to 1 Swiss franc, making the
28   estimated value approximately 800,000 U.S. Dollars.

perjury—his federal income tax returns for the years at issue with incorrect answers to question 7(a) of Schedule B Part III.  Question 7(a) asks whether Defendant had "an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account, and Defendant responded "no" for the years at issue despite his ownership of the Account.  Question 7(a) also directs the taxpayer to instructions that include exceptions and filing requirements, but Defendant stated that he did nothing to determine whether the Account was subject to any exceptions or to filing requirements.

Nor can Defendant claim that the reason he did not investigate reporting requirements was that the Account was a foreign account.  When Defendant opened an Italian bank account, an account that had less than the $10,000 FBAR reporting threshold, he informed Mr. Zipser of that account and asked if it had to be reported.  That Defendant could and did easily inquire regarding filing requirements for one foreign account, but did not for the other far larger Account, can only be explained by Defendant's desire to continue to conceal the Account as he had since inheriting—and failing to pay estate taxes on—it from his parents.

Defendant's efforts to conceal the Account went beyond failing to disclose it to Mr. Zipser.  He also made every effort to prevent the Account's direct disclosure to the U.S. government.  Defendant visited Basler on an annual basis to discuss his Account with Basler employees, and to withdraw money from the Account in person, in cash.  The only reason Defendant went to Switzerland was to visit Basler and withdraw cash from the Account.  Although Defendant could have avoided these trips to Switzerland by moving the money in the Account back the United States, he testified that he did not repatriate the funds in the Account in part because he "enjoy[ed] going" to Europe and in particular to "Trieste" in Italy where he and his wife went every summer for three to six weeks on trips funded by the money in the Account.

When Defendant did not spend all of the money he withdrew from the Account during his European vacations, the remainder (sometimes as much as a thousand dollars) was brought back into the United States.  In addition to spending money from the Account on himself, Defendant directed Basler, on at least three occasions, to hand deliver funds in excess of $7,000 to his son Michael when Michael was on business trips to Switzerland.  Defendant's expectation was that his son, an authorized signatory on the account, and his daughter would inherit the Account.  Presumably, this arrangement, which mimicked the arrangement that allowed Defendant to inherit the money in the Account without paying estate tax, would allow another generational transfer of funds without disclosure to and consequent taxation by the U.S. government.

Defendant also made decisions regarding how the money in the Account was invested.  Despite making determinations about how the money in the Account was invested, deciding how to spend the money in the Account, including on travel expenses and via disbursals of money in the Account to his son, and planning to leave the money in the Account to his children, Defendant testified that "it was my account in my name, but it wasn't my money."  Defendant did nothing to determine whether he was required to disclose the Account, such as by filing FBARs, as a result of his determination that he did not "own" the Account.

Defendant took other steps to conceal the Account's existence.  For example, Mr. Goldsmith paid a regular fee to Basler for Basler not to send him any mail in the United States—a "hold mail" order.  Then, on August 29, 2000, Basler gave Defendant a choice between disclosing his account to the IRS and divesting all U.S. securities, and Defendant chose to divest the securities rather than disclose the Account to the IRS.  The form, which Defendant signed, states that Defendant is "liable to US tax" and that the choice between disclosure to the IRS and divestment is due to "new US withholding tax and reporting regulations." Defendant has no explanation for why, after being forced to make this choice, he

did nothing to determine what if any disclosure requirements were imposed by U.S. law.

After 2000, Defendant signed additional forms confirming his choice to forego the opportunity to hold US securities in order to continue to conceal his account and identity to the IRS on September 18, 2002, August 9, 2007, and again on August 5, 2009.  Defendant also signed separate forms on September 18, 2002, August 9, 2007, and again on August 6, 2009, which note at the top that those forms are "subject to Swiss banking secrecy," and "will not be forwarded to either Swiss or foreign authorities," and state that Defendant was "subject to taxation" in the "USA" and that "under US taxation law [Defendant] is the beneficial owner" of the Account.

On August 5, 2009 and again on July 27, 2011, Defendant signed yet another form regarding U.S. reporting requirements, which confirms that he is waiving the right to hold U.S. securities and states in part that "[I]t is in particular unclear whether the QI Agreement in its future form is to apply generally to all US persons notwithstanding whether securities (including other than US securities) and/or other assets of whatever nature (including simply account relationships) are held by US persons with banks.  The IRS's intentions appear to be moving in the latter direction."  Despite signing all of these forms, Defendant did nothing to determine what if any reporting requirements attached to the Account and made no effort to pay taxes to the United States on income or gains generated by the Account.

At some point, Basler informed Defendant that the bank planned to close the Account even though Defendant "didn't want to close it."  Basler's notes regarding the Account state that on October 27, 2010, Basler explained to Defendant that there were issues related to the reporting requirements in the Foreign Account Tax Compliance Act ("FATCA") and that as a result of that discussion the "clients will probably terminate the relationship in 2011."

Basler's notes go on to state that on July 28, 2011 Defendant wished to terminate the Account within the next few months or years and was annoyed that Basler set a monthly cash withdrawal limit of $10,000. These notes also state that after the October 27, 2010 discussion of FATCA, Defendant's in person withdrawals accelerated in frequency. When Basler closed the Account, Defendant walked away with the $200,000 that remained in the Account after Defendant's withdrawals.

Defendant was motivated by potential criminal liability to disclose the Account. As a result of an agreement with the U.S. government, Basler agreed to disclose the identities of U.S. persons who held numbered accounts at Basler. It was only at this point that Defendant retained counsel and disclosed his ownership of the Account to the government as part of a voluntary disclosure program that provided immunity from criminal prosecution.

Although Defendant claims he did not believe that he owned the Account, he was not confused about other, domestic assets that could not be concealed from the IRS. When Defendant's mother passed away, he also inherited an interest in commercial properties located within the United States. Mr. Goldsmith informed his accountant Mr. Zipser of the existence of the inherited commercial properties, and paid taxes on income generated by those properties. When asked why he considered himself the owner of the interest in commercial properties he inherited from his mother, but not the money he inherited from his mother in the Account, the Defendant could only state that they were "different." Once again, when confronted by an asset Defendant paid taxes on, Defendant was unable to explain why he did nothing to determine whether there were disclosure and tax obligations that attached to the Account leading to the inexplicable conclusion that Defendant knew or suspected that there were tax and disclosure obligations that he could ignore as long as the government remained ignorant of the Account's existence.

In addition, Mr. Goldsmith is the beneficial owner of an account with Morgan Stanley.  For that account, Mr. Goldsmith relies on his stockbroker for investment strategy.  Despite Defendant's protestations that he did not think of Basler as a "bank," Defendant agreed that his experience with Basler and his experience at Morgan Stanley were "very similar."  Furthermore, Defendant confirmed that he understood that income from his Morgan Stanley account had to be reported to the IRS and could not explain why income from the Account would be any different.

## EXHIBIT LIST

| NUMBER | DATE MARKED | DATE ADMITTED | DESCRIPTION |
|---|---|---|---|
| 1 | | | Forms 13448 Penalty Assessment Certifications |
| 2 | | | IRS Letter demanding payment from Defendant for the civil penalties assessed under Sec. 5321 |
| 3 | | | Basler Kantonalbank's Statement of Fees for Defendant's Account |
| 4 | | | Partial copy of Defendant's 2008 Form 1040 tax return |
| 5 | | | Instructions for filling out Schedule B of Form 1040 for 2008 |
| 6 | | | Partial copy of Defendant's 2009 Form 1040 tax return |
| 7 | | | Partial copy of Defendant's 2010 Form 1040 tax return |
| 8 | | | Set 1 of internal Basler Kantonalbank notes regarding Defendant's Account and certificate of translation |
| 9 | | | Set 2 of internal Basler Kantonalbank notes regarding Defendant's Account and certificate of translation |
| 10 | | | Retained mail fee invoices charged by Basler Kantonalbank to Defendant |
| 11 | | | Declaration for those liable to US tax form signed by Defendant August 29, 2000 |
| 12 | | | Declaration for those liable to US tax form signed by Defendant September 18, 2002 |

| 13 | | | Client questionnaire signed by Defendant September 18, 2002 |
|----|--|--|---|
| 14 | | | Declaration for those liable to US tax form signed by Defendant August 9, 2007 |
| 15 | | | Client questionnaire signed by Defendant August 9, 2007 |
| 16 | | | US Person Waiver signed by Defendant August 5, 2009 |
| 17 | | | Declaration for those liable to US tax form signed by Defendant August 5, 2009 |
| 18 | | | US Person Waiver signed by Defendant July 27, 2011 |
| 19 | | | Letter to Howard Zipser regarding Banca Populare di Intra account |
| 20 | | | 2008 tax questionnaire |
| 21 | | | 2009 tax questionnaire |
| 22 | | | 2010 tax questionnaire |
| 23 | | | Offshore Voluntary Disclosures dated October 2, 2012 with Attachment to Offshore Voluntary Disclosures Letter and Transmittal and Foreign Account Statement |
| 24 | | | Letter to IRS opting out of OVDP |
| 25 | | | Form designating authorized signatories on Basler Kantonalbank account |
| 26 | | | 2008 tax preparation materials |
| 27 | | | 2009 tax preparation materials |
| 28 | | | 2010 tax preparation materials |
| 29 | | | Consents to Extend the Time to Assess Civil Penalties Provided By 31 U.S.C. Sec. 5321 for FBAR Violations |
| 30 | | | Blank 2008 FBAR with Instructions |
| 31 | | | Blank 2008 Schedule B to Form 1040 with Instructions |
| 32 | | | Blank 2009 FBAR with Instructions |
| 33 | | | Blank 2009 Schedule B to Form 1040 with Instructions |
| 34 | | | Blank 2010 FBAR with Instructions |
| 35 | | | Blank 2010 Schedule B to Form 1040 with Instructions |
| 36 | | | Deposition of Robert Goldsmith Transcript |
| 37 | | | Deposition of Michael Goldsmith Transcript |
| 38 | | | Deposition of Maxine Goldsmith Transcript |

| 39 | | | Deposition of Howard Zipser Transcript |
| 40 | | | Responses to USA's Interrogatory Requests |
| 41 | | | Responses to USA's Requests for Admission |

## WITNESS LIST

1. Robert Goldsmith

2. Maxine Goldsmith[3]

3. Michael Goldsmith[4]

4. Howard Zipser, CPA. Mr. Zipser is an unavailable witness who lives and works in Arizona, and the United States intends to designate his deposition testimony for trial and present a video of designated deposition testimony to the jury.

5. IRS Witness to authenticate IRS records for which the parties do not stipulate as to authenticity.

Dated: May 3, 2021.

DAVID A. HUBBERT
Acting Assistant Attorney General

*/s/ Nithya Senra*
JAMES PETRILA
NITHYA SENRA
Trial Attorneys, Tax Division
U.S. Department of Justice

*Attorneys for the United States of America*

---

[3] Maxine Goldsmith is presently located in Hawaii, but counsel understand that she may return to San Diego, CA prior to trial. If she does not and is otherwise unwilling to appear voluntarily, then she may be an unavailable witness. (Prior to the global COVID pandemic, Ms. Goldsmith resided in San Diego and, on information and belief, continues to own a residence here. However, she has been residing at a vacation property in Hawaii since the pandemic began. Therefore, at this time, it is unclear whether she could be subpoenaed for trial under Fed. R. Civ. P. 45.)
[4] Michael Goldsmith is a potentially unavailable witness, as he is presently located in Nevada, counsel have not yet confirmed whether Michael Goldsmith will travel to San Diego voluntarily.