1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

9
10

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No.:  3:20-cv-00087-BEN-KSC |
| Plaintiff, | ) |
| | ) **ORDER GRANTING PLAINTIFF'S** |
| v. | ) **MOTION FOR SUMMARY** |
| | ) **JUDGMENT** |
| ROBERT GOLDSMITH, | ) |
| Defendant. | ) **[ECF Nos. 19, 20, 21, 24]** |

11
12
13
14
15
16

## I.    INTRODUCTION

Plaintiff, the United States of America ("Plaintiff" or the "Government"), with the authorization of the Secretary of the Treasury, *see* 31 U.S.C. § 3711(g)(4)(C), and at the direction of the Attorney General of the United States, brings this action to collect from the Defendant, Robert Goldsmith ("Defendant" or "Mr. Goldsmith"), an outstanding civil penalty pursuant to 31 U.S.C. § 5321(a)(5) for failure to timely file Reports of Foreign Bank and Financial Accounts ("FBARs") for the 2008, 2009, and 2010 calendar years. First Amended Complaint, ECF No. 1 ("FAC") at 1[1]; Motion, ECF No. 19-1 ("Mot.") at 4:1-3.

Before the Court is the Government's Motion for Summary Judgment (the

17
18
19
20
21
22
23
24
25
26
27
28

---

[1]    Unless otherwise indicated, all page number references are to the ECF generated page number contained in the header of each ECF-filed document.

"Motion").  ECF No. 19.  The Motion was submitted on the papers without oral argument pursuant to Civil Local Rule 7.1(d)(1) and Rule 78(b) of the Federal Rules of Civil Procedure.   ECF No. 22.   After considering the papers submitted, supporting documentation, and applicable law, the Court finds no genuine issue of material fact exists as to whether Mr. Goldsmith willfully failed to file his FBARs, and as such, **GRANTS** the Government's Motion.

## II.   BACKGROUND

### A.   Statement of Facts[2]

Mr. Goldsmith is a United States ("U.S.") citizen, who currently resides in San Diego, California.  FAC at 2, ¶ 4.

Sometime prior to 1982, Mr. Goldsmith's father opened a bank account at Basler Kantonalbank, a Swiss cantonal bank ("Basler").  FAC at 3, ¶ 9; *see also* Ans. at 2, ¶ 9. When Mr. Goldsmith's father died in 1982, Mr. Goldsmith's mother inherited that account. FAC at 3, ¶ 9; *see also* Ans. at 2, ¶ 9; Mot. at 6:3-6 (citing Deposition Transcript of Robert Goldsmith[3] at 34:2-6, 104:25-105:8).  Sometime while his mother still had control of the

---

[2]   The majority of the facts set forth are taken from the operative complaint, *see* FAC, and were admitted in Mr. Goldsmith's Answer, ECF No. 7 ("Ans."), or the facts provided in Plaintiff's Motion, *see* ECF No. 19-1, which Mr. Goldsmith did not dispute in his opposition, *see* ECF No. 20.  For purposes of ruling on Plaintiff's motion for summary judgment, the Court liberally construes all allegations in favor of the non-moving party. *S.R. Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019), *cert. denied sub nom. Browder v. Nehad*, 141 S. Ct. 235 (2020) (noting that courts review "the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor").
[3]   A moving party must file and serve "copies of all documentary evidence which the movant intends to submit in support of the motion, or other request for ruling by the Court." S.D. Cal. Civ. R. 7.1 (f)(2)(a).  Here, the Government relied on Mr. Goldsmith's deposition transcript in support of its Motion, and Mr. Goldsmith relied on the same transcript in support of his opposition, but to the Court's knowledge, both parties failed to file and serve the transcript.  However, the Court accepts the Government's factual assertions, which rely on the transcript and deposition testimony for support to the extent Mr. Goldsmith failed to dispute the factual assertion in his opposition.  *See, e.g.*, *Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166, 1178 n.7 (9th Cir. 2016) (noting that "the plaintiffs did not raise that argument to the district court in their . . . opposition to the defendants' motion for

-2-

account and prior to 1989, Mr. Goldsmith was added as a signatory to the account at Basler. FAC at 3, ¶ 10; *see also* Ans. at 2, ¶ 10.

From 1989 through 2012, Mr. Goldsmith used Howard Zipser, CPA ("Mr. Zipser"), as his accountant and tax preparer.  *See* FAC at 4, ¶ 14; Ans. at 3, ¶ 14; Mot. at 6:19-20. Each year, Mr. Zipser relied on information provided by Mr. Goldsmith and his wife to prepare their Form 1040.  FAC at 4, ¶ 15; Ans. at 3, ¶ 15.  After Mr. Goldsmith started using Mr. Zipser, but also in 1989, Mr. Goldsmith's mother died, and Mr. Goldsmith inherited the funds at Basler, so Defendant traveled to Switzerland to meet with a Basler representative.  FAC at 3, ¶ 11; *see also* Exhibit 13 to Petrila Suppl. Decl., November 13, 2020 Deposition Transcript of Robert Goldsmith, ECF No. 26-1 ("R. Goldsmith Dep.") at 34[4]:2-6, 104:25-105:8).  Mr. Goldsmith transferred the funds he inherited in this account to a new numbered Swiss bank account[5] ending in 8171 at Basler (the "Account"), which contained hundreds of thousands of dollars for decades, including during the three years at issue here: 2008, 2009, and 2010.  Mot. at 4:6-9, 5:27-28, 6:3-6; *see also* R. Goldsmith Dep. at 34:2-6, 104:25-105:8); FAC at 3, ¶ 12; Ans. at 3, ¶ 12.

Even though Mr. Goldsmith had been working with Mr. Zipser when he inherited the Account, Mr. Goldsmith did not disclose the Account's existence to Mr. Zipser until

---

summary judgment, so the argument was waived."); *see also* S.D. Cal. Civ. R. 7.1(f)(3)(c) (providing that failure to oppose the granting of a motion or other request for ruling may constitute consent to granting the motion).  Further, subsequent to the Court taking this matter under submission, the Government submitted a declaration with the deposition transcripts.  *See* Declaration of James J. Patrila, ECF No. 26 ("Petrila Suppl. Decl."). However, some of the portions of the deposition transcripts cited were still not provided to the Court, in which case, the Court references the Government's motion instead rather than directly referring to the transcript.

[4]     When referencing any deposition transcripts in this Order, the Court refers to the page number on the deposition transcript rather than the page number in the ECF generated header.

[5]     With a numbered account, a number rather than a name identifies the account, which conceals the account holder's identity.  *United States v. Rum*, No. 19-14464, --- F.3d ---, 2021 WL 1589153, at *7, n.4 (11th Cir. Apr. 23, 2021).

July 1, 2011.  *See* Mot. at 6:19-24; *see also* Declaration James J. Petrila in Support of Plaintiff's Motion for Summary Judgment, ECF No. 19-3, ("Petrila Decl."), Exhibit 6 at 31.  However, when his mother passed away, Mr. Goldsmith also inherited an interest in commercial properties located within the U.S., informed Mr. Zipser of their existence, and paid taxes on the income the properties generated accordingly.  Mot. at 11:22-26 (citing R. Goldsmith Dep. at 13:1-13, 16:23-17:1).  Mr. Goldsmith testified that he did not inform Mr. Zipser of the Swiss Account because "[i]t wasn't an account"; rather, "[i]t was a fund." R. Goldsmith Tr. at 88:17-89:6.  However, he also testified that he had other "non-bank accounts," which earned him income, like "distributions from Monterey Pass or income earned from [his] Hawaii condo," about which he informed Mr. Zipser.  *Id.*

From 1989 until approximately 2012, Mr. Goldsmith owned the Account.  Mot. at 4:6-9, 5:27-28; *see also* FAC at 3, ¶ 12; Ans. at 3, ¶ 12.  As part of his management of the Account, Mr. Goldsmith added his wife and son as signatories to the Account and met annually with an account advisor from Basler in Switzerland.  FAC at 3, ¶¶ 12-13; Ans. at 3, ¶ 12.  In fact, during his deposition, Mr. Goldsmith testified that the only reason he went to Switzerland was to visit Basler and withdraw cash from the Account.  *See* R. Goldsmith Dep. at 36:19-23, 37:8-12.  During these annual in person meetings, Mr. Goldsmith made cash withdrawals from the Account, which he used for various expenses, including personal vacations in Europe.  *See* FAC at 3, ¶ 13; Ans. at 3, ¶ 13.  Mr. Goldsmith also made decisions—or at least participated in such decisions—regarding how the money in the Account was invested.  *See* R. Goldsmith Dep. at 34:20-35:5, 54:6-14, 58:9-15.  His management included opening the Account, *id.* at 104:21-105:11, directing what kind of investor profile Basler applied to the Account, *id.* at 92:6-13, "direct[ing] the people who were running the funds," id. at 92:14-18, and spending the money however he decided, whether on charitable causes or hotels, car rentals, and meals for his travels in Europe, *id.* at 47:21-25.  Despite making determinations about how the money in the Account was invested; deciding how to spend the money in the Account, including on travel expenses and via disbursals of money in the Account to his son; and planning to leave the money in

-4-

the Account to his children, Mr. Goldsmith testified that "it was my account in my name, but it wasn't my money." *See* R. Goldsmith Dep. at 53:18-19; 54:6-11).

On August 29, 2000, Basler asked Mr. Goldsmith to sign a form, which referenced "new US withholding tax and reporting obligations" and gave Mr. Goldsmith a choice between disclosing his Account to the U.S. Internal Revenue Service ("IRS") or divesting all of his U.S. securities. *See* Exhibit 11 to Petrila Decl. at 61. This form, often referred to as a Qualified Intermediary ("QI") Form, was part of "the Qualified Intermediary Program—a program which, until October 2008, allowed foreign banks to promise to identify clients with U.S. Securities, and send the taxes due on those securities."[6] *Norman v. United States*, 138 Fed. Cl. 189, 194, n.7 (2018), *aff'd,* 942 F.3d 1111 (Fed. Cir. 2019) (*Norman I*) (citing Rev. Proc. 2000-12, 2000-1 C.B. 387 (2000)). When presented with the QI form, Mr. Goldsmith chose to divest the Account of all U.S. securities rather than disclose the Account to the IRS. *See id.* at 61-68 (attaching multiple forms from 2000 to 2011 which Mr. Goldsmith signed, stating that he is "liable to US tax" and that the choice between disclosure to the IRS and divestment is due to "new US withholding tax and reporting regulations")). On September 18, 2002, August 9, 2007, and August 5, 2009, Mr. Goldsmith signed additional, similar QI forms confirming his choice to forego the opportunity to hold U.S. securities so he could avoid disclosing the Account to the IRS. *Id.*

Since the 1980s, when Mr. Goldsmith hired Mr. Zipser, Mr. Zipser had been providing Mr. Goldsmith and his wife with a financial questionnaire to assist with tax planning and compliance. FAC at 4, ¶ 15; Ans. at 3, ¶ 15; Mot. at 7:4-8. Upon receiving the questionnaire, Mr. Goldsmith and his wife collected financial information to answer it,

---

[6]   "The QI system requires foreign banks to enter into Qualified Intermediary Agreements with the IRS, to identify and document any customers who hold U.S. investments or have received U.S.-source income into their offshore accounts, and withhold income tax from payments of U.S.-source income received by foreigners." Song, Jane G., *The End of Secret Swiss Accounts?: The Impact of the U.S. Foreign Account Tax Compliance Act (FATCA) on Switzerland's Status as a Haven for Offshore Accounts*, 35 Nw. J. Int'l L. & Bus. 687, 697 (2015) (citing 55 26 U.S.C. §§ 1441–1443 (2013).

which they returned to Mr. Zipser.   FAC at 4, ¶ 15; *see also* Ans. at 3, ¶ 15.   This questionnaire asked whether the individual had (1) "any foreign income . . . during the year" or (2) "an interest in or a signature or other authority over a bank account, securities account, or other financial account in a foreign country."   *See* Exhibit 7 to Petrila Decl at 35-36; *see also* Mot. at 7:4-8; FAC at 4, ¶ 16; Ans. at 3, ¶ 16.   Although Mr. Goldsmith testified at his deposition that he never personally completed the questionnaire, stating instead, that his wife regularly completed it, R. Goldsmith Dep. at 83:19-84:3, he also testified that "*we* would fill it in and take it to [Mr. Zipser]," R. Goldsmith Dep. at 59:20-60:3.   Further, even though Mrs. Goldsmith testified that she would complete the questionnaire, she also state that she would "discuss what was sent off [in the questionnaire] with her husband," who "took an active role in those discussions" as they "used to gather the documents together and put them in a package."   M. Goldsmith Dep. at 62:17-63:21.   Similarly, Mr. Zipser testified that he thought both Mr. Goldsmith and his wife were involved in their tax preparation although "[Mrs. Goldsmith] was the primary person preparing the records on an annual basis."   Zipser Dep. at 25:19-25.

As of June 30, 2005, the Account had a value of CHF[7] 638,446.333.   *See* Exhibit 4 to Petrila Decl. at 18.   In subsequent years, including 2008 through 2010, the Account continued to maintain a value exceeding $10,000.00.[8]   Mot. at 6:11-18; *see also* Exhibit 5 to Petrila Decl. at 25.   Despite an Account balance exceeding $10,000.00, and thereby requiring disclosure to the IRS, Mr. Goldsmith indicated in Mr. Zipser's questionnaire for 2008, 2009, and 2010 that he had no foreign income for those years.   *See* Exhibit 7 to Petrila Decl. at 35-40.   For one of those years,[9] when asked whether Mr. Goldsmith had

---

[7]   CHF is the currency abbreviation for Switzerland's currency, the Swiss franc.   The abbreviation "CHF" is derived from the Latin name of the country, "Confederation Helvetica," with the "F" standing for "franc."

[8]   As is discussed below, U.S. citizens must file FBARs pertaining to any foreign accounts exceeding $10,000.00 in the prior calendar year.   31 C.F.R. § 1010.306(c).

[9]   The Government attaches three questionnaires as Exhibit 7 to Mr. Petrila's Declaration in Support of the Motion but fails to indicate which questionnaires correspond to which years.   *See* Exhibit 7 to Petrila Decl. at 35-40.   The first questionnaire references

"an interest in or signature or other authority over a bank account, securities account, or other financial account in a foreign country," the returned questionnaire shows a response of "no" despite Mr. Goldsmith's ownership of the Account. *Compare* Exhibit 7 to Petrila Decl. at 35-40 (showing Mr. Goldsmith answering "no" to the question regarding signature authority over a foreign account) *with* Exhibit 11 to Petrila Decl. at 67 (signing a QI Form related to the Account on August 5, 2009, which stated, "I, the custody account holder").

As a result of failing to disclose the Swiss Account to Mr. Zipser, Mr. Goldsmith's individual tax returns for the years 2008, 2009, and 2010, which he signed under penalty of perjury, also failed to disclose the Account. FAC at 4, ¶ 18, 5, ¶ 23, 6, ¶¶ 24-25; *see also* Ans. at 3, ¶ 18 (admitting that his 2008, 2009, and 2010 tax returns did not disclose the Account); Exhibit 6 to Petrila Decl. at 31; Exhibit 8 to Petrila Decl. at 35, 37, 39. For example, Question 7a on Schedule B, Part III, covering "Interest and Ordinary Dividends," on IRS Form 1040, asks, "At any time during [the previous year], did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account?" Exhibit 8 to Petrila Decl. at

---

a relative dying on June 24, 2011, suggesting it relates to the 2010 tax year. *See id.* at 35-36. The other two questionnaires contain nothing allowing the Court to infer to which corresponding tax year they relate, and neither Mr. Petrila's declaration nor the Government's Motion clarifies this issue. *Id.* at 37-40. In fact, the Motion states that for 2008 and 2009, the response to the question regarding whether the individual had an interest in a foreign account was "no," and only for 2010 was the response "yes." Mot. at 7:4-13 (citing Exhibit 7 to Petrila Decl. at 35, 38, 40). However, an examination of the exhibits cited shows that two—rather than one—of the three questionnaires have a "yes" response to the question about foreign income, while only one of the three questionnaires has a "no" response. *See* Exhibit 7 to Petrila Decl. at 35-36 (checking "yes" to indicate signature authority over a foreign account in 2011 but "no" in response to whether he had foreign income); 37-38 (checking "no" to both questions for an unknown year); 39-40 (checking "yes" for signature authority over a foreign account in 2011 but "no" to the question regarding foreign income). That being said, the Court finds it reasonable to infer the three questionnaires pertain to the years 2008, 2009, and 2010 (although it is unclear to which year each questionnaire corresponds). *See* Mot. at 7:8-13 (citing Exhibit 7 to Petrila Decl. at 35-40).

42-44.  In 2008, 2009, and 2010, Mr. Goldsmith answered "no" in response to this question. *See id.*; *see also* FAC at 6, ¶¶ 24-26; Ans. at 4, ¶¶ 24-26.  Question 7a also directs the taxpayer to "[s]ee page B-2 for exceptions and filing requirements," *see* Exhibit 8 to Petrila Decl., ECF No. 19-3 at 42-44, but Mr. Goldsmith testified that he did nothing to determine whether the Account fell within any of the exceptions to the filing requirements, *see* R. Goldsmith Dep. at 86:3-87:5.

During his deposition, Mr. Goldsmith's explanation for failing to disclose the Swiss Account to Mr. Zipser and the IRS was that "[i]t wasn't an account," rather, "[i]t was a fund," R. Goldsmith Dep. at 89:3-6.  However, Mr. Goldsmith had other "non-bank accounts," which earned him income, like "the distributions from Monterey Pass or income earned from [his] Hawaii condo, neither of [which] are banks," which he disclosed to both Mr. Zipser and the IRS.  R. Goldsmith Dep. at 88:17-23.  Mr. Goldsmith explained that disclosed these "non-bank accounts" because he "informed him [Mr. Zipser] about anything that [they] did here in the western hemisphere." *Id.*  However, in 2010, Mr. Goldsmith opened an account in Italy at the Banco Popolare Di Intra.  FAC at 5, ¶ 20; *see also* Ans. at 3, ¶ 20.  Mr. Goldsmith also informed Mr. Zipser about this Italian account even though it was not in the Western Hemisphere.  R. Goldsmith Dep. at 88:24-89:1.  On February 5, 2011, Mr. Goldsmith's wife also sent Mr. Zipser a letter informing him of the Italian account and asking whether any forms needed to be filled out in relation to that account.  FAC at 5, ¶ 20; *see also* Ans. at 3, ¶ 20; R. Goldsmith Dep. at 88:5-16.  Even though Mrs. Goldsmith informed Mr. Zipser about the Italian account, it did not trigger IRS reporting requirements because this account had less than $10,000.00.  Mot. at 7:8-13.

On August 5, 2009 and again on July 27, 2011, Defendant signed yet another QI form regarding U.S. reporting requirements, which again, confirmed he was waiving the right to hold U.S. securities.  *See* Exhibit 11 to Petrila Decl. at 66, 68.  This form stated, in part, that Basler had an agreement with the IRS, which required it to deduct taxes for qualifying transactions relating to U.S. securities.  *Id.*  It elaborated that although "it [was] in particular unclear whether the QI Agreement in its future form is to apply generally to

-8-

all US persons notwithstanding whether securities (including other than US securities) and/or other assets of whatever nature (including simply account relationships) are held by US persons with banks," the IRS appeared "to be moving in the latter direction." *Id.*

In addition to avoiding U.S. securities, Mr. Goldsmith also paid a regular fee to Basler to institute a "hold mail" order, or in other words, for Basler not to send him any mail in the U.S. *Compare* Exhibit 12[10] to Petrila Decl. at 73 (indicating on May 23, 2015 and June 14, 2010, that "the mail can be destroyed"); Exhibit 10 to Petrila Decl. at 55-59 (attaching statements for a "retained mail fee" dated December 16, 2010 for 200.00 CHF, December 16, 2011 for 245.00 CHF, March 30, 2012 for 95.00 CHF, May 4, 2012 for 31.67 CHF, and June 29, 2012 for 31.67 CHF) *with* R. Goldsmith Dep. at 94:15-21 (testifying that he could not recall giving Basler permission to destroy the held mail).[11]

---

[10]    The Government notes that Exhibits 9 and 10 are the "as produced Basler notes on Defendant's accounts," which are written in German.  Mot. at 9:24-26.  However, the Government has attached English translations along with a certificate of translation.  *Id.* The Court finds that the certificates of translation sufficiently authenticate the documents, particularly given Mr. Goldsmith's opposition does not dispute the accuracy of any of the translations or representations by the Government as to what the documents convey.  *See, e.g.*, Fed. R. Civ. P. 56(c)(4) (providing that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated"); Fed. R. Evid. 604 ("An interpreter must be qualified and must give an oath or affirmation to make a true translation."); Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."); *see also Jack v. Trans World Airlines, Inc.*, 854 F. Supp. 654, 659 (N.D. Cal. 1994) ("Witness testimony translated from a foreign language must be properly authenticated and any interpretation must be shown to be an accurate translation done by a competent translator.") (citing Fed. R. Evid. 604 and 901).

[11]    Although Mr. Goldsmith did not recall asking Basler to destroy the mail related to the Account, he also did not deny it.  The apparent discrepancy on this issue appears to arise from the fact that Mr. Goldsmith readily admits he asked Basler to hold his mail, *see, e.g.*, R. Goldsmith Dep. at 61:24-62:1 (testifying "Oh yeah, certainly" when asked whether he asked Basler not to send him any mail); *see also id.* at 64:1-65:4, he does not recall asking them to ***destroy*** his mail, *see* R. Goldsmith Dep. at 94:15-24.  In fact, Mr. Goldsmith admitted in the Government's Requests for Admission that he "instructed Basler

-9-

At some point, Basler informed Mr. Goldsmith that it planned to close the Account even though Mr. Goldsmith "didn't want to close it."  R. Goldsmith Dep. at 46:13-15. Basler's notes regarding the Account reflect that (1) on October 27, 2010, Basler explained to Mr. Goldsmith that there were issues related to the reporting requirements in the Foreign Account Tax Compliance Act ("FATCA") and that as a result of that discussion, the "clients will probably terminate the relationship in 2011"; (2) on July 28, 2011, Mr. Goldsmith indicated he wished to terminate the Account within the next few months or years and was annoyed that Basler set a monthly cash withdrawal limit of $10,000; and (3) after the October 27, 2010 discussion regarding the FATCA, Defendant's in-person withdrawals accelerated in frequency.  *See* Exhibit 12 to Petrila Decl., ECF No. 19-3 at 73-75 (listing Mr. Goldsmith's withdrawals); *but see* R. Goldsmith Dep. at 95:9-97:25, 98:1-8, 99:2-25 (denying his recollection of these discussions with Basler).  Mr. Goldsmith testified that when Basler said it was closing the Account, he "realized that maybe something was wrong …. [and] [m]aybe we shouldn't be doing something."  *See* R. Goldsmith Dep. at 46:15-17.  When Basler closed the Account, Mr. Goldsmith walked away with $200,000.00, which he repatriated to the U.S.  *See id.* at 45:24-46:1.

Although Mr. Goldsmith claims he did not believe he owned the Account, which is why he did not inform Mr. Zipser about it when his mother died, he informed Mr. Zipser about the other types of property he inherited, like the commercial properties.  *See* Mot. at 11:21-26 (citing R. Goldsmith Dep. at 13:1-13, 16:23-17:1).  When asked why he

---

Kantonalbank to retain banking correspondence regarding [his] Account at the bank instead of sending it to [him] in the United States."  Exhibit 6 to Petrila Decl. at 32.  Given Mr. Goldsmith raises no reasons to disbelieve Basler's notes, the Court assumes as true the Government's representation that Mr. Goldsmith instigated a hold mail order, as is reflected in Basler's notes along with the statements from Basler for the retained mail fee. Exhibit 10 to Petrila Decl. at 55-59.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  That being said, given only tax years 2008, 2009, and 2010 are at issue, the Court recognizes that four of the five retained mail statements are post-2010 and have little, if any, probative value.

considered himself the owner of the interest in commercial properties he inherited from his mother, but not the money he inherited from his mother in the Account, Mr. Goldsmith could only state that they were "different."  *See* R. Goldsmith Dep. at 56:24-57:18.  Mr. Goldsmith also owns an account with Morgan Stanley and cannot explain why the income from Morgan Stanley, which he knew had to be reported to the IRS, would differ his Account with Basler.  *See id.* at 59:3-18.

In the spring of 2012, prior to closing the Account, Mr. Goldsmith received a letter from Basler informing him and his wife of their U.S. tax reporting requirements.  FAC at 6, ¶ 27; *see also* Ans. at 4, ¶ 27.  Shortly thereafter, on April 25, 2012, Mr. Goldsmith closed the Basler Account.  FAC at 6, ¶ 28; *see also* Ans. at 4, ¶ 28.  Following Mr. Goldsmith's closure of the Account, Mr. Goldsmith informed the IRS of the Account and elected to participate in the IRS's Offshore Voluntary Disclosure Initiative ("OVDI"). Mot. at 15:17-23.  The OVDI program offers taxpayers with unreported accounts immunity from criminal prosecution and civil FBAR penalties in exchange for (1) full disclosure of the taxpayer's foreign account holdings; (2) payment of any tax deficiencies, penalties, and interest; and (3) payment of a miscellaneous civil penalty that would be less than the taxpayer's potential exposure under a full tax and/or FBAR examination.  *Id.* at 15:17-23. However, Mr. Goldsmith eventually decided to withdraw from the OVDI program, resulting in his case being referred to the IRS for a full tax examination and investigation into his FBAR compliance.  *Id.* at 15:23-25.

On March 11, 2015, February 9, 2016, February 10, 2017, and September 6, 2017, Mr. Goldsmith consented to extend the statute of limitations for assessing the FBAR penalty for calendar years 2008, 2009, and 2010 numerous times until the it was ultimately extended to December 31, 2018.  *See* Exhibit 1 to Petrila Decl. at 2-5.

On June 19, 2018, a delegate of the Secretary of the Treasury assessed civil penalties against Mr. Goldsmith in the total amount of $273,846.00, due to his alleged willful failure to timely file FBARs to disclose the Account to the IRS for the calendar years 2008, 2009 and 2010 as follows:

| Year | Penalty Assessed |
|------|------------------|
| 2008 | $122,375.00 |
| 2009 | $82,082.00 |
| 2010 | $69,389.00 |
| **TOTAL** | **$273,846.00** |

*See* FAC at 9, ¶ 39; *see also* Ans. at 5, ¶ 39.

### B.   Procedural History

On January 13, 2020, the Government filed the original complaint, alleging one claim for relief for a judgment for civil penalties pursuant to 31 U.S.C. § 5321(a)(5).  ECF No. 1.  The following day, on January 14, 2020, the Government filed the Amended Complaint.  *See* FAC.  That same day, January 14, 2020, Mr. Goldsmith signed a waiver of service of summons.  ECF No. 4.

On March 16, 2020, Mr. Goldsmith timely filed an Answer to the Amended Complaint.  *See* Ans.

On February 1, 2021, the Government filed the instant Motion for Summary Judgment, seeking summary judgment that Mr. Goldsmith's tax violations were willful.  *See* Mot.  On February 22, 2021, Defendant opposed.  Opposition, ECF No. 20 ("Oppo.").  On March 8, 2021, the Government replied.  Reply, ECF No. 21 ("Reply").

The Final Pretrial Conference is scheduled for June 7, 2021.  ECF No. 14.

### III.   LEGAL STANDARD

Where a moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," the Court must grant summary judgment.  FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material if it could affect the outcome of the case under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact is genuine if the evidence, viewed in light most favorable to the non-moving party, "is such that a reasonable jury could return a verdict for the non-moving party."  *Id.*

If the moving party has the burden of proof at trial on an issue, like Plaintiff, that party must affirmatively show that no reasonable jury could find other than in the moving

-12-

party's favor.  *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting).  The moving party may make this showing by identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323. If a moving party carries its burden of showing the absence of evidence as to an essential element of the opposing party's case (e.g., a genuine issue of material fact), "the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010); *see also Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927-28 (9th Cir. 2009). "This burden is not a light one."  *Oracle*, 627 F.3d at 387.  The party opposing the motion for summary judgment "must show more than the mere existence of a scintilla of evidence" by coming forward "with evidence from which a jury could reasonably render a verdict in the non-moving party's favor."  *Id.*  The nonmoving party must go beyond the pleadings and designate facts showing a genuine issue for trial.  *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324.  It can do this by citing to specific parts of the materials in the record or by showing that the materials cited by the moving party do not compel a judgment in the moving party's favor.  FED. R. CIV. P. 56(c).

In ruling on a motion for summary judgment, the substantive law governing a claim determines whether a fact is material.  *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009).  The court also draws inferences from the facts in the light most favorable to the nonmoving party.  *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  However, the nonmoving party's mere allegation that factual disputes exist between the parties will not defeat an otherwise properly supported motion seeking summary judgment.  *See* FED. R. CIV. P. 56(c).  Further, if the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary.  *Matsushita*, 475 U.S. at 587.

In a motion for summary judgment involving assessments of tax penalties for willful

-13-

1   violations, whether a taxpayer has willfully failed to comply with the taxpayer's federal

2   reporting requirements to the IRS is question of fact. *Rykoff v. United States*, 40 F.3d 305,

3   307 (9th Cir. 1994).  The Government must prove the willful failure by a preponderance

4   of the evidence. *United States v. Bohanec*, 263 F. Supp. 3d 881, 889 (C.D. Cal. 2016).

5   **IV.    DISCUSSION**

6       The Bank Secrecy Act of 1970, also known as the Currency and Foreign

7   Transactions Reporting Act, 31 U.S.C. § 5311, *et seq.* (the "Act"), requires all U.S. citizens

8   to "keep records and file reports, when the resident, citizen, or person makes a transaction

9   or maintains a relation for any person with a foreign financial agency."  31 U.S.C. §

10   5314(a).  In part, Congress passed the Act to require certain reports and records that may

11   be useful in "prevent[ing] . . . money laundering and the financing of terrorism."  31 U.S.C.

12   § 5311(2).

13       Under the Act's implementing federal regulations, 31 C.F.R. § 1010.100, *et seq.*,

14   every U.S. "person having a financial interest in, or signature authority over, a bank,

15   securities, or other financial account in a foreign country shall report such relationship to

16   the Commissioner of Internal Revenue for each year in which such relationship exists" as

17   well as "provide such information . . . in a reporting form prescribed under 31 U.S.C. 5314

18   to be filed by such persons." 31 C.F.R. § 1010.350(a).  "The form prescribed under section

19   5314 is the Report of Foreign Bank and Financial Accounts (TD-F 90-22.1), or any

20   successor form." 31 C.F.R. § 1010.350(a).  Covered persons must file such reports by June

21   30th each year for foreign accounts containing at least $10,000.00 in the prior calendar

22   year.  31 C.F.R. § 1010.306(c). "Thus, § 1010.350 (and the FBAR form) describes what

23   information must be disclosed in the report prescribed by § 5314—the FBAR—while §

24   1010.306 imposes a deadline for when the FBAR must be filed." *United States v. Boyd*,

25   991 F.3d 1077, 1082 (9th Cir. 2021).

26       The Secretary of the Treasury may impose a civil money penalty on any person who

27   fails to comply with the Act's reporting requirements by violating, *inter alia*, 31 U.S.C. §

28

5314 ("Section 5314") due to failing to file a FBAR.[12]  *See* 31 U.S.C. § 5321.  Where a taxpayer violates Section 5314, under the "reasonable cause exception," no penalty is imposed where the violation (1) was due to reasonable cause and (2) the amount of the transaction or balance in the account at the time of the transaction was properly reported. 31 U.S.C. § 5321(a)(5)(B)(ii).  Where a Section 5314 violation does not qualify for the "reasonable cause exception, the penalty for non-willful violations of Section 5314 "shall not exceed $10,000."  31 U.S.C. § 5321(a)(5)(B).  Where the individual violating Section 5314 does so willfully or willfully causes the violation, the reasonable cause exception does not apply, and the maximum penalty is increased to the greater of either (1) $100,000.00 or (2) 50 percent of the amount of (a) the transaction in the case of a violation involving a transaction or (b) the balance in the account at the time of a violation involving a failure to report the existence of an account.  31 U.S.C. § 5321(C)-(D).

To fulfill the Act's requirements during the years at issue, 2008, 2009 and 2010, Mr. Goldsmith, as a citizen of the U.S. who owned foreign bank accounts exceeding $10,000.00—namely, the Swiss Account—was required to file a FBAR.  FAC at 3, ¶ 7; *see also* Ans. at 2, ¶ 7.  For the years at issue, his FBAR was due by June 30 "of each calendar year with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year."  31 C.F.R. § 1010.306(c); *see also* FAC at 3, ¶ 7; Ans. at 2, ¶ 7.  However, Mr. Goldsmith's interest in the Account was not reported even though from 2008 to 2010, Mr. Goldsmith (1) had a balance in the Account exceeding $10,000.00; (2) made annual cash withdrawals of between $17,000 and $61,000 per year; (3) received offshore interest and dividend income from the Account; and (4) received gross proceeds

---

[12]     The Ninth Circuit recently held that where a taxpayer files a FBAR late, but the content of the FBAR is accurate, the taxpayer violates 31 C.F.R. § 1010.306, which requires taxpayers to file the FBAR by June 30th of each year, rather than 31 C.F.R. § 1010.350, which sets forth the requirements for the content of the FBAR.  *Boyd*, 991 F.3d at 1082.  Such a violation for an untimely report constitutes a single violation even if the FBAR applies to multiple accounts.  *Id.*  Although not clearly specified by the Government, in this case, the Government appears to pursue three penalties for Mr. Goldsmith's failure to file FBARs entirely.

1  in excess of $225,000.00 from the sale of securities in the Account.  FAC at 5-6, ¶ 23; *see*
2  *also* Ans. at 4, ¶ 23.

3       The Government argues that the Court should grant summary judgment in this case
4  because in order to recover the penalties it seeks, it only needs to prove four elements, three
5  of which are undisputed, and the fourth of which warrants judgment by the Court as a
6  matter of law based upon the evidence in this case.  Mot. at 4:19-22, 14:13-17.  Mr.
7  Goldsmith responds that the Court should deny summary judgment because the evidence
8  in this case, at a minimum, shows a genuine issue of fact exists as to whether his conduct
9  qualifies as willful.  Oppo. at 10:17-24.  He argues that (1) the Government's willfulness
10  standard is flawed as it flies in the face of Congressional intent, which establishes three
11  penalty categories for FBAR violations, and (2) genuine issues of material fact exist
12  appropriate for determination by a jury because "the facts brought forward by the
13  Government are not viewed in a light most favorable to the nonmoving party and/or
14  misrepresent the facts gathered through discovery." *Id.* at 2:5-11.  However, other than the
15  two factual assertions addressed below, Mr. Goldsmith's Opposition never actually
16  disputes the facts asserted by the Government in its Motion but rather argues that the facts,
17  if true, prevent the Court from finding Mr. Goldsmith liable.  *See generally id.*

18       The only two alleged facts Mr. Goldsmith appears to dispute are that he (1) knew he
19  owned the Account and (2) managed the Account.  For instance, in *Norman v. United*
20  *States*, 942 F.3d 1111, 1116-17 (Fed. Cir. 2019) (*Norman II*), the Federal Circuit affirmed
21  the lower court's judgment finding the taxpayer's failure to file a FBAR willful where she
22  denied that the money in the Swiss account was hers or that she had control over it, but the
23  evidence showed she (1) opened the account, (2) actively managed the account, and (3)
24  withdrew money from it.  The Court finds that like the *Norman II* defendant, the evidence
25  in this case blatantly contradicts Mr. Goldsmith's argument on these issues.  First, Mr.
26  Goldsmith signed several QI forms that stated, "The undersigned custody account holder
27  declares that under US-taxation law he/she is the beneficial owner of the assets and income
28  therefrom to which this declaration refers."  Exhibit 11 to Petrila Decl., ECF No. 19-3 at

-16-

63, 65.  Second, like the taxpayer in *Norman*, Mr. Goldsmith (1) opened the Account, *see* R. Goldsmith Dep. at 34:2-6, 104:21-105:11; (2) actively managed the Account by directing Basler to maintain a growth strategy and "direct[ing] the people who were running the fund," *see id.* at 92:6-18; and (3) withdrew money to pay for rental cars, hotels, and meals related to his European travels, *see id.* at 40:20-41:5, 47:21-25.  Thus, these two contested facts do not, in fact, create a genuine issue of fact.  *Compare Banks v. Hayward*, 216 F.3d 1082 (9th Cir. 2000) (providing that "in evaluating a motion for summary judgment, the court 'may not make credibility determinations or weigh conflicting evidence,'" and instead, must believe the non-movant's evidence while drawing all justifiable inferences in his favor) *with Scott*, 550 U.S. at 380 (holding that a court should not adopt a version of the facts "blatantly contradicted by the record, so that no reasonable jury could believe it").  Here, no reasonable jury could believe Mr. Goldsmith did not own the Account in light of the evidence, including his own testimony, indicating otherwise.

In reply, the Government argues that in his opposition, Mr. Goldsmith does not dispute that he (1) personally visited Basler to withdraw money from the Account to cover his travel expenses during annual European vacations; (2) ordered cash withdrawn from the Account and hand-delivered to his son Michael, while Michael was in Switzerland; (3) paid to have his mail for the Account held in Switzerland and not sent to the United States; (4) knew the balance of the Account exceeded $10,000 during each of the years at issue; and (5) failed to disclose the existence of the Account on his federal tax returns as required by Schedule B to Form 1040 (which also directs taxpayers to the FBAR filing requirements).  Reply at 2:12-3:3; *see also* Oppo.

The Government also contends that Mr. Goldsmith does not dispute that he (1) knew the Account existed; (2) controlled the overall investment strategy of the Account, including by specifically directing Basler to divest any U.S. Securities held in the Account to avoid U.S. reporting requirements; and (3) did not disclose the Account's existence to his accountant despite Mr. Zipser asking Mr. Goldsmith and his wife to fill out and then discuss a form every year that specifically asked about foreign accounts.  Reply at 2:12-

-17-

3:3.  However, the Court finds that in his opposition, Mr. Goldsmith argued that (1) he "did not actively manage the account and . . . always relied on the advice of the bank's representatives on what investment programs to follow," Oppo. at 3:15-18 (citing R. Goldsmith Dep. at 58:6-8), and (2) "Mrs. Goldsmith completed the annual questionnaire on her own without her husband's involvement," *id.* at 2:18-24; *see also* FAC at 4, ¶¶ 16-17; Ans. at 3, ¶¶ 16-17; Exhibit 7 to Petrila Decl. at 35-40.  Thus, Mr. Goldsmith's Opposition did, in fact, dispute two of the three above facts.  However, the Court finds that again, the record contradicts Mr. Goldsmith's attempt to refute these facts.  *See, e.g.*, Exhibit 5 to Petrila Decl. at 31 (admitting that he did not disclose the Account to Mr. Zipser prior to July 1, 2011); Exhibit 11 to Petrila Decl. at 61-68 (describing Mr. Goldsmith as the beneficial owner of the Account while also showing Mr. Goldsmith made decisions about how the funds in the Account were invested).  As such, the Court finds these three additional facts undisputed as well.  *See Scott*, 550 U.S. at 380.

Finally, the Government argues that "[w]ith no material facts in dispute, the undisputed facts demonstrate that Defendant should have known there was a grave danger that he was not complying with reporting requirements and that he was in a position to easily find out whether that was the case."  Reply at 11:4-7.  Because "[t]hat is the standard that must be met for the imposition of a civil willfulness penalty under 31 U.S.C. § 5321(a)(5)," the Government contends the Court should enter judgment imposing penalties in its favor.  *Id.* at 11:7-9.

Where a non-moving party "fails to properly address another party's assertion of fact as required by Rule 56(c), the court may," *inter alia*, (1) "consider the fact undisputed for purposes of the motion" or (2) "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."  FED. R. CIV. P. 56(e).  As discussed below, the Court finds that first, Mr. Goldsmith has failed to show any genuine issues of fact exist in this case.  Second, those undisputed facts show that as a matter of law, Mr. Goldsmith's conduct qualifies as willful, thereby warranting penalties under 31 U.S.C. § 5321(a)(5) ("Section 5321(a)(5)").  In arriving at

-18-

1  this conclusion, the Court adopts the tests adopted by the Third, Fourth, and Eleventh
2  Circuits for whether a taxpayer's conduct qualifies as willful.

3       **A.    Mr. Goldsmith's Opposition Fails to Raise a Genuine Issue of Fact**

4       In his opposition, Mr. Goldsmith argues that the Court cannot grant summary
5  judgment because construing the facts in the light most favorable to him, there are five
6  issues of genuine fact. *See generally* Oppo.  The Government replies that Mr. Goldsmith's
7  opposition illuminates why there are no disputed material facts in this case because even
8  though "Defendant claims that certain facts are in dispute, he does not dispute the what,
9  where, when or how of any of the relevant facts."  Reply at 3:13-16.  Instead, Mr.
10 Goldsmith contends that his subjective belief regarding FBAR reporting requirements
11 creates genuine issues of fact.  *Id.* at 3:16-18.  However, "why" Defendant concealed the
12 Account is irrelevant to whether his concealment was reckless, and therefore, willful.  *Id.*
13 at 3:18-21.  For example, Mr. Goldsmith repeatedly explained that his recklessness in
14 failing to file FBARs should be excused because he did not believe he owned the Account;
15 however, as the Government points out, that "neither creates a material dispute nor
16 provides a defense against the evidence that Defendant's conduct was 'willful' because
17 improper motive is unnecessary to establish willfulness." *Id.* at 3:22-27.  The Court, after
18 analyzing each of the facts Mr. Goldsmith argues he disputes, finds that he does not, in
19 fact, dispute any of the facts relied on by the Government to argue it is entitled to judgment
20 as a matter of law.

21       **1.    *Mr. Goldsmith Fails to Show a Genuine Issue of Fact Exists as to Whether He Concealed the Swiss Account from his Tax Preparer***
22

23       The Government argues that Mr. Goldsmith concealed the Account from his tax
24 preparer, Mr. Zipser, because he failed to correctly respond to the annual questionnaire's
25 foreign account question.  Mot. at 6:24-7:13, 20:22-23.   Mr. Goldsmith disputes
26 "concealing" this fact for three reasons: First, Mr. Goldsmith contends that "all facts in the
27 record demonstrate that Mrs. Goldsmith completed the annual questionnaire on her own
28 without her husband's involvement and organized all the documentation that would be

provided to Mr. Zipser."  Oppo. at 2:18-24, 10:6-10 (citing M. Goldsmith Dep. 62:20-63:12).  Second, Mr. Goldsmith also testified that his wife was the one who took care of the questionnaire and he never did it.  *Id.* at 2:24-3:3:2, 10:11-12 (citing R. Goldsmith Dep. 81:12-15).  Third, Mr. Goldsmith argues he was unaware "that it was necessary to report the funds held by Basler Kantonalbank until he read the newspaper article about it."  Oppo. at 3:2-4 (citing Exhibit 5 to Mot., Defendant's Responses to Plaintiff's Interrogatories, ECF No. 19-3 at 25:15-23).  The Government replies that "[n]o matter who physically filled out the questionnaires, the evidence is incontrovertible that Defendant did not tell Mr. Zipser about the Account, when Mr. Zipser regularly put Defendant on notice of his obligation to inform his accountant of his foreign bank accounts."  Reply at 10:16-22.  The Government also notes that even if Mrs. Goldsmith filled out the questionnaire, Mr. Goldsmith still failed to inform Mr. Zipser about the Account when he "reviewed his actual income tax return."  *Id.* at 10:24-11:2 (citing H. Zipser Dep. at 26:1-7; R. Goldsmith Dep. at 84:9-18).

As to Mr. Goldsmith's first and second arguments, even if Mrs. Goldsmith completed the annual questionnaire, that questionnaire was sent to both parties and served to ensure that the tax returns for both Mr. and Mrs. Goldsmith were correct.  If he delegated the duty to collect relevant documentation to his wife, that delegation does not negate the fact that he failed to inform Mr. Zipser of the Account.  *See Price v. Comm'r*, 887 F.2d 959, 965 (9th Cir. 1989).  In fact, under the innocent spouse exception, a spouse signing an inaccurate joint tax return may seek relief for the tax consequences of those inaccuracies where he or she "did not know" or "had no reason to know" of the inaccuracy.  26 U.S.C. § 6015(b).[13]  Where, on the other hand, a spouse knows virtually all of the facts pertaining

---

[13]   Although the text of the statute is clear, the legislative history confirms the purpose of the statute: "Relief may be desirable, for example, where one spouse claims a phony business deduction in order to avoid paying tax and the other spouse has no reason to know *that* the deductions are phony and may be unaware that there are untaxed profits from the business which the other spouse has squandered."  *Price*, 887 F.2d at 964 (citing Supplemental Report of Comm. on Ways & Means, H.R. Rep. 98-432 (Pt. 2), on Tax Reform Act of 1984, H.R. 4170, at 1502 (1984), 1984 U.S. Code Cong. & Admin. News 1143) (original emphasis).

to the transaction underlying a tax inaccuracy, as was the case here, his or "her defense in essence is premised solely on ignorance of law." *Price*, 887 F.2d at 965. However, "[o]f itself, ignorance of the attendant legal or tax consequences of an item which gives rise to a deficiency is no defense for one seeking to obtain innocent spouse relief." *Price*, 887 F.2d at 965; *see, e.g.*, *Price v. Comm'r*, 53 T.C.M. (CCH) 1414 (T.C. 1987) (denying a wife's attempt to seek protection under the innocent spouse exception where she "admitted that she knew of the embezzled funds, but merely did not know that embezzled funds were taxable"); *Levin v. Comm'r*, 53 T.C.M. (CCH) 6, 8-9 (T.C. 1987) (holding that a spouse cannot claim innocent spouse protection "by simply turning a blind eye to—by preferring not to know of—facts fully disclosed on a return, of such a large nature as would reasonably put such spouse on notice that further inquiry would need to be made").

In this case, to the extent Mr. Goldsmith's argument attempts to argue protection under the innocent spouse exception, this argument fails as a matter of law. Courts considering whether a spouse has reason to know of an inaccuracy examine the following: "(1) the spouse's level of education; (2) the spouse's involvement in the family's business and financial affairs; (3) the presence of expenditures that appear lavish or unusual when compared to the family's past levels of income, standard of living, and spending patterns; and (4) the culpable spouse's evasiveness and deceit concerning the couple's finances." *Pietromonaco v. Comm'r*, 3 F.3d 1342, 1345 (9th Cir. 1993). Even assuming Mrs. Goldsmith completed the questionnaire, Mr. Goldsmith cannot claim protection as an innocent spouse. Even though neither party provides information regarding Mr. Goldsmith's education, the record indicates that first, Mr. Goldsmith maintained a high level of involvement in the family's financial affairs as evidenced by his (1) opening the Account, (2) withdrawing funds for the family's leisure and vacations, and (3) closing the Account. *See* R. Goldsmith Dep. at 34:2-6, 40:20-41:5, 45:24-47:1, 47:21-25, 104:25-105:8. Second, Mr. Goldsmith also participated in vacations throughout Europe and knew of the family's spending patterns. *Id.* at 47:21-25 (testifying "we would spend the money while we were there [in Europe]" on "hotels, . . . car rentals, . . . meals"); *but see id.* at

53:18-19, 54:6-11 (testifying "it was my account in my name, but it wasn't my money")). Thus, Mr. Goldsmith should have known that even if he did not read the tax returns, the amounts paid in taxes did not cover the income earned from the Swiss Account.

The fact that Mrs. Goldsmith completed the questionnaire does not create a genuine issue of fact as to whether Mr. Goldsmith failed to inform Mr. Zipser of the Account. More importantly, Mr. Goldsmith does not dispute the fact at hand (*i.e.*, that he did not disclose the Account to Mr. Zipser), only its consequences (*i.e.*, whether he should be held accountable for that failure). As to Mr. Goldsmith's point regarding a lack of awareness of his obligation to report the Swiss Account, this argument again, not only does not dispute the fact that he did not inform his tax preparer of the Account but also fails to prevent a finding of willfulness as a matter of law. *Norman*, 942 F.3d at 1116-17.

## 2. *Mr. Goldsmith Fails to Show a Genuine Issue of Fact Exists as to Whether He Informed Mr. Zipser About the Italian Account*

The Government also argues that "[w]hen Defendant opened an Italian bank account … he informed Mr. Zipser of that account and asked if it had to be reported." Mot. at 8:1-2. Although neither party fleshes out the relevance of this fact, the inference to be made is that by asking Mr. Zipser if he needed to report the Italian account, Mr. Goldsmith suspected foreign accounts needed to be reported to the IRS. Mr. Goldsmith responds that "[t]his again ignores that fact that Mrs. Goldsmith completed the annual questionnaire on her own without her husband's involvement and organized all the documentation that would be provided to Mr. Zipser." Oppo. at 4:10-13 (citing Exhibit 14 to Petrila Suppl. Decl., November 3, 2020 Deposition Transcript of Maxine Goldsmith, ECF No. 26-2 ("M. Goldsmith Dep.") at 62:20-63:12; R. Goldsmith Dep. at 81:12-15). Mr. Goldsmith argues that because his wife completed the questionnaire, "it is misleading to state that [he] was the one to inform Mr. Zipser of the Italian Account or that he asked any questions about whether or not it should be reported. Oppo. at 4:14-16. The argument he appears to be making is that if Mrs. Goldsmith, rather than Mr. Goldsmith, disclosed the Italian Account, knowledge of the obligation to report foreign accounts should not be imputed to Mr.

Goldsmith.  Not only is this argument belied by Mr. Goldsmith's own testimony that he did, in fact, tell Mr. Zipser about the Account, *see* R. Goldsmith Dep. at 88:5-11, 88:24-89:1, but it is also legally incorrect.   Regardless of who completed Mr. Zipser's questionnaire, Mr. Goldsmith is charged with knowledge of any tax returns he signs under penalty of perjury.  *See, e.g.*, *Kimble v. United States*, 991 F.3d 1238, 1242-43 (Fed. Cir. 2021) (*Kimble II*) ("[W]hether [the taxpayer] ever read her . . . tax return is of no import because '[a] taxpayer who signs a tax return will not be heard to claim innocence for not having actually read the return, as ... she is charged with constructive knowledge of its contents.'").   Further, just because he delegated the duty to respond to Mr. Zipser's questionnaire to Mrs. Goldsmith does not negate the fact that Mr. Goldsmith did not, in fact, inform Mr. Zipser of the Italian Account.  *Cf. Norman*, 942 F.3d at 1116 ("Actions can be willful even if taken on the advice of another.").

### 3.   *Mr. Goldsmith Fails to Show a Genuine Issue of Fact Exists as to Whether He Concealed Information from the Government*

The Government also argues that "Defendant's concealment of the Account from Mr. Zipser was part and parcel of Defendant concealing the Account from the U.S. government."  Mot. at 7:14-15.  In other words, the Government contends that Mr. Goldsmith concealed his Swiss Account from the IRS.  In his opposition, Mr. Goldsmith disputes this fact for two reasons: First, he argues that "[i]n his responses to interrogatories[, he] answered that 'he did not know that it was necessary to report the funds held by Basler Kantonalbank until he read the newspaper article about it.'"  Oppo. at 3:7-10 (citing Exhibit 5 to Mot., Defendant's Responses to Plaintiff's Interrogatories, ECF No. 19-3 at 25:15-23).  Second, he notes that in the same responses, he indicated that "the income derived from this account during the tax years at issue only amounted 0.22% of Mr. Goldsmith's overall taxable income during these years."  *Id.* at 3:10-13 (citing Exhibit 5 to Mot., Defendant's Responses to Plaintiff's Interrogatories, ECF No. 19-3 at 26:5-10).  Both of these points are arguments, not facts, and Mr. Goldsmith never disputes that he did not, in fact, inform the IRS of the Account.  Rather, he appears to dispute the

-23-

characterization of his failure to inform the IRS as "concealment."  However, whether his failure to report the Account to the IRS qualifies as concealment is an issue of law, not fact. Further, as previously noted, Mr. Goldsmith's defense of ignorance of the law is not a defense.  *Price*, 887 F.2d at 965.  Thus, Mr. Goldsmith has failed to show a genuine issue of fact exists as to the fact that he did not inform the IRS of the Swiss Account.

### 4. *Mr. Goldsmith Fails to Show a Genuine Issue of Fact Exists as to Whether He Controlled the Account*

The Government contends that Mr. Goldsmith "also made decisions regarding how the money in the Account was invested." Mot. at 9:6-7.  Mr. Goldsmith disputes this fact for two reasons: First, he argues that he testified at his deposition that he "did not actively manage the account and he always relied on the advice of the bank's representatives on what investment programs to follow."  Oppo. at 3:15-18 (citing R. Goldsmith Dep. 58:6-8).  Second, he points out that he also stated in his response to Interrogatory No. 9 that he (1) "left all decisions regarding the investments to Basler Kantonalbank because he had no interest in how it was managed" and (2) "the income derived from this account during the tax years at issue only amounted to 0.22% of Mr. Goldsmith's overall taxable income." Oppo. at 3:18-24 (citing Exhibit 5 to Mot., Defendant's Responses to Plaintiff's Interrogatories, ECF No. 19-3 at 26:5-9).

Mr. Goldsmith's arguments are unpersuasive.  His deposition testimony indicates he participated in the making of decisions regarding the Account.  Again, Mr. Goldsmith testified that he (1) directed the individuals at Basler, R. Goldsmith Dep. at 92:14-18; (2) decided whether to spend the funds in the Account on charitable causes or his family's travels through Europe, *id.* at 47:21-48:12; and (3) directed Basler as to what type of investor profile to apply to his Account, *id.* at 92:6-13.  He also testified that he recalled Basler suggesting investment in a Japanese railroad and Mr. Goldsmith "figured that as long as we made some money out of it, why not."  *Id.* at 58:9-15.  The Ninth Circuit has reiterated that "[a] deposition is not a take home examination." *Hambleton Bros. Lumber Co. v. Balkin Enters.*, 397 F.3d 1217, 1225 (9th Cir. 2005).  "Allowing a deponent to alter

-24-

testimony through after-the-fact changes (potentially in consultation with [his] attorney) would undermine these well-settled deposition rules, effectively permitting the substitution of interrogatory answers for deposition testimony and permitting attorneys to alter the deponent's testimony." *ViaSat, Inc. v. Acacia Communs., Inc.*, No. 16cv463 BEN (JMA), 2018 U.S. Dist. LEXIS 25357, at *9-10 (S.D. Cal. Feb. 15, 2018).  Thus, Mr. Goldsmith cannot attempt to create an issue of fact by contradicting his own unfavorable deposition testimony, given under oath, with his interrogatory responses that were prepared with the assistance of counsel.  *See, e.g.*, *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1008 (9th Cir. 1998) ("A party cannot create a triable issue of fact, and thus survive summary judgment, merely by contradicting his or her own sworn deposition testimony with a later declaration.").  Finally, Mr. Goldsmith fails to explain his argument that "the income derived from this account during the tax years at issue only amounted to 0.22% of Mr. Goldsmith's overall taxable income." Oppo. at 3:18-24.  It is unclear whether he is trying to argue he was not obligated to report his foreign accounts due to the percentage of income they represented or whether the argument is that because the unreported income was only approximately one-fiftieth of his income, it should be understandable that he overlooked it.  Either way, the argument is both unpersuasive and does not refute the fact that Mr. Goldsmith had some control over the Account as evidenced by the fact that he had the ability to close the Account.

Again, despite his arguments to the contrary, the Court finds that the record in this case indicates Mr. Goldsmith both owned and controlled the Account.  First, upon inheriting the Account, he transferred them to a new Swiss, numbered bank account.  *See* Mot. at 4:6-9, 5:27-28, 6:3-6 (citing R. Goldsmith Dep. at 34:2-6, 104:25-105:8); *see also* FAC at 3, ¶ 12 (pleading that Mr. Goldsmith "became the title holder to a Basler Kantonalbank account containing the inherited funds and ending in number 8171" as well as "owned and managed the Basler Account, and personally used and profited from the funds in the Basler Account") *with* Ans. at 3, ¶ 12 (admitting that he became the title holder to the Account, owned the Account, personally used the Account, and profited from the

-25-

Account but denying that he "managed the Basler Account").  Second, by signing the QI forms, he also managed the Account by deciding whether it invested in U.S. securities or not.  *See* Exhibit 11 to Petrila Decl. at 61.  Third, Mr. Goldsmith helped decide how the funds in the Account were invested.   R. Goldsmith Dep. at 58:9-15, 92:6-18.  Fourth, on April 25, 2012, Mr. Goldsmith closed the Basler Account, FAC at 6, ¶ 28; *see also* Ans. at 4, ¶ 28, which he could not have done if he did not manage, or at least own, the Account.

Thus, Mr. Goldsmith has failed to show a genuine issue of fact exists as to whether he controlled the Account.

### 5.     *Mr. Goldsmith Fails to Show a Genuine Issue of Fact Exists as to Whether He Chose to Divest U.S. Securities*

The Government argues that "on August 29, 2000, Basler gave Defendant a choice between disclosing his account to the IRS and divesting all U.S. securities, and Defendant chose to divest the securities rather than disclose the Account to the IRS."  Mot. at 9:22-10:16.  It also notes that that "Defendant signed multiple forms describing Defendant as the beneficial owner of the account, a U.S. taxpayer, and referencing U.S. reporting obligations, but did nothing to investigate what tax and reporting obligations he was under."  *Id.* at 17:15-18.

First, Mr. Goldsmith attempts to dispute this fact by arguing he testified at his deposition that he (1) "just signed the documents that they advised me to sign" and (2) only "skimmed" the documents he signed and was not even sure what he was signing.  Oppo. at 3:28-4:7, 8:17-22 (citing R. Goldsmith Dep. 67:22-68:20).  However, these points only address whether Mr. Goldsmith should be held liable for signing the forms but does not dispute the fact at issue: Mr. Goldsmith signed forms choosing to divest himself of U.S. securities rather than reporting the Account to the IRS.  Thus, this fact is not in dispute.  While Mr. Goldsmith disputes whether he should be charged with the knowledge of documents he signed, this issue is an issue of law, and as a matter of law, a party may not avoid the consequences of an agreement by claiming he or she did not read the entire agreement.  *See, e.g.*, *Oregon-Pac. Forest Prod. Corp. v. Welsh Panel Co.*, 248 F. Supp.

903, 908 (D. Or. 1965) (providing that "[i]t is no defense that a party, seeking to avoid the contract, did not read it"); *Conyer v. Hula Media Servs., LLC*, 53 Cal. App. 5th 1189, 1197 (2020), *review filed* (Oct. 5, 2020) (noting that "[i]t has long been the rule in California that a party is bound by a contract even if he did not read the contract before signing it").

Second, Mr. Goldsmith also attempts to dispute this fact by arguing that he stated in his response to Interrogatory No. 9 that he "left all decisions regarding the investments to Basler Kantonalbank because he had no interest in how it was managed." Oppo. at 8:22-24 (citing Exhibit 5 to Petrila Decl., Defendant's Responses to Plaintiff's Interrogatories, ECF No. 19-3 at 26:5-9). Again, this argument does nothing to dispute that he did, in fact, sign the QI forms divesting himself of U.S. securities. Further, like his previous argument, this argument fails to provide a defense to Mr. Goldsmith. Delegating authority does not alleviate a taxpayer of responsibility. *See, e.g.*, *Norman*, 942 F.3d at 1116 ("Actions can be willful even if taken on the advice of another."); *Jones v. United States*, No. SACV1900173JVSRAO, 2020 WL 4390390, at *7 (C.D. Cal. May 11, 2020) (noting that "reliance by a lay person on an accountant or attorney 'cannot function as a substitute for compliance with an unambiguous statute.'").

In sum, Mr. Goldsmith argues that "[l]ooking at these facts in the light most favorable to Defendant, if he never understood, completely read what he was signing, or made determinations on how the form was to be filled out, instead relying on the bank's representatives, he would not have been alerted to the fact that he needed to investigate what tax and reporting obligations he was under." Oppo. at 8:24-28. As stated, this argument does not dispute the fact at hand; rather, it disputes whether he should be held liable for his tax violations ***due to*** the fact at hand. However, the law is clear that he should be held liable.

Having established that Mr. Goldsmith's opposition does not, in fact, dispute any of the facts in this case but rather merely disputes whether he may be held liable for those facts as a matter of law, the Court finds this case appropriate for summary judgment as no facts remain in dispute. Thus, the Court proceeds to analyze Mr. Goldsmith's liability

1   under the now-established undisputed facts of this case.

2       **B.**   <u>**Liability**</u>

3       In order to find a taxpayer liable for a willful violation under Section 5321(a)(5), the

4   United States must prove, by a preponderance of the evidence, that the taxpayer (1) is a

5   U.S. citizen, resident alien, or entity created under United States law; (2) had an interest in,

6   or authority over a foreign financial account; (3) had a balance exceeding $10,000.00 at

7   some point during the reporting period in the foreign financial account; and (4) willfully

8   failed to disclose the account and file a FBAR.  *Jones*, 2020 WL 4390390 at * 5 (citing 31

9   U.S.C. §§ 5314, 5321(a)(5)(A); 31 C.F.R. §§ 1010.350(a) and (b)).  Consequently, the

10  Government argues that the Court should grant summary judgment that Mr. Goldsmith's

11  failure to file his FBARs was willful under Section 5321 so long as it shows that Mr.

12  Goldsmith (1) was a "U.S. Person," who (2) had an interest in or authority over the Swiss

13  Account, which (3) had an aggregate value of $10,000.00 or more, and (4) that he willfully

14  failed to file an FBAR Form for the accounts.  Mot. at 14:6-11 (citing *United States v.*

15  *Pomerantz*, No. C16-0689-JLR, 2017 WL 2483213, at *5 (W.D. Wash. June 8, 2017)).

16      The Government points out that it has already established the first three elements:

17  First, the operative complaint pleads that Mr. Goldsmith was a U.S. citizen during the

18  pertinent time period, *see* FAC at 7, ¶ 29, and Mr. Goldsmith's Answer admitted those

19  allegations, *see* Ans. at 4, ¶ 29.  Second, Paragraph 30 of the Amended Complaint pleads

20  that "[d]uring the calendar years 2008, 2009 and 2010, Defendant had a financial interest,

21  within the meaning of 31 C.F.R. § 1010.350(e), over the Basler Account," which was "a

22  bank account in a foreign country."  FAC at 7, ¶¶ 30-31.  Mr. Goldsmith has admitted to

23  these allegations as well.  *See* Ans. at 4, ¶¶ 30-31.  Third, Defendant has also admitted that

24  "[d]uring each of the calendar years 2008, 2009 and 2010, the balance of the foreign

25  accounts in which defendant had a reportable interest exceeded $10,000."  FAC at 7, ¶ 32;

26  *see also* Ans. at 4, ¶ 32.  In fact, Mr. Goldsmith confirmed the balances were in excess of

27  $275,000.00 during each relevant year.  *See* Exhibit 5 to Petrila Decl., Defendant's

28  Responses to Plaintiff's Interrogatories, at 25:1-12.  Thus, the Government has established

-28-

that (1) Mr. Goldsmith is a U.S. Person, who (2) had an interest in or authority over foreign bank accounts in the years 2008, 2009, and 2010, which (3) had an aggregate value of $10,000.00 or more.  Mot. at 14:13-17 (citing Ans. at ¶¶ 7, 23).

As to the fourth and final element, the Amended Complaint pleads that "Defendant failed to timely file an FBAR with regard to the 2008, 2009 and 2010 calendar years as required by 31 U.S.C. § 5314 and 31 C.F.R. § 1010.306(c)."  FAC at 3, ¶ 7, 5-6, ¶ 23, 7, ¶ 33; *see also* Ans. at 2, ¶ 7, 4, ¶ 23.  Mr. Goldsmith admits the failure to file these reports. *See also* Ans. at 4, ¶ 33.  Thus, the IRS assessed a civil penalty for those years.  Mot. at 14:1-18.  However, the Amended Complaint also alleges that "[t]he failure of Defendant to timely file an FBAR with regard to the 2008, 2009 and 2010 calendar years was willful within the meaning of 31 U.S.C. § 5321(a)(5)."  FAC at 7, ¶ 34.  Mr. Goldsmith, although admitting to failing to file a FBAR, denies the willful nature of his failure.  *See, e.g.*, Ans. at 4, ¶ 34 (pleading that "Defendant denies the allegations contained in Paragraph 34 of Plaintiff's Amended Complaint.").  As a result, the sole remaining issue in dispute in this case is whether that failure qualifies as willful.

"Penalties for violations of 31 U.S.C. § 5314 and 31 C.F.R. § 1010.350 are provided in 31 U.S.C. § 5321(a)(5)."  *United States v. Toth*, No. 15-CV-13367-ADB, 2019 WL 7039627, at *6 (D. Mass. Dec. 20, 2019).  If the Court finds Mr. Goldsmith's Section 5314 violation willful, Section 5321(a)(5) provides for enhanced penalties.  *Id.* (citing 31 U.S.C. § 5321(a)(5)(C)).  However, "Section 5321(a)(5) does not define how to assess whether an individual acted willfully in his failure to comply with the reporting requirements imposed by § 5314."  *United States v. McBride*, 908 F. Supp. 2d 1186, 1204 (D. Utah 2012). "'[W]illfully' is a 'word of many meanings whose construction is often dependent on the context in which it appears.'" *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007) (quoting *Bryan v. United States*, 524 U.S. 184, 191 (1998)).

In the context of criminal penalties for willful violations of 31 U.S.C. § 5324's reporting requirements, *see* 31 U.S.C. § 5322, the Supreme Court has held that in order "[t]o establish that a defendant 'willfully violated' the antistructuring law, the Government

must prove that the defendant acted with knowledge that his conduct was unlawful," *see Ratzlaf v. United States*, 510 U.S. 135, 136-37 (1994). *See also Safeco*, 551 U.S. at 68, n.18 ("Unlike civil recklessness, criminal recklessness also requires subjective knowledge on the part of the offender."). For example, in *Ratzlaf*, the Government sought criminal penalties pursuant to 31 U.S.C. § 5322 for violations of 31 U.S.C. § 5313, which similar to Section 5314, requires banks and financial institutions to file reports whenever involved in a domestic cash transaction exceeding $10,000.00. 510 U.S. at 137. The Supreme Court held that "willfulness" meant that "the defendant acted with knowledge that his conduct was unlawful," meaning he intentionally violated "a known legal duty." *Id.* Thus, in the criminal-FBAR context, a knowing violation requires actual knowledge of the FBAR reporting requirement and a specific intent to commit the crime. *Id.* at 141. This is the standard Mr. Goldsmith contends should apply in this case. *See* Oppo. at 7:4-21.

In this case, however, because the Government seeks penalties pursuant to 31 U.S.C. § 5321(a)(5), which imposes civil (as opposed to criminal) penalties for willful violations but does not define willfulness, "the applicable definition of willfulness is that which has been used in other civil contexts, including civil tax collection matters and compliance with reporting requirements." *McBride*, 908 F. Supp. 2d at 1204. Neither the Supreme Court nor the Ninth Circuit have set forth the requirements for establishing a willful violation of the Act in the civil context. Oppo. at 5:24-26 ("On the issue of willfulness with respect to FBAR violations in the civil context, there is no controlling case law from the Ninth Circuit or the Southern District of California and therefore, this is an issue of first impression for this Court."); Reply at 6:14-20 (noting that "the Ninth Circuit has yet to apply the civil willfulness standard in the FBAR context" but citing to three cases from the Central District of California that had done so) (citing *United States v. Zimmerman*, No. 2:19-CV-4912-CAS-EX, 2020 WL 6065333 (C.D. Cal. Sept. 16, 2020); *United States v. Bohanec*, 263 F. Supp. 3d 881 (C.D. Cal. 2016); *Jones v. United States*, No. CV1904950JVSRAOX, 2020 WL 2803353 (C.D. Cal. May 11, 2020)). Thus, this Court looks to Supreme Court cases interpreting willfulness with respect to other civil statutes as well as other federal courts

interpreting Section 5321.

In the analogous context of violations of the Fair Credit Reporting Act ("FCRA"), the United States Supreme Court has held that reckless action violating the FCRA is covered by this willful requirement.  *Safeco*, 551 U.S. at 52, 57 (noting that "where willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well"); *cf. United States v. Illinois Central R. Co.,* 303 U.S. 239, 242-43 (1938) ("willfully" includes "conduct marked by careless disregard whether or not one has the right to so act") (citation omitted)); *see also Bedrosian v. United States et al.*, 912 F.3d 144, 152 (3d Cir. 2018) (holding that for the purposes of civil FBAR penalties, willfulness incorporates recklessness).  In doing so, the Court noted that "[w]hile 'the term recklessness is not self-defining,' the common law has generally understood it in the sphere of civil liability as conduct violating an objective standard: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'"  *Safeco*, 551 U.S. at 68; *see also* Mot. at 13:9-26 (quoting *Safeco*).  Thus, civil recklessness requires proof of something more than mere negligence: "It is [the] high risk of harm, objectively assessed, that is the essence of recklessness at common law."  *Safeco*, 551 U.S. at 69.  "Therefore, 'willfulness' may be satisfied by establishing the individual's reckless disregard of a statutory duty, as opposed to acts that are known to violate the statutory duty at issue."  *McBride*, 908 F. Supp. 2d at 1204 (citing *Safeco*, 551 U.S. at 57).  "An improper motive or bad purpose is not necessary to establish willfulness in the civil context."  *Id.*; *see also* Mot. at 14:16-19 (citing same).

While reckless conduct satisfies the willfulness standard, the Supreme Court also recently held that willful blindness also meets the willfulness requirement in civil case.  *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 760-61, 766 (2011).  In *Global-Tech*, the Supreme Court held that induced patent infringement under 35 U.S.C. § 271(b) "requires knowledge that the induced acts constitute patent infringement."  *Id.*  Instead of proving actual knowledge that the induced acts infringe, the Supreme Court held that "willful blindness" could satisfy the knowledge requirement, where the defendant (1)

subjectively believed there was a high probability that a fact exists and (2) takes deliberate actions to avoid learning of that fact. *Id.* at 769.  In doing so, the Court acknowledged that where criminal statutes have required that a defendant acted willfully, courts have applied "the doctrine of willful blindness [to] hold that defendants cannot escape the reach of these statutes by deliberately shielding themselves from clear evidence of critical facts that are strongly suggested by the circumstances." *Id.* at 766.  "Given the long history of willful blindness and its wide acceptance in the Federal Judiciary," the Court saw "no reason why the doctrine should not apply in civil lawsuits for induced patent infringement under 35 U.S.C. § 271(b)." *Id.* at 768.

Although disjointed, the sum result of the relevant caselaw interpreting the willfulness standard for FBAR-reporting violations is that a willful violation may be found where the violation results from conduct qualifying as either (1) knowing and intentional or (2) reckless, including due to willful blindness. *United States v. DeMauro*, 483 F. Supp. 3d 68, 82 (D.N.H. 2020).  The Government bears the burden of proving willfulness under either theory by a preponderance of the evidence. *Bedrosian*, 912 F.3d at 153.  Willful intent may be proven by circumstantial evidence and reasonable inferences drawn from the facts given direct proof of the taxpayer's intent is rarely available. *Spies v. United States*, 317 U.S. 492, 499 (1943).  Courts may infer willfulness from (1) "conduct meant to conceal or mislead sources of income or other financial information" or (2) "a conscious effort to avoid learning about reporting requirements." *United States v. Sturman*, 951 F.2d 1466, 1476 (6th Cir. 1991) (citing *Spies*, 317 U.S. at 499; *United States v. Bank of New England, N.A.*, 821 F.2d 844, 855 (1st Cir.), *cert. denied,* 484 U.S. 943 (1987)); *see also Bohanec*, 263 F. Supp. 3d at 890, n.2.  Examples of conduct allowing an inference of willfulness include keeping a duplicate set of books; making false entries, invoices, or documents; destroying records or books; concealing assets or income; or "handling of one's affairs to avoid making the records usual in transactions of the kind." *Spies*, 317 U.S. at 499 (1943); *see also United States v. Williams*, 489 Fed. App'x 655, 659 (4th Cir. 2012) (holding that where the defendant signed his tax return, "made a 'conscious effort to

-32-

avoid learning about reporting requirements," and submitted "false answers on both the tax organizer and his federal tax return," his "conduct . . . was 'meant to conceal or mislead sources of income . . . ,'" constituting "willful blindness to the FBAR requirement"); *see also McBride*, 908 F. Supp. 2d at 1204-05 (inferring willfulness from the taxpayer's signature on his tax returns indicating constructive knowledge of relevant tax statutes).

Mr. Goldsmith argues this Court should deny the Government's Motion because "the Ninth Circuit has held that the issue of whether a person has willfully failed to comply with a tax reporting requirement is a question of fact." Oppo. at 7:14-17. The Government replies that even though willfulness is a question of fact, "courts have decided the question on summary judgment where, as here, the undisputed facts showed that the civil willfulness standard was satisfied." Reply at 5:6-17 (citing, *inter alia*, *Kimble II*, 991 F.3d at 1241-42 (affirming the Court of Federal Claims' decision granting summary judgment against the defendant on the issue of willfulness because "based on the undisputed facts," her "actions constituted a 'reckless disregard' for the legal duty to disclose foreign bank accounts and . . . was therefore 'willful' under § 5321(a)(5)"); *United States v. Kelley-Hunter*, 281 F. Supp. 3d 121, 124 (D.D.C. 2017) (granting summary judgment and awarding civil penalties for willful violations where there was no dispute that during the relevant time period, the defendant was a U.S. citizen, had a clear interest in the foreign account, the balance of which easily exceeded the $10,000.00 threshold, and did not disclose the account for the relevant tax year)).

The Court finds that while a genuine issue of fact exists as to whether Mr. Goldsmith's violations were knowing, no genuine issue of fact exists as to whether his conduct was reckless and willfully blind. Thus, as shown below, the Government has proven that no genuine issue of fact exists as to whether Mr. Goldsmith's conduct qualifies as willful so as to warrant a penalty under 31 U.S.C. § 5321(a)(5).

### 1. *A Genuine Issue of Fact Exists as to Whether Mr. Goldsmith Had Actual Knowledge of the FBAR Requirements*

Courts have held that "an intentional violation of a legal duty to report" a foreign

account qualifies as "a 'willful' failure for purposes of the Bank Secrecy Act." *United States v. Pomerantz*, No. C16-689 MJP, 2017 WL 4418572, at *3 (W.D. Wash. Oct. 5, 2017); *see also   Lefcourt v. United States*, 125 F.3d 79, 83 (2d Cir. 1997) (defining "willfulness" in the context of a civil penalty for willfully failing to disclose required information to the IRS as conduct that 'requires only that a party act voluntarily in withholding requested information, rather than accidentally or unconsciously'"); *accord Denbo v. United States,* 988 F.2d 1029, 1034-35 (10th Cir. 1993) (defining "willful" conduct as a "voluntary, conscious and intentional decision").

The Government argues that Mr. Goldsmith's subjective belief that he did not own the Account does not create a genuine issue of fact because the Court can still find a willful violation regardless of his subjective belief. Mot. at 22:1-4. In fact, the Government points out that the evidence of willfulness in this case surpasses evidence in other cases where the court also found the defendant's behavior willful. *Id.* at 22:4-18 (citing *United States v. Kalai*, 696 Fed. App'x 228, 231 (9th Cir. 2017) (upholding a jury's determination in the criminal context that failure to file an FBAR was willful because the defendant knew the foreign account held more than $10,000, had signatory authority over the account, and was informed of at least one transfer of funds). Indeed, courts confronting evidence similar to the evidence in this case have granted summary judgment on the issue of willfulness. *See Rum*, 2019 WL 3943250, at *8 (granting summary judgment where taxpayer's "pattern of signing his tax returns without reviewing them, along with falsely answering 'no' to question 7(a) suffices to support a finding of willfulness"); *Horowitz*, 978 F.3d at 384 (affirming summary judgment on evidence that the taxpayers set their account up as a numbered account with "hold mail" service, kept a not insignificant amount of money in the account, and as a result, were aware of it but failed to disclose it to their accountant, resulting in them falsely answering question 7(a) under penalty of perjury). However, Mr. Goldsmith argues that the position advocated by the Government would "water down the willfulness standard by suggesting that the only way to avoid a willfulness penalty after signing a tax return under penalties of perjury would be to argue that 'he or she did not

-34-

know about the foreign account.'"  Oppo. at 8:7-10 (citing Mot. at 17:13).

In sum, Mr. Goldsmith argues that holding that a taxpayer liable for FBAR violations regardless of subjective knowledge or intent "would render [the] different categories of intent under section 5321 meaningless." Oppo. at 8:6-7.  Under the rule against surplusage, courts must avoid interpreting statutes in a manner that would render a portion of the statute superfluous or meaningless.  *See, e.g.*, *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 632 (2018) ("Absent clear evidence that Congress intended this surplusage, the Court rejects an interpretation of the statute that would render an entire subparagraph meaningless" as "the Court is 'obliged to give effect, if possible, to every word Congress used.'"); *see also Jackson v. Kelly*, 557 F.2d 735, 740 (10th Cir. 1977) ("We should not and do not suppose that Congress intended to enact unnecessary statutes.").  Here Mr. Goldsmith argues that the Government's position would result in "only two possible penalty outcomes[:] . . . either a significant willfulness penalty or no penalty at all under the reasonable cause exception," which "would ignore the presumed 'non-willful' penalty assertion outlined in the statute."  Oppo. at 8:10-13.  If the Court agrees that interpreting willfulness to disregard subjective intent or knowledge renders the categories of intent within Section 5321 (*i.e.*, the differing penalties for non-willful violations, violations falling under the reasonable cause exception, and willful violations) meaningless, the Court must avoid that interpretation.  However, the Government's proposed interpretation does not, in fact, make the categories of intent superfluous or create a strict liability standard as Mr. Goldsmith contends.  Rather, even if a taxpayer signed a federal income tax Form 1040 under penalty of perjury, the failure to file an FBAR could still be non-willful if "a taxpayer did not know about, and had no reason to know about, [his or] her overseas account." *Jones*, 2020 WL 2803353, at *6.

The Government replies that while in the criminal context, it would need to prove that Mr. Goldsmith knew his failure to report the foreign accounts was unlawful, "in the civil context, the government does not need to prove knowledge that conduct was unlawful to prove willfulness."  Reply at 3:4-9.  It also notes that (1) Mr. Goldsmith "cites no

authority for [his] positions, and the distinctions he draws fail to articulate why the civil meaning of willfulness, as articulated by the Supreme Court, does not apply here," *id.* at 6:2-4; (2) Mr. Goldsmith's standard would mean "the issue of willfulness can never be determined on a motion for summary judgment," *id.* at 6:5-12; and (3) even if it cannot prove actual knowledge, the undisputed facts viewed in the light most favorable to Mr. Goldsmith still establish recklessness, meaning the Government proves willfulness regardless of whether it proves actual knowledge or intent, *id.* at 3:9-12.

If courts required the Government to prove a knowing violation in order to recover civil penalties, such penalties would rarely be recovered because taxpayers rarely admit that to knowingly violating the law. *See, e.g.*, *United States v. Ott*, 441 F. Supp. 3d 521, 529 (E.D. Mich. 2020) ("In the objective willfulness inquiry, a court may consider 'circumstantial evidence and reasonable inferences drawn from the facts because direct proof of the taxpayer's intent is rarely available.'"). Although Mr. Goldsmith claims he did not believe he owned the Account, this does not prevent the Court from granting summary judgment because the Court has already established this contention is refuted by the record in this case. Further, courts in similar situations have found willfulness in the face of a defendant's denial of ownership of the foreign bank account. *See, e.g.*, *Norman*, 942 F.3d at 1116 (affirming a decision finding a taxpayer's Section 5314 violation willful where she denied the money in the Swiss account was hers or that she had control over it, but the evidence showed "[s]he opened the account in 1999, actively managed the account for many years, and even withdrew money from the account in 2002"). Thus, the Government argues that "Defendant's explanation that he did not believe that he owned the Account, and thus that the Court should excuse his failure to file FBARs or pay taxes on the Account does not create a material issue of fact considering Defendant's complete control over the Account including use of the Account for his own personal benefit." Mot. at 22:25-23:5.

Both parties discuss the case of *United States v. Pomerantz*, No. C16-0689JLR in the context of whether willfulness requires a taxpayer to know his or her actions violate

the law.  However, the Government cites one opinion in the case granting a motion to dismiss failure to state a claim, *see* Mot. at 21 and Reply at 7 (citing *United States v. Pomerantz*, No. C16-0689JLR, 2017 WL 2483213, at *6-7 (W.D. Wash. June 8, 2017) (*Pomerantz I*)), while Mr. Goldsmith cites another opinion, denying a motion to dismiss the subsequent amended complaint, Oppo. at 7 (citing *United States v. Pomerantz*, No. C16-689 MJP, 2017 WL 4418572, at *7 (W.D. Wash. Oct. 5, 2017) (*Pomerantz II*).  In any event, neither *Pomerantz I* nor *Pomerantz II* warrant the Court finding subjective intent is required for a willful violation.

The *Pomerantz I* court held that the Government's allegations that the defendant's failure to timely file FBAR forms was willful, implying that the defendant had either constructive or actual knowledge, were nothing more than "threadbare recitals of the elements of a cause of action."  2017 WL 2483213 at *6.  Such allegations did "not plausibly support the inference that Mr. Pomerantz knew of the reporting duty" because the Government never alleged that he had ever filled out a Schedule B Form or even knew of its contents and instructions regarding the FBAR reporting requirement.  *Id.* at *6-7. Thus, even though "[a]ctual knowledge of the duty to report may be inferred from a course of conduct" or constructive knowledge, knowledge of the FBAR reporting requirement could not be inferred from the defendant's prior completion of Schedule B as the Government had not alleged the defendant completed one in the past.  *Id.*  As a result, the Government failed to sufficiently plead that any failure to report regarding the foreign accounts was willful.  *Id.*  However, the Government amended its complaint, and in *Pomerantz II*, 2017 WL 4418572 at *3, the district court held that "[t]he Government's amended complaint . . .  [pled] sufficient factual content to allow the Court to draw the reasonable inference that the defendant willfully failed to file FBAR Forms for the CIBC Accounts." 2017 WL 4418572 at *3.  The amended complaint alleged the defendant failed to timely file FBAR Forms, reporting his interest in foreign bank accounts for the 2001, 2002, and 2005 tax years.  2017 WL 4418572 at *3.  The court concluded that the Government's allegation that the defendant signed tax returns in later years reporting the

income from the foreign bank accounts when the income was less significant while failing to report it in the years they had higher account balances supported an inference that the defendant acted with knowledge that his conduct was unlawful.  *Id.*

The Government cites to *Pomerantz I* for the proposition that "[a]ctual knowledge of the duty to report may be inferred from a course of conduct that demonstrates a conscious attempt to conceal the failure to report."  Mot. at 21:3-8 (citing *Pomerantz I*, 2017 WL 2483213, at *6).  It argues that Mr. Goldsmith's "purposeful attempts to conceal the Basler account from his tax preparer and the IRS" qualify as a course of conduct evidencing Mr. Goldsmith's willfulness in failing to timely file required FBARs.  *Id.*  Mr. Goldsmith responds by pointing out that the *Pomerantz II* court also stated that "a 'willful' failure for purposes of the Bank Secrecy Act is 'an intentional violation of a known legal duty to report.'"  Oppo. at 7:9-14 (citing *Pomerantz II*, 2017 WL 4418572 at *7).  Thus, he contends the Government must show he intentionally violated a known duty to report his foreign accounts in order to be found liable for willful violations.  *See id.*  However, other than a non-binding district court case from the Southern District of Florida and an IRS chief counsel advisory opinion addressing the definition of "willful" in relation to civil penalties for FBAR reporting violations, the case *Pomerantz II* cited for the proposition, *Ratzlaf*, 510 U.S. at 154, n.5, is a criminal case addressing penalties under Section 5322 (covering criminal violations) rather than under Section 5321 (covering civil penalties). *See id.*  The Government replies that Mr. Goldsmith's "attempt to distinguish *Pomerantz* is unavailing."  Reply at 7:11.  It points out that the *Pomerantz I* court recognized that knowledge of a duty to report may be actual or constructive, while suggesting that if the Government had alleged the defendant filed his tax returns under penalty of perjury, then Schedule B would have put him under inquiry notice of his duty to file an FBAR.  Reply at 7:11-16 (citing *Pomerantz I*, 2017 WL 2483213 at *6).  The Government also notes that in *Pomerantz II*, "the later decision that Defendant cited to, the Court denied Pomerantz's motion to dismiss and approvingly cites *United States v. McBride* and *Williams* for the proposition that signing tax returns under penalty of perjury puts the taxpayer on inquiry

-38-

1  notice of the need to file an FBAR such that a willfulness penalty is appropriate."  Reply

2  at 7:16-21 (citing *Pomerantz II*, 2017 WL 4418572, at *3).

3         This Court finds that both *Pomerantz I* and *Pomerantz II* involved motions to dismiss

4  in which the sufficiency of the facts pled in the complaint were evaluated under the

5  *Twombly*/*Iqbal* standard, which evaluates whether the facts pled, if true, state a claim for

6  relief.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550

7  U.S. 544, 570 (2007).  Thus, *Pomerantz* is procedurally inapposite to this case, which

8  involves a motion for summary judgment evaluating whether the moving party is entitled

9  to judgment as a matter of law.  *See* FED. R. CIV. P. 56.  More importantly, *Pomerantz* does

10  not change this Court's conclusion that the law does not require actual knowledge of the

11  FBAR reporting requirements or that one's conduct violates those requirements in order

12  for a court to find a defendant liable for a willful violation for civil penalties under Section

13  5314.

14         As the Government correctly points out, Mr. Goldsmith "wants this Court to adopt

15  a test that requires the government to prove his subjective intent, but that is the criminal

16  standard for willfulness, not the civil standard applicable here."  Reply at 7:22-24.  If

17  subjective intent represented the legal standard in civil cases, taxpayers could refrain from

18  reporting foreign income, and then, seek to avoid civil penalties by ignoring Section 5314

19  and subsequently claiming ignorance of the law.  *Id.* at 7:24-26.  Thus, while actual

20  knowledge may show a willful violation, it is not required.  In this case, Mr. Goldsmith has

21  shown a genuine issue of fact exists as to whether he had actual (as opposed to constructive)

22  knowledge of the FBAR reporting requirements during the years at issue or intentionally

23  violated such requirements.  Accordingly, the Court continues on to evaluate whether the

24  Government can show the absence of a genuine issue of fact as to whether Mr. Goldsmith's

25  conduct rose to the level of recklessness, thereby qualifying as willful.

26         **2.    *A Genuine Issue of Fact Does Not Exist as to Whether Mr. Goldsmith***

27         ***Recklessly Disregarded His FBAR Requirements***

28         A taxpayer "commits a reckless violation of the FBAR statute by engaging in

conduct that violates an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Bedrosian*, 912 F.3d at 153 (quoting *Safeco*, 551 U.S. at 68) (internal quotation marks omitted); *see also Rum*, 2021 WL 1589153, at *6 (holding as recently as April 23, 2021, that the Eleventh Circuit would "join with every other circuit court that has interpreted this provision" in holding "that willfulness in § 5321 includes reckless disregard of a known or obvious risk"). In *Bedrosian*, the Third Circuit held that a taxpayer recklessly disregards his or her obligations to report foreign accounts when the taxpayer "(1) clearly ought to have known that (2) there was a grave risk that the filing requirement was not being met and if (3) he or she was in a position to find out for certain very easily." 912 F.3d at 153 (applying this standard to a case involving FBAR violations pursuant to Section 5314); *see also* Mot. at 13:20-27 (citing *Bedrosian*'s three-pronged test); Oppo. at 6:11-16 (arguing *Bedrosian*'s three-pronged test stems relies on *Carrigan*, which is inapposite[14]). Of the Circuit Courts of

---

[14]    In applying the three-pronged test to FBAR violations for civil penalties in *Bedrosian*, the court quoted *United States v. Carrigan*, 31 F.3d 130, 134 (3d Cir. 1994), which in turn, relied on *United States v. Vespe*, 868 F.2d 1328, 1335 (3d Cir. 1989). Both *Carrigan* and *Vespe* applied the standard to cases involving penalties assessed pursuant to 26 U.S.C. § 6672 ("Section 6672") for the defendant's failure to pay federal employment taxes.

    Mr. Goldsmith argues that payroll related penalties are "remarkably different" from FBAR penalties because the statute imposing such payroll penalties does not provide for any other penalties to be imposed based on differing levels of intent, like Section 5321. Oppo. at 6:16-25. Section 5321, on the other hand, "provides three (3) different penalties based upon the individual's intent." *Id.* at 6:25-26. Further, the Section 6672 penalty never exceeds the amount of the tax withheld whereas the Section 5321 penalty allows the IRS to assess a penalty unrelated to the actual unpaid tax. *Id.* at 6:26-7:3. The Government responds that Mr. Goldsmith cites no authority for his positions and fails to articulate why the civil standard for willfulness set forth by the Supreme Court would not apply to this case. Reply at 5:28-6:4. It points out that "in the analogous context of payroll tax penalties under § 6672 of the Internal Revenue Code ('I.R.C.'), the Ninth Circuit regularly holds that a determination of willfulness is appropriate on summary judgment." *Id.* at 5:17-23 (citing *Phillips v. U.S. I.R.S.*, 73 F.3d 939, 942 (9th Cir. 1996) ("We have said that 'reckless disregard' of whether the taxes are being paid over, as distinguished from actual knowledge of whether they are being paid over, may suffice to establish willfulness.")).

Appeal, only the Third, Fourth, and Eleventh Circuit Court of Appeals have addressed civil penalties under Section 5314 and applied this test to such violations.  *See Bedrosian*, 912 F.3d at 152-53; *United States v. Horowitz*, 978 F.3d 80, 89 (4th Cir. 2020) (holding that "as the Third Circuit has held, when imposing a civil penalty for an FBAR violation, willfulness based on recklessness is established if the defendant" satisfies the three criteria set forth in *Bedrosian*); *Rum*, 2021 WL 1589153, at *6 ("We join our sister circuits in holding that the appropriate standard of willfulness to warrant the FBAR penalty is—borrowing from *Safeco*—'an objective standard'") (citing *Bedrosian*, 912 F.3d at 153; *Horowitz*, 978 F.3d at 89).  District courts within the First, Fifth, Sixth, and Ninth Circuits have also adopted the *Bedrosian* test in civil cases involving penalties for FBAR-reporting violations. *See DeMauro*, 483 F. Supp. 3d at 82; *Flume*, 390 F. Supp. 3d at 854; *Ott*, 441 F. Supp. 3d at 528; *United States v. Zimmerman*, No. 2:19-CV-4912-CAS-EX, 2020 WL 6065333, at *4 (C.D. Cal. Sept. 16, 2020).  The Ninth Circuit, although recently issuing an opinion on non-willful Section 5314 violations, *see Boyd*, 991 F.3d at 1078, has not yet addressed the standard for civil penalties for willful violations.  The Federal Circuit has held that willfulness encompasses recklessness but has not specifically adopted the three-pronged test for recklessness.  *See, e.g.*, *Norman II*, 942 F.3d at 1115 (did not address three-pronged test though).

The Government argues that the undisputed facts of the case evidence that "Defendant acted recklessly as a matter of law" under the *Bedrosian* standard.  Mot. at 15:2.  As to the first and second prongs of *Bedrosian*, the Government contends that Mr. Goldsmith should have known of the grave risk he was violating the law either because (1) Question 7a on Schedule B of his federal tax return, which specifically asks about foreign accounts, put him on notice of his need to report such accounts, or (2) the forms Basler asked him to sign included provisions acknowledging his tax obligations. *Id.* at 15:2-7.  It also argues that in light of Mr. Goldsmith's "actual efforts to determine what obligations attached to an Italian account he opened," Mr. Goldsmith was in a position to easily figure out what, if any, filing obligations had had with respect to his Swiss Account, thereby

-41-

1    meeting the third prong of *Bedrosian*. *Id.* at 15:8-11.

2         Mr. Goldsmith opposes adoption of the *Bedrosian* test, arguing that "the

3    Government's position that the 'careless or reckless disregard of the duty to file an [sic]

4    FBAR' satisfies the requirement of the willful standard under Section 5321(a)(C)(5) is

5    deeply flawed and goes against Congressional intent because such a definition would

6    render subsection (B)(ii)—the imposition of nonwillful penalties—meaningless." Oppo.

7    at 6:7-11.   First, he argues that the adoption of the Government's position would

8    "improperly alter the willfulness standard, under section 5321(a)(C)(5), to one of strict

9    liability" such that "any individual could be subject to the draconian willful FBAR

10   penalties for simply failing to correctly answer question 7(a) on Part III of Schedule B of

11   Form 1040." *Id.* at 7:4-8.  Second, Mr. Goldsmith argues that "the Ninth Circuit has held

12   that the issue of whether a person has willfully failed to comply with a tax reporting

13   requirement is a question of fact." Oppo. at 7:14-17 (citing *Rykoff v. United States*, 40 F.3d

14   305, 307 (9th Cir. 1994); *Williams*, 489 Fed. App'x. at 658).  Thus, he contends the Court

15   should not grant summary judgment because willfulness is an issue of fact, and willfulness

16   is the only issue that both parties dispute.  *Id.*

17        The Government replies that "[t]here is more than enough evidence for the Court to

18   find that Defendant's conduct was willful now, on summary judgment." Reply at 6:21-23.

19   It contends that while the Court could rely on the fact that Mr. Goldsmith filed a federal

20   income tax return under penalty of perjury, which "failed to disclose the existence of the

21   Account on Schedule B (or follow the instructions relating to FBAR filings listed in

22   Schedule B)" to find that Mr. Goldsmith had constructive notice of the FBAR

23   requirements, it "is not asking the Court to do so because there is so much other evidence

24   from which the Court can find willfulness." Reply at 6:23-7:1.  The Government points

25   out that the undisputed facts make clear that Mr. Goldsmith (1) had actual knowledge of

26   the existence of the Account; (2) regularly used the Account; (3) reviewed the performance

27   of the investments in the Account; (4) had actual knowledge that the balance of the Account

28   exceeded $10,000 during each year at issue; (5) regularly traveled to Switzerland to meet

-42-

with representatives of Basler regarding the Account; (6) signed forms specifying he wanted to change the investments held in the Account to avoid disclosure to U.S. authorities; (7) paid money to have the bank hold mail regarding the Account in Switzerland; and (8) failed to disclose the Account to his accountant who had asked him to disclose his interest in foreign bank accounts in each of the years at issue.  *Id.* at 7:1-10.

The Fourth, Eleventh, and Federal Circuit Court of Appeals have all affirmed a district court's decision to grant summary judgment by finding a taxpayer's failure to report foreign accounts in violation of Section 5314 willful where the taxpayer (1) answered "no" to Question 7a, despite having foreign income while also failing to pursue knowledge of further reporting requirements as suggested on Schedule B; (2) used a numbered account; (3) asked the foreign bank where the foreign account was held to hold all mail related to the foreign account; (4) concealed income or financial information related to the foreign account from his or her tax preparer; and (5) signed federal tax return, which failed to disclose a foreign account, without reviewing it for accuracy.  *See Rum*, --- F.3d ---, 2021 WL 1589153, at *2, 6-7; *Kimble II*, 991 F.3d at 1241-43 (Fed. Cir. 2021); *Horowitz*, 978 F.3d at 81-82, 90.  Like the defendants in *Rum*, *Kimble*, and *Horowitz*, Mr. Goldsmith also (1) answered "no" to Question 7a, despite having foreign income while also failing to pursue knowledge of further reporting requirements as suggested on Schedule B, *see* Exhibit 8 to Petrila Decl. at 42-47 (attaching Mr. Goldsmith's 2008, 2009, and 2010 federal tax returns); (2) used a numbered account, Mot. at 6:3-6 (citing R. Goldsmith Dep. at 104:25-105:8); (3) asked Basler, where his foreign Account was held to hold all mail related to the foreign Account, *see* Exhibit 5 to Petrila Decl. at 32; Exhibit 10 to Petrila Decl. at 55-59; (4) concealed income or financial information related to the foreign Account from his or her tax preparer, *see* Exhibit 5 to Petrila Decl. at 31; Exhibit 8 to Petrila Decl. at 35-40; and (5) signed federal tax return, which failed to disclose a foreign account, without reviewing it for accuracy, *see* Exhibit 8 to Petrila Decl. at 42-47.   In addition to the above, factors courts have also considered whether the taxpayer (1) knew domestic income was taxable and knew the foreign account earned him or her income, *Horowitz*,

978 F.3d at 82, 89, and (2) chose to divest U.S. securities rather than report the income to the IRS, *Rum*, --- F.3d ---, 2021 WL 1589153, at \*7 ("Rum declined to complete the W-9, but instead directed UBS not to invest in U.S. securities.").  Likewise, in this case, Mr. Goldsmith also knew he (1) owed (and in fact, paid) taxes on domestic income, *see* R. Goldsmith Dep. at 59:3-7, and (2) earned income from the Account as demonstrated from the Account balances in light of the amounts deposited and withdrawn,  *see* Ans. at 3, ¶ 12; *see also* R. Goldsmith Dep. at 58:4-15.

Although Mr. Goldsmith disavows managing the Account, or even knowing that he owned it, the Court finds these statements not only contradicted by the record, *see* R. Goldsmith Dep. at 58:9-15; *see also* Ans. at 3, ¶ 12, but also entirely uncredible. *See, e.g.*, *Kimble II*, 991 F.3d at 1241 (affirming summary judgment on the issue of willfulness even though the defendant argued that (1) her spouse had previously prepared joint tax returns, which did not report foreign income, and (2) "she was not an active manager of the account because she followed the advice of her late husband"); *see also id.* at 1244 ("Whether a party follows the advice of another is irrelevant to whether she manages an account, so the IRS did not abuse its discretion in determining that Ms. Kimble actively managed the account.").

The Government argues that Mr. Goldsmith acted recklessly, in satisfaction of the willful requirement for the penalties sought by the Government, for five principal reasons: First, Mr. Goldsmith failed to disclose the Account to his tax preparer and accountant.  Mot. at 20:22-23.  Second, Mr. Goldsmith admitted to filing his federal income tax returns for the calendar years 2008, 2009 and 2010 under penalty of perjury. *Id.* at 16:1-2.  Third, Mr. Goldsmith signed multiple forms describing himself as the beneficial owner of the Account, a U.S. taxpayer, and referencing U.S. reporting obligations; yet, he did nothing to investigate what tax and reporting obligations he was under for that Account.  *Id.* at 17:15-18.   Fourth, Mr. Goldsmith knew the Account was generating income, had appreciating assets, and benefited him but did not pay taxes on that income. *Id.* at 18:13-15.  Fifth, Mr. Goldsmith set up the Account as a "numbered" account, making it more

-44-

difficult for the U.S. Government to connect him with the Account while also paying a Basler a regular fee to "hold" all mail regarding the Account, so he would not receive mail in the U.S. related to the Account.  *Id.* at 20:8-9.

The Court finds that the first four facts demonstrate willfulness by evidencing that Mr. Goldsmith was charged with constructive knowledge of his FBAR-reporting obligations and reckless disregard thereof, while the fifth fact shows willful blindness.

a.   *Mr. Goldsmith Recklessly Failed to Disclose the Account to his Tax Preparer Despite being Explicitly Asked About it*

As to Mr. Goldsmith's failure to disclose the Account to Mr. Zipser in the questionnaire Mr. Zipser sent Mr. Goldsmith and his wife each year, Mot. at 20:22-23, the Court finds that this evidences willfulness given Mr. Zipser's questionnaires put Mr. Goldsmith on notice that he likely needed to report income from foreign accounts.  Further, Mr. Goldsmith's failure to disclose much less even inquire about his obligations to disclose foreign income in 2008, 2009, and 2010, to Mr. Zipser, who Mr. Goldsmith had been working with since 1989, shows a conscious effort to avoid learning of his reporting requirements.  *See, e.g.*, *Ott*, 441 F. Supp. 3d at 530 ("The Defendant's failure to discuss his foreign investments with his long-time accountant Weide, for example, indicates 'a conscious effort to avoid learning about reporting requirements.'").

Even though Mr. Goldsmith used Mr. Zipser to prepare his tax returns for the entirety of the time he owned the Account, he never disclosed the existence of the Account to Mr. Zipser until July 1, 2011 despite the fact that each year, Mr. Zipser sent Mr. Goldsmith an annual questionnaire asking about foreign income.  *See* Exhibit 6 to Petrila Decl. at 31; Exhibit 7 to Petril Decl. at 35-40.  In fact, this questionnaire included multiple questions about foreign accounts that would have encompassed the Account.  *See id.*  Other courts have held that summary failures to disclose foreign accounts to tax preparers qualifies as recklessness and willfulness.  *See, e.g.*, *McBride*, 908 F. Supp. 2d at 1212 ("The fact that McBride did not discuss these significant financial strategies, involving millions of dollars, with his accountant for the tax year 2000 is significant evidence of willfulness or at least

-45-

recklessness and willful blindness."); *United States v. Drape*, 668 F.2d 22, 25 (1st Cir. 1982) (considering it "significant" in determining whether the taxpayer had acted willfully in a criminal tax case that the taxpayer "never mentioned . . . he had invested in tax shelters" to his accountant for the previous year).

For example, in *United States v. Bohanec*, 263 F. Supp. 3d 881, 883, 890 (C.D. Cal. 2016), the court, in its findings and facts and conclusions of law after a bench trial, found that the defendants "were at least reckless, if not willfully blind, in their conduct with respect to their Swiss UBS account and their reporting obligations regarding the account." In finding the defendants met the willful requirement for civil FBAR penalties, the court relied on the fact that the defendants never (1) provided their bank with their home address; (2) told anyone other than their children about the existence of the Swiss bank account, including the tax preparers they hired to help them file tax returns; (3) "asked a lawyer, accountant, or banker about requirements regarding the UBS account"; and (4) "used a bookkeeper or kept any books once the UBS account was opened." *Id.* Like the *Bohanec* defendants, for Mr. Goldsmith to read the numerous QI related forms he signed on at least five separate occasions without ever even inquiring with Mr. Zipser about whether he needed to disclose the Account is at best, willfully blind, and at worst, reckless. *See also* Mot. at 18:9-12.

The Government argues that (1) each time Mr. Goldsmith filled out that questionnaire and failed to disclose the Account, "he acted to conceal the Basler account and evade his reporting responsibilities," (2) Mr. Goldsmith's purposeful attempts to conceal the Basler account from his tax preparer and the IRS are further evidence of his willfulness, and (3) *Bedrosian* requires courts evaluating recklessness to evaluate whether the taxpayer "was in a position to find out [about his or her reporting requirements] for certain very easily." Mot. at 21:1-11 (citing *Bedrosian*, 912 F.3d at 153). In this case, as shown by Mr. Goldsmith and his wife inquiring as to any reporting obligations with respect to their Italian bank account, Mr. Goldsmith easily could have disclosed a foreign account, such as the Account at Basler, to his accountant and discover that he needed to file FBARs.

Mot. at 21:15-18; *see also United States v. Katwyk*, No. CV 17-3314-GW(JCX), 2017 WL 6021420, at *4 (C.D. Cal. Oct. 23, 2017) (in granting a default judgment, the court noted that the defendant "was clearly aware of FBAR reporting requirements as he had made previous disclosures to the IRS regarding his other foreign bank accounts"). Further, the fact that Mr. Goldsmith or his wife asked Mr. Zipser about whether they needed to report the Italian account "speaks to the first t[w]o prongs of the *Bedrosian* test," Mot. at 21:19-20, or whether Mr. Goldsmith "(1) clearly ought to have known that (2) there was a grave risk that the filing requirement was not being met," *Bedrosian*, 912 F.3d at 153. If Mr. Goldsmith knew there was a risk that one foreign financial account (*e.g.*, the Italian account) triggered reporting obligations he also "clearly ought to have known" there was a risk regarding another foreign account with significantly higher balances (*i.e.*, the Swiss Account). Mot. at 21:23-25.

Mr. Goldsmith's opposition largely attempts to counter any arguments that he had any knowledge—actual, constructive, or otherwise—of the reporting requirements because his wife completed Mr. Zipser's questionnaires. *See generally* Oppo. Mr. Goldsmith predominantly argues in favor of an actual knowledge requirement in lieu of a recklessness standard but spends little time addressing whether, if the Court applies a recklessness standard, his conduct qualifies as reckless as a matter of law. The Government replies that "[n]o matter who physically filled out the questionnaires, the evidence is incontrovertible that Defendant did not tell Mr. Zipser about the Account, when Mr. Zipser regularly put Defendant on notice of his obligation to inform his accountant of his foreign bank accounts." Reply at 10:16-22. It also notes that even if Mrs. Goldsmith filled out the questionnaire, Mr. Goldsmith still failed to inform Mr. Zipser about the Account when he "reviewed his actual income tax return." *Id.* at 10:24-11:2 (citing R. Goldsmith Deposition at 84:9-18; Exhibit 15 to Petrila Suppl. Decl., November 12, 2020 Deposition Transcript of Howard Zipser, ECF No. 26-3 ("Zipser Dep.") at 26:1-7). This Court already established that even if Mrs. Goldsmith completed the questionnaire, Mr. Goldsmith participated in the process. *See* R. Goldsmith Dep. at 59:20-60:3, 83:19-84:3. This last

issue—whether by virtue of signing his tax returns, Mr. Goldsmith was charged with knowledge of his reporting requirements—is the lynch pin of liability.  Although the Court finds that failing to disclose foreign accounts to a tax preparer evidences concealment, which in turn, shows recklessness in satisfaction of the willfulness requirement, *see Ott*, 441 F. Supp. 3d at 530, it also recognizes that Mr. Goldsmith disputes completing the questionnaire, Oppo. at 2:18-24.  On summary judgment, the Court accepts this factual proposition as true but finds that the remaining evidence in this case cannot be disputed and overwhelmingly show recklessness.  *Matsushita*, 475 U.S. at 587.

> b.  *Mr. Goldsmith Recklessly Signed Tax Returns Under Penalty of Perjury Falsely Indicating He Had No Foreign Accounts*

As to Mr. Goldsmith's tax returns, which asked about foreign income, and which he signed under penalty of perjury, the Court finds the overwhelming authority holds that signing such tax returns charged Mr. Goldsmith with constructive knowledge of his duty to report foreign income.   Consequently, any failure to report that income qualifies as reckless.

All United States citizens are charged with knowledge of all federal statutes and regulations.  *See, e.g.*, *United States v. Great Am. Ins. Co. of New York*, 738 F.3d 1320, 1331 (Fed. Cir. 2013) ("In general, publication in the Federal Register is legally sufficient to provide notice to interested parties."); 44 U.S.C. § 1507 (filing of a document with the Office of Federal Register is sufficient to give notice of the contents of the document to a person subject to or affected by it); *accord Fed. Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384-85 (1947); *Jones v. United States,* 121 F.3d 1327, 1330 (9th Cir. 1997).  Thus, "[i]t is well established that taxpayers are charged with the knowledge, awareness, and responsibility for their tax returns, signed under penalties of perjury, and submitted to the IRS."  *McBride*, 908 F. Supp. 2d at 1206.

Question 7a on Schedule B, Part III, covering "Interest and Ordinary Dividends," on IRS Form 1040, asks, "At any time during [the previous year], did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a

bank account, securities account, or other financial account?"  Exhibit 8 to Petrila Decl. at 42-44; *see also* Mot. at 16:3-7.  The parties do not dispute that Mr. Goldsmith's individual tax returns for the years 2008, 2009, and 2010, which he signed under penalty of perjury, answered "no" in response to Question 7a.  FAC at 4, ¶ 18, 5, ¶ 23, 6, ¶¶ 24-25; *see also* Mot. at 7:14-20; Exhibit 8 to Petrila Decl. at 42 (checking "no" in response to question 7a, for 2008), 43 (same for 2009), 44 (same for 2010); *but see McBride*, 908 F. Supp. 2d at 1208 ("The simple yes-or-no question of Schedule B makes it inconceivable that [a taxpayer] could have misinterpreted this question.").  While Question 7a also directs taxpayers to "[s]ee page B-2 for exceptions and filing requirements," *see* Exhibit 8 to Petrila Decl. at 42-44, Mr. Goldsmith testified he did nothing to determine whether the Account fell within any of those exceptions.  R. Goldsmith Dep. at 86:19-87:6.

The Government argues that Mr. Goldsmith's false answers, given under penalty of perjury, are evidence not only of "of an intent to conceal the Account from the IRS" but also "of recklessness because question 7(a) directs the taxpayer to instructions covering the filing requirements (including FBAR obligations) and exceptions to those requirements." Mot. at 16:7-13 (citing Exhibit 8 to Petrila Decl.).  Indeed, "a taxpayer signing their returns cannot escape the requirements of the law by failing to review their tax returns."  *Kimble II*, 991 F.3d at 1242-43 (Fed. Cir. 2021); *see also Price*, 887 F.2d at 965 (analyzing the innocent spouse provision under 26 U.S.C. § 6013(e), which was repealed and replaced with 26 U.S.C. § 6015(b)); *Greer v. Comm'r*, 595 F.3d 338, 347 n.4 (6th Cir. 2010) ("A taxpayer who signs a tax return will not be heard to claim innocence for not having actually read the return, as he or she is charged with constructive knowledge of its contents."); *accord United States v. Doherty*, 233 F.3d 1275, 1282 n.10 (11th Cir. 2000); *Park v. Comm'r,* 25 F.3d 1289, 1299 (5th Cir. 1994).  While the Ninth Circuit has not considered whether signing a tax return puts a taxpayer on notice as to whether he or she needs to file a FBAR, at least one District Court within the Ninth Circuit has come to the same conclusion as the Fourth Circuit. *See, e.g.*, *Bohanec*, 263 F. Supp. 3d at 890 (holding that "Defendants' representations that they were unaware of or did not understand their

obligations, and deferred entirely to Kluck, are not credible" because "Part III of Schedule B of Defendants' 1998 tax return put them on notice that they needed to file an FBAR").

In fact, the majority of courts have found falsely answering question 7(a) on Part B of Form 1040 under penalty of perjury to be *prima facie* evidence of willfulness. Mot. at 16:18-17:14. *See Kimble v. United States*, 141 Fed. Cl. 373, 386 (2018), *aff'd,* 991 F.3d 1238 (Fed. Cir. 2021) (*Kimble I*) (granting summary judgment where taxpayer's false answer to question 7(a) "evidence[s] conduct by Plaintiff, as a co-owner of the UBS account that exhibited a 'reckless disregard' of the legal duty under federal tax law to report foreign bank accounts to the IRS by filing a FBAR."); *Horowitz*, 978 F.3d at 90 (affirming summary judgment where, *inter alia*, the taxpayers falsely answered Question 7a); *see also Bedrosian v. United States*, No. CV 15-5853, --- F. Supp. 3d ---, 2020 WL 7129303, at *5 (E.D. Pa. Dec. 4, 2020) (*Bedrosian III*) (finding on remand from the Third Circuit in *Bedrosian*, which ordered the district court to evaluate the defendant's recklessness using an objective standard, that "Bedrosian knew or should have known the form he signed was inaccurate" when he signed his Form 1040 under penalty of perjury).

Mr. Goldsmith argues that the Court should not consider his signing of his tax returns as imputing constructive knowledge of his FBAR-reporting requirements. Oppo. at 7:4-8. Only a minority of courts have adopted this position. For instance, in *United States v. Schwarzbaum*, the Southern District Court of Florida disagreed with the proposition that simply signing an incorrect tax return could suffice to find a willful violation:

> However, upon review, the Court agrees with the recent decision in *United States v. Flume*, No. 5:16-CV-73, 2018 WL 4378161, at *7 (S.D. Tex. Aug. 22, 2018), that the theory of constructive knowledge is unpersuasive in this instance. Imputing constructive knowledge of filing requirements to a taxpayer simply by virtue of having signed a tax return would render the distinction between a non-willful and willful violation in the FBAR context meaningless. Because taxpayers are required to sign their tax returns, a violation of the FBAR filing requirements could never be non-willful. Yet, the statute provides for non-willful penalties. Applying the USA's suggested reasoning would lead to a draconian result and one that would preclude a

consideration of other evidence presented.   Accordingly, the USA cannot satisfy its burden of proof in this case on the issue of willfulness simply by relying on the fact that Schwarzbaum signed his tax returns or neglected to review them as thoroughly as he should have.

No. 18-CV-81147, 2020 WL 1316232, at *8 (S.D. Fla. Mar. 20, 2020), *appeal dismissed* (Nov. 25, 2020).

More recently, however, in *Jones*, 2020 WL 4390390 at *6, the Central District of California rejected the reasoning in *Schwarzbaum* and *Flume*, finding more "persuasive the reasoning in *Bohanec*, *Williams*, *Norman*, and *McBride* that signing a tax return and declaring under penalty of perjury to have examined the return and accompanying schedules and statements, is evidence that the taxpayer was provided constructive knowledge of the FBAR requirements."   On the one hand, the court disagreed with *Bohanec*, finding that "signing a tax return on its own cannot ***automatically*** make the taxpayer's violation 'wilfull' as that would collapse the willfulness standard to strict liability."   *Id.* at *9 (emphasis added).   On the other hand, it found that the fact that a defendant signs a "tax return under the declaration of perjury is prima facie evidence that he knew the contents of the return and at a minimum the directions in line 7a of Schedule B put him on constructive notice of the FBAR filing requirements."   *Id.*   It reasoned that "[s]uch a finding does not ignore the distinction drawn by Congress between a willful and non-willful violation because 'an FBAR violation would generally not be willful where a taxpayer did not know about, and had no reason to know about, her overseas account.'" *Id.* at *6 (citing *Norman*, 942 F.3d at 1115). "Thus, there exists ways in which a violation would be non-willful."   *Id.*

This Court agrees with the *Jones* court and concludes that Mr. Goldsmith is incorrect in his assertion that imputing constructive knowledge of FBAR-filing requirements to a taxpayer by virtue of signing a tax return renders the distinction between willful and non-willful penalties meaningless.  For example, in *Norman II*, 942 F.3d at 1115-17, the Federal Circuit affirmed the Court of Federal Claims decision finding a taxpayer's failure to file a

-51-

FBAR in violation of Section 5314 willful.  The evidence showed that the taxpayer, Ms. Norman, took various steps, "each of which had the effect of inhibiting disclosure of the account to the IRS," which included (1) opening "her foreign account as a 'numbered account'"; (2) "sign[ing] a document preventing UBS from investing in U.S. securities on her behalf"; (3) withdrawing "money from the account, [which] her Swiss bank account manager delivered . . . to her in cash," (4) "sign[ing] her 2007 tax return under penalty of perjury, [which] . . . falsely indicated that she had no interest in any foreign bank account," and (5) filing that tax return "after her accountant sent her a questionnaire that specifically asked whether she had a foreign bank account." *Id.* at 1116.  Ms. Norman, like Mr. Goldsmith also denied that the money in the Swiss account was hers or that she had control over it. *Id.*  However, the evidence showed that "[s]he opened the account in 1999, actively managed the account for many years, and even withdrew money from the account in 2002." *Id.*  Thus, "at the very least, Ms. Norman signed her 2007 tax return—which falsely indicated that she owned no interest in any foreign bank account—knowing that she owned a foreign bank account and controlled the assets within." *Id.* The court also rejected her argument "that she could not have willfully violated the FBAR requirement because she did not read her 2007 tax return." *Id.*  Instead, it held that "[t]he fact that Ms. Norman did not read her 2007 tax return supports that she acted recklessly toward the existence of reporting requirements." *Id.* at 1117.

Just like Ms. Norman, Mr. Goldsmith (1) opened his Account as a numbered account; (2) signed a document directing Basler to divest him of all U.S. securities; (3) withdrew money from the Account in cash; (4) signed his 2008, 2009, and 2010 tax returns, which indicated he had no interest in foreign accounts, under penalty of perjury; (5) filed the aforementioned tax returns after receiving a questionnaire from his accountant specifically asking about whether he had a foreign account; and (6) currently denies owning or controlling the Account.  Mot. at 9:14-16 (citing R. Goldsmith Dep. at 53:18-19-54:6-11).  However, in this case, Mr. Goldsmith testified that he reviewed the draft returns Mr. Zipser sent him, including by "skimming through" Question 7a.  *See* R. Goldsmith Dep. at

84:16-18, 85:21-86:10.   In fact, Mr. Goldsmith testified that he even recalled reading Question 7a, stating that "we didn't think it applied to the funds if we wrote no," referring to the exceptions on page B-2.   *Id.* at 86:16-23.   Thus, just like the *Norman II* court, this Court finds that the fact that Mr. Goldsmith did not read his 2008, 2009, and 2010 tax returns supports that he acted recklessly toward the existence of reporting requirements. 942 F.3d at 1117.   This is, however, not the only evidence supporting a finding that Mr. Goldsmith acted recklessly.

Knowledge can only be imputed where the taxpayer knew of the Account and failed to disclose it (regardless of whether he or she knew or the reporting requirements).   Here, however, the evidence confirms Mr. Goldsmith knew about the Account.   Mr. Goldsmith also does not dispute that he signed his 2008, 2009, and 2010 federal income tax returns, which failed to disclose the Account, under penalty of perjury.   *See* Reply at 8:24-27 (citing Oppo. at 8).   However, the Government argues that even if the Court disregards Mr. Goldsmith's signing the federal tax returns as evidence of willfulness, the remaining evidence in this case still warrants a finding of willfulness.   *See* Reply at 8:26-9:5.   The Court agrees that it need not rely on Mr. Goldsmith's signing incorrect tax returns alone as further evidence supports the Court's finding of willfulness.   *See, e.g.*, *Rum*, 2021 WL 1589153 at *6 (concluding that "we need not rely solely on Rum signing his returns" because "Rum's signature on his returns is but one among many facts that constitute overwhelming evidence that Rum acted in a manner that at least rises to the level of the recklessness standard described above").

c.   *Mr. Goldsmith's Signing of Multiple Documents Provided from Basler Discussing His U.S. Tax Obligations Imputed Constructive Knowledge of those U.S. Tax Obligations*

As to Mr. Goldsmith's signing of multiple QI forms, each of these forms clearly described Mr. Goldsmith as the beneficial owner of the Account, a U.S. taxpayer, and referenced U.S. tax reporting obligations; yet, Mr. Goldsmith did nothing to investigate what the tax obligations mentioned in the documents he signed were.   Mot. at 17:15-18. Instead, he chose to decline to hold U.S. securities in favor of allowing Basler to inform

-53-

the IRS about his Account. "When, as here, a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds at his own peril." *Crispin v. Comm'r*, 708 F.3d 507, 520 (3d Cir. 2013); *see also Hansen v. Comm'r*, 471 F.3d 1021, 1029 (9th Cir. 2006) ("Negligence is 'strongly indicated' when '[a] taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be "too good to be true" under the circumstances.'") (citing Treas. Reg. § 1.6662–3(b)(1), (b)(1)(ii)).

In this case, Mr. Goldsmith instructed Basler to sell all of his U.S. securities at the same time he signed Basler's QI form. *See* Exhibit 11 to Petrila Decl. at 61-68. Under the QI regime, banks that offer their clients the ability to invest in U.S. securities must register with the IRS and undertake documentation, withholding, and reporting requirements in relation to those investments. *Id.* at 17:20-23. However, even if Mr. Goldsmith did not earn income with Basler from U.S. securities, he still had an obligation to report any foreign income, like capital gains, he earned from his Swiss bank Account. *See* 26 U.S.C. §§ 1, 988(a)(1)(A). Rather than risk Basler reporting his Account to the IRS under the QI regime, Mr. Goldsmith sold his U.S. securities. Mot. at 17:23-24. Mr. Goldsmith argues that the Government ignores his testimony that he "just signed the documents that they advised me to sign," was unsure "what he was signing," and only "skimmed" them. Oppo. at 8:17-22 (citing R. Goldsmith Dep. 67:22-68:20). He argues that "[l]ooking at these facts in the light most favorable to [him], if he never understood, completely read what he was signing, or made determinations on how the form was to be filled out, instead relying on the bank's representatives, he would not have been alerted to the fact that he needed to investigate what tax and reporting obligations he was under." *Id.* at 8:24-28. However, the law establishes that (1) failing to read a contract, like the QI forms, does not avoid its consequences, *Oregon-Pac*, 248 F. Supp. at 908, and (2) even actions taken in reliance on another, like Basler representatives, may be willful, *see Norman*, 942 F.3d at 1116.

In its reply, the Government points out that Mr. Goldsmith does not dispute that he

signed the QI forms and did nothing to investigate his tax liability but argues he simply may not have understood what he signed.  Reply at 9:9-12 (citing Oppo. at 8).  However, Mr. Goldsmith "does not contend that he was legally or physically incapacitated at any time when he read and signed these forms," and the forms were in English, a language Mr. Goldsmith speaks fluently.  *Id.* at 9:12-15.  Thus, there should be no reason he did not understood the forms.  Consequently, his arguments fail to raise a factual dispute because "[t]he undisputed fact is that Defendant read and signed these forms, which put Defendant on notice of his obligations to the U.S. government and IRS such that he easily could have inquired of his accountant regarding those obligations even if he did not understand the entirety of the form itself."  *Id.* at 9:15-20.  Mr. Goldsmith had been working with Mr. Zipser since 1989, or for approximately twenty years by 2009; yet, he never asked about or disclosed the Account "even after being asked to sign forms stating in bold that he had tax obligations."  *Id.* at 9:20-24.

Other courts confronted with this type of evidence found willfulness.  For instance, in *Rum*, 2021 WL 1589153 at *6-8, the Eleventh Circuit affirmed the district court's decision granting summary judgment in favor of the government and finding that "no genuine issue of material fact existed as to his willfulness (i.e., recklessness)."  Based on the defendant's conduct, it agreed "with the district court that there [were] no genuine issues of material fact regarding Rum's willfulness or recklessness" where, *inter alia*, in 2002, the defendant, like Mr. Goldsmith, "declined to complete the W-9, [and] instead directed UBS not to invest in U.S. securities" after her UBS adviser explained that (1) income from U.S. securities was required to be reported to the IRS, (2) Rum would have to file a W-9 form, and (3) the bank would be required to withhold."  *Id.* at *7.  Additionally, "in 2004, on a visit to UBS in Switzerland, he signed a form expressly declaring that: 'In accordance with regulations applicable under US law relating to withholding tax, I declare, as the holder of the above-mentioned account, that I am liable to tax in the USA as a US person."  *Id.*  At the time, the defendant's account balance greatly exceeded the reportable amount in 2007 and 2008.  *Id.* at *2, 7-8.  Similarly, in *Norman I*,

138 Fed. Cl. at 194-95, the Court of Federal Claims, in its findings of fact and conclusions of law after a bench trial, found that Ms. Norman willfully violated Section 5314 because she "acted to conceal her income and financial information" and "either recklessly or consciously avoided learning of her reporting requirements."  Similar to Mr. Goldsmith, who claimed the money in the Account was not his, the *Norman I* defendant "claimed that she did not know of any details of the account," but the evidence clearly showed that she (1) met annually with her Swiss banker, (2) executed a waiver of her right to invest in U.S. securities, and (3) "[e]xecuted management agreements in 2004, 2005, and 2006 with different choices of investment strategies."  *Id.*

Finally, in *United States v. Toth*, the district court concluded that the Government had provided more than sufficient evidence to establish the defendant acted in a willfully blind or reckless manner when she decided not to investigate her U.S. tax obligations for her Swiss bank account or report the account to the IRS.  2019 WL 7039627 at *8.  Like Mr. Goldsmith, the *Toth* defendant checked "no" in response to Question 7a regarding whether she had any foreign financial accounts but also testified she "didn't know there was a duty to report" her foreign bank accounts to the IRS.  *Id.* at *7.  The court noted that her foreign bank sent her account statements, so she "would have been able to determine that UBS was not, in fact, deducting funds from her account to pay U.S. taxes on her behalf."  *Id.*  Her failure to question her bank's lack of deductions evidenced "her reckless disregard for the risks of not investigating her tax obligations as to the Account.  *Id.* at *8.  It also relied on the fact that when presented with a QI Agreement between the U.S. government and her bank, she, like Mr. Goldsmith, declined to complete the W-9.  *Id.*  This conduct showed that she "sought to keep the Account hidden from U.S. authorities by refusing to complete a W-9 and by ensuring that the Account would not contain U.S. securities, which would trigger UBS's reporting requirements."  *Id.*  The court concluded that her "willfulness in failing to file a 2007 FBAR '[could] be inferred from [her] conscious effort to avoid learning about reporting requirements.'"  *Id.* at *8.  It reasoned that "[s]he took deliberate steps to maintain the secrecy of the Account, in spite of

-56-

opportunities for disclosure, which evidences willful 'conduct meant to conceal or mislead sources of income.'" *Id.*

Here, it is undisputed that Mr. Goldsmith read and signed the forms in question.  R. Goldsmith Tr. at 65:1-73:9).  The language on these forms put him on notice of the clear risk that there was a grave danger he was not complying with his federal tax and reporting obligations.  Like the defendants in *Rum*, *Norman I*, and *Toth*, Mr. Goldsmith also declined to complete a W-9 in favor of divesting himself of U.S. securities.  *Rum*, 2021 WL 1589153 at *7-8; *Norman I*, 138 Fed. Cl. at 194-95; *Toth*, 2019 WL 7039627 at *7-8.

First, Mr. Goldsmith signed a form entitled, "Declaration for those liable to US tax," on August 29, 2000, September 18, 2002, August 9, 2007, and August 5, 2009, which stated, "With regard to US withholding tax and the holding of US securities or other securities that are held via a US custodian bank, I, the custody account holder, declare that I am liable to US tax."  Exhibit 11 to Petrila Decl., ECF No. 19-3 at 61, 62, 64, 67.  This language is almost identical to the language in the form in *Rum*, which the court found put the defendant on notice of his U.S. tax obligations.  2021 WL 1589153 at *7.  This form shows Mr. Goldsmith knew or should have known he was liable for U.S. taxes, and because it was provided to him by his Swiss bank, should have put him on notice that he owed taxes related to any income from that foreign Account.  These forms also stated,[15] "I do not authorize the bank to forward my name, but I authorize the bank to sell all my US Investments held by the bank in accordance with my instructions during the course of 2000."  *Id.*  Such forms evidence an intent to conceal the Account from the IRS.  *See Norman I*, 138 Fed. Cl. at 194-95.

Second, on September 18, 2002, August 9, 2007, and August 5, 2009, Mr. Goldsmith signed another form entitled "Determining your status as 'US-person' or 'non-US-person,'" which asked, "Have you resided in the US this year and the last two years for

---

[15] The language quoted is from the August 29, 2000 form.  *See* Exhibit 11 to Petrila Decl. at 61.  The language on the forms throughout the following years may have changed slightly but more or less remained substantively the same.

longer than a total of 183 days?" to which Mr. Goldsmith responded, "yes" on each form. Exhibit 11 to Petrila Decl. at 63, 65.  These forms also (1) asked "[i]n which country are you subject to taxation (D, CH, F etcs)?," to which Mr. Goldsmith responded "USA"; (2) advised that "[i]f you answered Yes to any of the questions, you must complete the Declaration for US Persons"; and (3) stated, "The undersigned custody account holder declares that under US-taxation law he/she is the beneficial owner of the assets and income therefrom to which this declaration refers." *Id.*  On August 9, 2007, Mr. Goldsmith also signed a form entitled, "Client Questionnaire," which stated that "[a]ll information is subject to Swiss banking secrecy" and "will not be forwarded to either Swiss or foreign authorities." *Id.* at 65.  This form not only shows Mr. Goldsmith knew or should have known of his U.S. tax obligations but also proves that he owned the Account—a fact Mr. Goldsmith has attempted to dispute—and attempted to keep that Account concealed from the IRS.

Finally, on August 5, 2009, Mr. Goldsmith also signed a form entitled, "US Person Waiver – Declaration by US persons in connection with opening or maintaining a bank account," which stated that "[i]n 2001, . . . Basler . . . along with most other Swiss banks, entered into a so-called Qualified Intermediary Agreement . . . with the US tax authorities (Internal Revenue Service IRS)."  Exhibit 11 to Petrila Decl. 3 at 66.  It continues by stating, "According to this QI Agreement, tax is deducted at source on, among other things, interest receipts, dividends and proceeds of sale of US securities." *Id.*  The form Mr. Goldsmith signed on July 27, 2011, entitled, "Waiver by Us Person (without Form W9) – Declaration by US persons in connection with opening or maintaining a bank account," contained identical language. *Id.* at 68.  All of these forms explicitly state that Mr. Goldsmith would be liable for the maintenance or sale of U.S. securities, and Mr. Goldsmith explicitly informed Basler not to acquire U.S. securities to avoid U.S. tax liability.  Thus, the Court acknowledges there is an argument to be made that these forms, in fact, did not provide notice to Mr. Goldsmith of his tax liability related to the Swiss Account, because they all suggested that he would only be held liable if he held U.S.

securities, and he explicitly directed Basler to not hold U.S. securities.  Yet, at the same time, these forms put Mr. Goldsmith on notice of the potential for tax liability related to the Swiss Account, which should have caused him to, at a minimum, inform Mr. Zipser of the Account and inquire about potential tax liability.  These forms also put Mr. Goldsmith's ownership and management of the Account beyond dispute because he signed numerous forms as the "beneficial owner of the Account" and managed the Account by deciding whether or not it invested in U.S. securities.

Like the defendants in *Rum*, *Norman I*, and *Toth*, who the courts found acted willfully by signing QI related forms and electing to divest themselves of U.S. securities rather than sign a W-9 and disclose the account to the IRS, *see Rum*, 2021 WL 1589153 at *7-8; *Norman I*, 138 Fed. Cl. at 194-95; *Toth*, 2019 WL 7039627 at *7-8, Mr. Goldsmith acted willfully by signing similar QI forms which provided him constructive notice of his U.S. tax obligations related to the Account.

Thus, Mr. Goldsmith's signing of multiple QI related forms provided by Basler on at least five different occasions, all of which related to his Swiss Account and described him as a U.S. taxpayer, put him on notice of potential tax liabilities related to the Account. By failing to even inquire about such tax liabilities with his long-time accountant of roughly twenty years, Mr. Goldsmith acted recklessly.

d.   *Defendant Knew the Account Generated Income for Him and Recklessly Failed to Disclose It*

As to Mr. Goldsmith's knowledge that the Account generated income, the Court finds that Mr. Goldsmith did, in fact, know the Account generated income for him.  *See, e.g.*, Ans. at 3, ¶ 12 (admitting that he profited from the Account but denying that he "managed the Basler Account").

The record in this case shows that it is undisputed that Mr. Goldsmith knew (1) he had tax obligations as a U.S. citizen as evidenced by the fact that he hired Mr. Zipser in the first place; (2) he had to pay taxes on domestic income as evidenced by his work with Mr.

Zipser and filing of tax returns;[16] and (3) the Swiss Account generated income. *See* R. Goldsmith Dep. at 58:4-59:7, 82:4-83:18. The undisputed facts also indicate Mr. Goldsmith inherited both commercial property and the Swiss Account from his mother after she died. *Id.* at 56:24-57:18. Even though the commercial properties were not a typical account as they were held by a partnership, and he received income from the distributions from the partnership, Mr. Goldsmith informed Mr. Zipser about the income from the partnership/properties and paid taxes on such income accordingly. *Id.* at 88:7-23. Mr. Goldsmith's testimony fails to plausibly explain why he knew he would have to pay taxes on the income from the commercial properties and Italian account but failed to inform the IRS about the Swiss Account. *Id.*; *see also Matsushita*, 475 U.S. at 587.

In *United States v. DeMauro*, following a two-day bench trial, the court found in favor of the Government on its willful FBAR-penalty claim. 483 F. Supp. 3d 68, 71. It determined that while the defendant did not commit a knowing or conscious violation, her conduct still qualified as willful because it was reckless and willfully blind. *Id.* at 71, 85. In 2000, the same year she was finalizing her divorce, the *DeMauro* defendant, Annette DeMauro, opened a numbered bank account with UBS AG, a Swiss bank. *Id.* at 72, n.12. "While the United States correctly note[d] that DeMauro took steps to conceal her foreign bank accounts and money transfers, she credibly testified that she did so in an attempt to hide assets from her abusive ex-husband . . . and because she trusted the many professionals around her to handle the finer details of her finances." *Id.* at 71. Thus, "[t]he court [found]

---

[16]   During his deposition, Mr. Goldsmith testified that he informed Mr. Zipser of his distributions from commercial properties, or in other words, income that was not "typical bank income." *See* R. Goldsmith Tr. at 88:17-89:5 (testifying "Yeah, we informed him about anything that we did here in the western hemisphere, of course," when asked whether informed Mr. Zipser about non-bank accounts, like "the distributions from Monterey Pass or income earned from your Hawaii condo"). Yet, when asked why he did not inform Mr. Zipser about the Account in Switzerland, his response was, "It wasn't an account. It was a fund. It was not ours, you know. It's completely separate." R. Goldsmith Tr. at 89:5-6. In light of the fact that the commercial properties, which he informed Mr. Zipser about, were also not "accounts," this response appears to be an implausible and uncredible explanation for his failure to inform Mr. Zipser about the Account.

that the United States failed to prove by a preponderance of the evidence that DeMauro knowingly violated § 5314" and proceeded to "assesses whether the United States has proven by a preponderance of the evidence that DeMauro violated § 5314 recklessly." *Id.*

As to recklessness or willful blindness, the Court held that the Government had proven by a preponderance of the evidence that Ms. DeMuaro "acted with willful blindness by taking 'deliberate' or 'conscious effort to avoid learning about [FBAR] reporting requirements.'" 483 F. Supp. 3d at 87. The evidence supporting this finding included "her purported failure to seek advice from tax professionals or attorneys despite (1) her past practice of relying on such professionals to handle her affairs, (2) ***her admission that she knew her foreign accounts were accruing interest***, (3) her payment of taxes on interest earned from her domestic savings accounts, (4) her payment of taxes on residential assets she acquired through her divorce decree, and (5) her representation to UBS that she had sought unspecified tax advice for her account." *Id.* at 87. Thus, even if she "did not consciously avoid learning about the FBAR reporting requirement, she at the very least should have surmised that there was a grave risk she was not meeting her tax-filing obligations," and such conduct "constitutes a willful civil violation." *Id.* at 71.

The Government contends that like the *DeMauro* defendant, Mr. Goldsmith knew that (1) the Account was generating income, (2) the investments in the Account were appreciating, and (3) he, in fact, benefited from the Account's appreciation in value but did not pay taxes on that income. Mot. 18:13-15. The Government relies on *DeMauro* for the proposition that knowledge of a foreign account generating income in the absence of paying taxes on such income is evidence of willfulness. Mot. at 19:9-15 (citing *DeMauro*, 2020 WL 5757466, at *12–14). It argues that like the *DeMauro* defendant, who the court found willfully blind for disclosing some but not all of her property—namely, her foreign accounts, which she knew earned income—to the professionals handling her affairs after her divorce, after Mr. Goldsmith's mother died, Mr. Goldsmith disclosed certain property, like his commercial properties, to Mr. Zipser but not his Swiss Account. Mot. at 19:15-19 (citing *DeMauro*, 2020 WL 5757466, at *13-14). In his opposition, Mr. Goldsmith argues

*DeMauro* is inapposite as that case involved an opinion following a two-day bench trial rather than a motion for summary judgment, and as such, the Government cannot rely on *DeMauro* to show that knowledge of income proves willfulness on summary judgment. Oppo. at 9:4-11. Thus, Mr. Goldsmith argues that "*DeMauro* supports [his] assertion that the issue of willfulness is one of fact and must be determined at trial herein." *Id.* at 9:11-13. In reply, the Government notes that once again, Mr. Goldmisth does not actually dispute the fact at hand (*i.e.*, whether he knew the Account generated income), just whether that knowledge should warrant holding him liable. Reply at 9:28-10:2. While the Court finds that *DeMauro* still proves insightful as to what evidence factors into a finding of recklessness, the Government also relies on *Horowitz*, in which the Fourth Circuit affirmed summary judgment in the Government's favor for penalties for willful violations of Section 5314. Mot. at 19:25-20:4 (citing *Horowitz*, 978 F.3d at 89). It contends the Court should disregard Mr. Goldsmith's statements disavowing knowledge of his tax reporting obligations and find his conduct willful like the *Horowitz* defendants. *Id.*

The *Horowitz* court held that even if the defendants lacked actual knowledge of the reporting requirements, their reckless behavior "sufficed for a finding of willfulness." 978 F.3d at 81-82. Thus, despite the defendants' contentions regarding their subjective intent, their failure to file FBARs was objectively unreasonable. *Id.* at 89. After adopting the three-pronged test for recklessness from the Third Circuit in *Bedrosian*, the Fourth Circuit affirmed the district court's conclusion that the undisputed facts established that the defendants' failure to file the FBARs for 2007 and 2008 was objectively reckless. *Id.* at 89. The court reasoned that the evidence showed that the defendants (1) "knew that they were holding a significant portion of their savings—nearly $2 million—in a foreign bank account and earning interest income on that account," (2) primarily established the Swiss bank account because their Saudi bank did not pay interest, (3) "knew that the salary income they earned in Saudi Arabi was reportable to the IRS," (4) "recognized that interest income was taxable income under American law, at least when earned in a domestic bank account," (5) had a numbered account with "hold mail" service, which "would and did

assist U.S. clients in concealing assets and income from the IRS" by "eliminat[ing] the paper trial associated with the undeclared assets and income they held," (6) had "Swiss bank accounts[, which] were by no means small or insignificant and thus susceptible to being overlooked," (7) "tended to that nest egg, traveling twice to Switzerland specifically to look after it," and (8) filed tax returns with the IRS, which they were sent to review and sign under penalty of perjury by their accountant, in which they explicitly answered "no" when asked whether they had a foreign bank account. *Id.* at 88-90. Thus, the defendants clearly "recognized that interest income was taxable income under American law, at least when earned in a domestic bank account" as "demonstrated by the fact that when [one of the defendants] supplied the accountant with information for the preparation of the [their] tax returns, he included interest income from domestic banks." *Id.* at 89. "With this compound knowledge—that interest income was taxable income and that foreign income was taxable in the United States—the Horowitzes could hardly conclude reasonably that the interest income from their Swiss accounts was not subject to taxes." *Id.* "Taking all of these circumstances together, the record indisputably establishe[d] not only that the [defendants] 'clearly ought to have known' that they were failing to satisfy their obligation to disclose their Swiss accounts, but also that they were in a 'position to find out for certain very easily.'" *Id.* at 90.

The Government argues that just as the *Horowitz* court rejected the defendants' claims that they did not know they had to file FBARs because of a conversation with a friend in Saudi Arabia in the late 1980s, this Court should likewise reject Mr. Goldsmith's claims that he did not know he needed to report foreign accounts (1) until he read a newspaper article and (2) due to his belief that he did not own the Account. Mot. at 20:1-7. Indeed, Mr. Goldsmith testified that the first time he learned about his duty to disclose the Account was when he "read a newspaper report about the requirement to disclose foreign accounts and that the IRS created a program for those with foreign accounts to come forward," Exhibit 5 to Petrila Decl., Mr. Goldsmith's Responses to Interrogatories, at 23. However, the *Kimble II* defendant had a strikingly similar story, testifying that "the

first time she learned of her obligation to disclose her foreign bank accounts" was when she "read an article in the New York Times reporting on the Treasury Department's investigation into UBS for abetting tax fraud with respect to its numbered accounts." *Kimble II*, 991 F.3d at 1241.   Nonetheless, the Federal Circuit still affirmed summary judgment in favor of the Government on willfulness.   *Id.*

The Court agrees that Mr. Goldsmith never disputes (1) signing the QI forms, which discussed the potential for U.S. tax obligations related to his Swiss Account, (2) failing to seek Mr. Zipser's advice as to whether he had any tax obligations related to the Swiss Account after signing the QI forms, (3) earning interest on the Account, and (4) knowing, as a U.S. citizen, he had tax obligations for at least domestic income.   All of the aforementioned facts support this Court finding Mr. Goldsmith's conduct reckless and willfully blind.   *See DeMauro*, 483 F. Supp. 3d at 71; *see also Horowitz*, 978 F.3d at 89; *Rum*, 2021 WL 1589153 at *7-8, n.4; *see also Kimble I*, 141 Fed. Cl. at 386.

e.   <u>*Mr. Goldsmith Recklessly Set the Account up in a Manner that Made it More Difficult for the Government to Discover it and Easier for Him to Avoid Knowledge of His U.S. Tax Obligations*</u>

As to the fact that Defendant set the Account up as a numbered account while also paying an extra fee to Baser for a mail hold service, the Court finds these weigh in favor of a finding of willful blindness and recklessness.   *See Horowitz*, 978 F.3d at 88-89.

The Government contends that like the *Horowitz* defendants, who acted recklessly, and therefore, willfully, Mr. Goldsmith also "set up his 'numbered' account and paid Basler a regular fee to 'hold' all mail regarding the account."   Mot. at 20:8-9.   Mr. Goldsmith responds by arguing that there are significant factual differences between *Horowitz* and the instant case.   Oppo. at 9:18-19.   Specifically, he argues that (1) "the Horowitzes never gave UBS their address in the United States," (2) maintained a foreign account that "was one of the Horowitzes largest assets and was described as their retirement account," and (3) "closed their account with UBS in July 2008 due to investigations against UBS and moved their account to another Swiss bank."   *Id.* at 9:19-23 (citing *Horowitz*, 978 F.3d at 83).   He

-64-

points out that in this case, however, Mr. Goldsmith "testified that the reason he requested that the bank not send him any mail was because it was generally all in German and he did not understand German." *Id.* at 9:23-25 (citing R. Goldsmith Dep. 2-14). As such, he argues that looking at this evidence in the light most favorable to him, his reason for holding the mail does not support the Government's position of willfulness and creates a genuine issue of material fact for a jury. *Id.* at 9:25-10:3. The Government responds that Mr. Goldsmith's opposition does not dispute that Mr. Goldsmith set up a numbered account or paid a regular fee to Basler to hold all mail related to the Account. Reply at 10:3-7 (citing Oppo. at 9). It notes that even though Mr. Goldsmith attempts to distinguish *Horowitz*, he "has not advanced any meaningful difference." *Id.* at 10:7. Rather, "*Horowitz* is directly on point here, as it is analogous to Defendant's conduct in this action where he claims that he did not think that any tax or reporting obligations attached to the Account because he did not think that he 'owned' the Account." *Id.* at 10:12-15. The Court agrees that Mr. Goldsmith has failed to point out any meaningful difference between his conduct and the conduct in *Horowitz*. More importantly, even if he had, numerous courts have held similar conduct evidences recklessness, or at a minimum, willful blindness.

With a numbered account, a number rather than a name identifies the account, which conceals the account holder's identity. *See, e.g.*, *Rum*, 2021 WL 1589153 at *7, n.4 (noting the defendant "opened his second account as a numbered account, thus continuing to conceal his identity"). With a hold mail service, the customer of a bank pays the bank extra money to hold all mail related to the account, so the customer never receives any mail related to the account at his or her address associated with the account. *See, e.g.*, *United States v. Zimmerman*, No. 2:19-CV-4912-CAS-EX, 2020 WL 6065333, at *2 (C.D. Cal. Sept. 16, 2020) ("The Zimmermans also placed a 'stop mail' hold on the account, which prevented any mail regarding the account from being sent to them in the United States."); *Bedrosian III*, 2020 WL 7129303 at *4 ("Next the Court found that the foreign account was set up with hold mail service, which the bank knew would and did assist U.S. clients

in concealing assets and income from the IRS.") (internal quotation omitted).  Courts have found that both maintaining a numbered account as well as requesting a "hold mail" service from a foreign bank qualify as evidence of intent to conceal a foreign account from the U.S. government.  *See, e.g.*, *Zimmerman*, 2020 WL 6065333, at *4 ("Relevant acts of concealment include redirecting mail regarding the account away from the United States, and using numbered instead of named accounts."); *see also Ott*, 441 F. Supp. 3d at 531 ("Evidence of acts to conceal income and financial information, combined with the defendant's failure to pursue knowledge of further reporting requirements as suggested on Schedule B, provide a sufficient basis to establish willfulness," and such "acts of concealment range in severity in the FBAR context, from creating 'numbered' bank accounts to avoid detection, to creating shell corporations") (internal citations omitted).

The Fourth Circuit, Federal Circuit, and Eleventh Circuit have all affirmed district court's decisions to grant summary judgment in favor of the Government where the evidence included the fact that the defendant had set up a numbered account along with a hold mail order.  *See, e.g.*, *Rum*, 2021 WL 1589153 at *7-8, n.4 (affirming the district court's decision to grant summary judgment in favor of the government where "the evidence was overwhelming that Rum sought to hide his overseas accounts from the United States government," and included the fact that the defendant set up a numbered account, paid an extra fee to avoid receiving statements, personally visited the bank in Switzerland several times, and declined to complete a W-9, choosing instead, to direct the bank not to invest in U.S. securities); *Kimble I*, 141 Fed. Cl. at 384 (granting the Government's motion for summary judgment where the plaintiff, *inter alia*, "maintained a numbered account and instructed UBS not to send any account-related correspondence to the United States," which the court factored into its decision that her failure to report was voluntary); *Horowitz*, 978 F.3d at 83 (affirming summary judgment because the defendant's numbered account together with a "hold mail" service "allowed U.S. clients to eliminate the paper trail associated with the undeclared assets"); *Bedrosian III*, 2020 WL 7129303 at *4 (noting that after the defendant admitted to reading an article about the federal government tracing

-66-

1  mail into the U.S., he paid a fee to place his Swiss bank accounts on a mail hold, which the
2  Government argued "the purpose of which was to prevent correspondence from the foreign
3  bank being tracked by the IRS"). Like the *Rum*, *Kimble I*, *Horowitz*, and *Bedrosian III*
4  courts, this Court also finds that Mr. Goldsmith's decision to set up his account as a
5  numbered account while also paying Basler to hold his mail constituted at best willful
6  blindness, and at worst, acts of concealment in reckless disregard of his tax obligations.
7  *See Rum*, 2021 WL 1589153 at *7-8, n.4; *Kimble I*, 141 Fed. Cl. at 384; *Horowitz*, 978
8  F.3d at 83; *Bedrosian III*, 2020 WL 7129303 at *4.

9  In sum, Mr. Goldsmith's claim that any of the material facts presented by the
10 Government are in dispute is incorrect. Rather, the undisputed facts in this case show that
11 Mr. Goldsmith acted willfully. While whether he acted with actual knowledge or a
12 subjective belief his conduct violated the law remains an issue of fact in dispute, this Court
13 agrees with the Third, Fourth, and Eleventh Circuit Court of Appeals that have adopted the
14 *Bedrosian* test and held that his subjective knowledge or intent is not required for this Court
15 to find willful conduct. *See, Rum*, 2021 WL 1589153, at *6 (joining the Third and Fourth
16 Circuits in adopting the *Bedrosian* test); *see also Kimble I*, 141 Fed. Cl. at 383-84 (holding
17 that a Section 5321(a)(5) violation qualifies as willful "where a taxpayer: (1) violates the
18 law 'voluntarily rather than accidentally;' (2) is 'willfully blind' to the legal duty to report;
19 or (3) engages in conduct that is in 'reckless disregard' of the legal duty to report.").

20 Under the *Bedrosian* test, Mr. Goldsmith (1) clearly ought to have known that (2)
21 there was a grave risk that an accurate FBAR was not being filed and (3) he was in a
22 position to find out for certain very easily. 912 F.3d at 153; *see also* Reply at 11:4-7.
23 Because this reckless behavior evidences willfulness, the Court may impose penalties
24 pursuant to Section 5321(a)(5).

25 **C.  <u>Damages</u>**

26 Having concluded that no genuine issue of fact exists as to whether Mr. Goldsmith
27 willfully violated Section 5314, assessment of a civil money penalty under Section 5321 is
28 appropriate. *Norman I*, 138 Fed. Cl. at 196. Section 5321(a)(5) allows the Government to

-67-

recover penalties in the amount of fifty percent (50%) of the Account balance. *See id.*; *see also* 31 U.S.C. § 5321(a)(5)(C). In its Motion, the Government seeks the following amounts:

| Year: | Account Balance on June 30th of Reporting Year: | Penalty for Willful Violations: <br> 31 U.S.C. § 5321(a)(5)(C)-(D) | Late Payment Penalty: <br> 31 U.S.C. § 3717(e)(2) | Pre-Judgement Interest: <br> 31 U.S.C. § 3717(a)-(d) | TOTAL: |
|---|---|---|---|---|---|
| **2008** | $328,065.62 | $122,375.00 | Unknown | Unknown | Unknown |
| **2009** | $288,250.39 | $82,082.00 | Unknown | Unknown | Unknown |
| **2010** | $331,577.18 | $69,389.00 | Unknown | Unknown | Unknown |
| **TOTAL:** | | **$273,846.00** | **$30,520.70** | **$5,086.78** | **$309,453.48** |

*See* Mot. at 23:7-18. In his opposition, Mr. Goldsmith only disputes whether penalties should be imposed under Section 5321(a)(5), but he never argues that the amount of the penalties sought by the Government is incorrect. *See generally* Oppo. Unfortunately, the Government provides the Court with no information whatsoever as to how these damages were calculated, including but not limited to (1) the calculations for the penalty, (2) how the late payment penalty was calculated, and (3) how the pre-judgment interested was calculated. This leaves the Court guessing whether interest was calculated using the correct dates or applying the correct interest rates. That being said, the Court's own calculations indicate the damages sought are far below the amount the Government could have sought.

First, in order to calculate the penalties, the Court must determine the balances in the Account for the years at issue in U.S. dollars. The exchange rate on previous dates is available on the Federal Reserve's publicly accessible website. *See* https://www.federalreserve.gov/releases/h10/default.htm; *see also* Mot. at 6:26-28, n.3-4 (noting that "[t]he average exchange rate in 2005 was 1.25 dollars to 1 Swiss franc" and "[d]uring the years at issue, the USD:CHF exchange rate moved between .93 and 1.2"); *see also* Oppo. (failing to refute the accuracy of this exchange rate). The Court, *sua sponte*, takes judicial notice of these exchange rates. *See, e.g.*, FED. R. EVID. 201(c)(1) (providing that the court "[m]ay take judicial notice on its own," or *sua sponte*); *see also Waterford Twp. Police v. Mattel,*

-68-

*Inc.*, 321 F. Supp. 3d 1133, 1143 (C.D. Cal. 2018), *aff'd sub nom. Castro v. Mattel, Inc.*, 794 Fed. App'x 669 (9th Cir. 2020) ("Exchange rates listed on the Federal Reserve's system are a fitting subject of a request for judicial notice."); *see also* 26 U.S.C. § 986(a) (providing that "[f]or purposes of determining the amount of the foreign tax credit, . . . the amount of any foreign income taxes (and any adjustment thereto) shall be translated into dollars by using the average exchange rate for the taxable year to which such taxes relate"). This website shows that on June 30, 2009, when the FBAR for the 2008 tax year became due, the exchange rate was 1.0867 CHF to $1.00.  *See* https://www.federalreserve.gov/releases/h10/20090706/.  On June 30, 2010, when the FBAR for the 2009 tax year became due, the exchange rate was 1.0774 CHF to $1.00.  *See* https://www.federalreserve.gov/releases/h10/20100706/.  On June 30, 2011, when the FBAR for the 2010 tax year became due, the exchange rate was 0.8413 CHF to $1.00.  *See* https://www.federalreserve.gov/releases/h10/20110705/.  Applying these exchange rates, the values of the Account in U.S. dollars are shown below:

| Year: | Account Balance on June 30th of Reporting Year: | Reporting Year: | Exchange Rate on Date: | Value in U.S. Dollars: |
|---|---|---|---|---|
| **2008** | 356,705.60 CHF | June 30, 2009 | 1 USD = 1.0867 CHF | $328,065.62 |
| **2009** | 310,560.97 CHF | June 30, 2010 | 1 USD = 1.0774 CHF | $288,250.39 |
| **2010** | 278,955.88 CHF | June 30, 2011 | 1 USD = 0.8413 CHF | $331,577.18 |

Having determined the Account balances on June 30th of each applicable year, the Court must next attempt to determine how the Government calculated the penalties it seeks in order to verify the Government seeks the appropriate penalty.  The Government seeks penalties pursuant to Section 5321(a)(5)(B)(ii), which allows a penalty of fifty percent (50%) of "the balance in the account at the time of the violation" where the violation arises from "a failure to report the existence of an account."  As shown below, the Court, through its own calculations, determines the penalty sought by the Government does not exceed, and in fact, is far below, the fifty percent (50%) penalty of the Account balance the Government could seek:

| Account | Penalty: |
|---|---|

| Year: | Balance on June 30th of Reporting Year: | Penalty Sought: | Penalty Sought Divided by Account Balance: | | Percentage of Balance Sought as Penalty by Government: |
|---|---|---|---|---|---|
| 2008 | $328,065.48 | $122,375.00 | $\frac{\$122,375.00}{\$328,065.48}$ | = 0.372814199 | 37% |
| 2009 | $287,929.70 | $82,082.00 | $\frac{\$82,082.00}{\$287,929.70}$ | = 0.284759372 | 29% |
| 2010 | $331,340.87 | $69,389.00 | $\frac{\$69,389.00}{\$331,340.87}$ | = 0.209269529 | 21% |
| TOTAL: | | $273,846.00 | | | |

In addition to the statutory penalties, the Government also seeks late payment penalties, *see* FAC at 8, ¶ 41; *see also* Mot. at 23:7-18, pursuant to 31 U.S.C. § 3717(e)(2), which allows "[t]he head of an executive, judicial, or legislative agency," like the Secretary of the Treasury, to "assess on a claim owed by a person . . . . a penalty charge of not more than 6 percent a year for failure to pay a part of a debt more than 90 days past due."  *See also* Exhibit 3 to Petrila Decl. at 12 (warning in the June 27, 2018 letter from the IRS to Defendant that "[i]n accordance with 31 U.S.C. § 3717(e)(2), a late payment penalty charge of 6% each year will be assessed on any portion of the penalty that remains unpaid 90 days from the date of this letter").  In this case, ninety (90) days from the date of the IRS' letter is September 25, 2018.  As shown below, six percent 6% penalty on the penalties sought by the Government amounts to $15,489.66 for 2008, $10,389.56 for 2009, and $8,782.94 for 2010, for a total of $34,662.15:

| | Late Payment Penalty | | | | | | |
|---|---|---|---|---|---|---|---|
| Year: | Penalty for Willful Violations: | 6% Annual Penalty: | Daily Penalty Amount: | Date Penalty Began to Accrue: | Days Since: | Penalty Due (Daily Penalty x Days Since Penalty Accrued): | Late Payment Penalty Sought by IRS: |
| 2008 | $122,375.00 | $7,342.50 | $20.12 | 9/25/2018 | 770 | $15,489.66 | Unknown |
| 2009 | $82,082.00 | $4,924.92 | $13.49 | 9/25/2018 | 770 | $10,389.56 | Unknown |
| 2010 | $69,389.00 | $4,163.34 | $11.41 | 9/25/2018 | 770 | $8,782.94 | Unknown |
| TOTAL: | $273,846.00 | | | | | $34,662.15 | $30,520.70 |

-70-

Thus, the Court finds the actual late penalty owed or allowed by law ($34,662.15) exceeds the late payment penalty sought by the Government ($30,520.70), and as such, the penalty sought by the Government is appropriate.

Finally, the Government also seeks pre-judgment interest, *see* FAC at 8, ¶ 41; *see also* Mot. at 23:7-18, pursuant to 31 U.S.C. § 3717(a)-(d), which allows the Secretary of the Treasury, to "charge a minimum annual rate of interest on an outstanding debt . . . that is equal to the average investment rate for the Treasury tax and loan accounts for the 12-month period ending on September 30 of each year, rounded to the nearest whole percentage point." The Government provides no information as to what the average tax and loan rates were or what years it used (*i.e.*, the years the debt accrued or the years, or 2008 through 2010, or the years it sought the debt, 2018). This interest accrues from the date "notice of the amount due is first mailed to the debtor at the most current address of the debtor available." 31 U.S.C. § 3717(b)(2). However, if the amount due is paid within thirty (30) days of receiving notice, no interest will be charged. 37 U.S.C. § 3717(d). Here, the Government cautioned Plaintiff in its June 27, 2018 letter, that "[i]n accordance with 31 U.S.C. § 3717(a)-(d), interest will accrue at the rate of 1% per year," which will be charged as of the date of this letter if payment isn't received within 30 days," or by Friday, July 27, 2018. *See* Exhibit 3 to Petrila Decl. at 12. Because payment was not received, interest accrued at the rate one percent (1%) as of June 30, 2018. As shown below, applying a one percent (1%) interest rate to the penalties sought by the Government results in pre-judgment interest of $3,185.10 for the 2008 tax year, $2,136.38 for the 2009 tax year, and $1,806.02 for the 2010 tax year, for a total of $7,127.50 for all three years.

| Pre-Judgment Interest: | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year: | Penalty for Willful Violations: | Date Letter Was Mailed: | Days Since: | Annual Interest (1%): | Daily Interest Rate: | Actual Interest Accrued: | Interest Sought by Plaintiff: |
| **2008** | $122,375.00 | 6/27/2018 | 950 | $1,223.75 | $3.3527 | $3,185.10 | Unknown |
| **2009** | $82,082.00 | 6/27/2018 | 950 | $820.82 | $2.2488 | $2,136.38 | Unknown |
| **2010** | $69,389.00 | 6/27/2018 | 950 | $693.89 | $1.9011 | $1,806.02 | Unknown |
| **TOTAL:** | **$273,846.00** | | | | | **$7,127.50** | **$5,086.78** |

Thus, the actual interest owed ($7,127.50) exceeds the pre-judgment interest sought by the Government ($5,086.78).  Accordingly, the amount of interest the Government seeks is appropriate.

In sum, although the Government did not provide the Court with any information as to how the penalties it seeks were calculated, the Court finds the amounts sought do not exceed the amounts permitted by law.  Thus, the Court awards the Government damages as follows:

| Damages: | Amount: |
|---|---|
| **Penalty for Willful Violations (31 U.S.C. § 5321(a)(5)(C)-(D)):** | $273,846.00 |
| **Late Payment Penalty (31 U.S.C. § 3717(e)(2)):** | $30,520.70 |
| **Pre-Judgement Interest (31 U.S.C. § 3717(a)-(d)):** | $5,086.78 |
| **TOTAL:** | **$309,453.48** |

## V.    CONCLUSION

For the above reasons, the Court **GRANTS** Plaintiff's Motion for Summary Judgment as follows:

1.    The Court finds that Mr. Goldsmith's repeated and admitted lack of care reaches the standard of reckless disregard for the law required to constitute a willful violation of Section 5314.  Such lack of care is shown by, *inter alia*, his (1) filing inaccurate official tax documents under penalty of perjury, which he testified he reviewed, (2) signing foreign banking documents without any review, (3) failing to inform his tax preparer about his Swiss Account despite receiving a questionnaire from that tax preparer explicitly asking about foreign accounts, and (4) setting up his Swiss Account as a numbered account with a hold mail service.

2.    Because the Court finds Mr. Goldsmith willfully violated Section 5314, it concludes that assessment of the civil money penalty provided under Section 5321(a)(5) is appropriate in the amounts sought by the Government, which are below the amount of fifty percent (50%) of the account balance allowed under the law.

3.    The Clerk of the Court will enter judgment in favor of Plaintiff, the United States of America, in the amount of $309,453.48, consisting of (1) $273,846.00 in penalties

authorized by 31 U.S.C. § 5321(a)(5)(C)-(D) for willful violations of Mr. Goldsmith's obligation to report foreign accounts during the 2008, 2009, and 2010 tax years; (2) $30,520.70 in late payment penalties authorized by 31 U.S.C. § 3717(e)(2); and (3) $5,086.78 for pre-judgment interest authorized by 31 U.S.C. § 3717(a)-(d).  Plaintiff shall also recover post-judgment interest pursuant to 28 U.S.C. § 1961 from the date of judgment until the judgment is paid in full.  28 U.S.C. § 1961(a).

4.      All future dates in this case are vacated, including but not limited to the June 7, 2021 Final Pretrial Conference.

**IT IS SO ORDERED.**

DATED:    May 25, 2021

**HON. ROGER T. BENITEZ**
United States District Judge

-73-

3:20-cv-00087-BEN-KSC